12 CIV 7728

Bruce Karpati
**Chief, Asset Management Unit**
**New York Regional Office**
**SECURITIES AND EXCHANGE COMMISSION**
**3 World Financial Center, Room 400**
**New York, NY 10281**
**(212) 336-1100**
**Attorney for Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
OCT 17 2012
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| Plaintiff, | : |
| -against- | : |
| **YORKVILLE ADVISORS, LLC,** | : |
| **MARK ANGELO, and EDWARD SCHINIK,** | : |
| Defendants. | : |

**12-CV-7728**

COMPLAINT

**ECF CASE**

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendants Yorkville Advisors LLC ("Yorkville"), Mark Angelo ("Angelo"), and Edward

Schinik ("Schinik") (collectively, "Defendants"), alleges as follows:

### SUMMARY OF ALLEGATIONS

1.      Yorkville is a New Jersey-based investment adviser that, at its peak, purportedly

managed more than $1 billion in assets. Angelo is Yorkville's founder and president, and

Schinik is Yorkville's chief financial officer. From at least 2008, Defendants engaged in a

fraudulent scheme pursuant to which they reported false and inflated values for certain

convertible debentures, convertible preferred stock (collectively, "convertibles"), and promissory

1

note investments held by the hedge funds managed by Yorkville (the "Funds") instead of writing down the values of those securities. The purpose of this fraudulent scheme was to increase the Funds' assets under management and to maintain the Funds' positive year-end performance, allowing Defendants to claim entitlement to greater fees than allowable. As a result of the inflated value of such investments, Yorkville improperly received more than $10 million of unearned fees from the Funds. In addition, by maintaining such inflated values, Defendants were able to tout positive investment returns even under adverse market conditions, which they used to solicit investors to make additional investments in the Funds as well as in new funds started by Yorkville, and to entice investors who wanted to redeem their investments in the Funds to participate in a special redemption fund. This resulted in Yorkville improperly receiving additional fees in an amount to be determined at trial. In connection with its fraudulent scheme, Defendants created and provided false and misleading documents to the Funds' auditor, McGladrey & Pullen LLP ("McGladrey") and also withheld adverse information about the investments from McGladrey.

 2. In addition, from at least April 2008 through January 2010, the Defendants made materially false and misleading statements to its investors and potential investors about: (1) the value of certain investments in the Funds; (2) its valuation policies generally; (3) the collateral underlying the investments; (4) the liquidity of the Funds, and (5) Yorkville's use of third-party valuation consultants. These misrepresentations allowed Yorkville to mask the risky and illiquid nature of its investment strategy. The Defendants' false portrayal of Yorkville as a firm that employed "robust" internal controls caused pension funds and funds of funds to invest over $280 million in the Funds. As a result of these misrepresentations, Defendants improperly obtained fees in an amount to be determined at trial.

3.      Defendants should be permanently enjoined from violating the provisions of the securities laws described herein.  Defendants should also be ordered to disgorge any ill-gotten gains or benefits derived as a result of their violations, whether realized, unrealized or received, and prejudgment interest thereon, and ordered to pay appropriate civil money penalties.

## VIOLATIONS

4.      Yorkville has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts practices and courses of business that constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

5.      Angelo has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices and courses of business that constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; and Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. In addition, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Angelo is liable as a control person for Yorkville's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]. In addition, Angelo has engaged in, and unless enjoined, will continue to engage, directly or

3

indirectly, in transactions, acts, practices and courses of business that aided and abetted Yorkville's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)]; and Advisers Act Sections 206(1), 206(2) and 206(4) [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

6.      Schinik has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices and courses of business that constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].  In addition, Schinik has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices and courses of business that aided and abetted Yorkville's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)]; and Advisers Act Sections 206(1), 206(2) and 206(4) [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

8.      Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the acts, transactions, practices

and courses of business alleged herein took place in the Southern District of New York.
Defendants solicited funds from investors and prospective investors that reside in the Southern
District of New York, and Yorkville's clearing firm maintained custody of the Funds'
convertibles in the Southern District of New York.

9.      The Defendants, directly and indirectly, made use of the means or
instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities
exchange, in connection with the transactions, acts, practices, and courses of business alleged in
this complaint.

## DEFENDANTS

10.     **Yorkville** is an investment adviser that became registered with the Commission
on June 13, 2012. Yorkville is located in Jersey City, New Jersey and it organized as a Delaware
limited liability company in January 2001.  In communications with investors, Yorkville
acknowledged that it was a fiduciary and owed fiduciary duties to the various funds that it
managed.

11.     **Angelo**, age 40, resides in Westfield, New Jersey. He is the founder, president and
majority owner of Yorkville and is the Portfolio Manager of the funds advised by Yorkville.
Angelo is also a majority owner and managing member of Yorkville Advisors GP, LLC, the
general partner of YA Global Investments, L.P. and YA Global Investments (U.S.), LP.  Angelo
held Series 4, 7, 24, and 63 licenses prior to founding Yorkville.  Yorkville's promotional
documents identify Angelo as the "portfolio manager" of the Funds who is responsible for
overseeing all aspects of the Funds' day-to-day operations.

12.     **Schinik**, age 47, resides in Watchung, New Jersey.  Schinik has served as
Yorkville's Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and as the

chairman of its valuation committee since December 2005.  Schinik is licensed as a certified

public accountant ("CPA") in New York.

## RELEVANT ENTITIES

13.    **YA Global Investments (U.S.), LP** ("YA US") is a fund managed by Yorkville.

YA US is a Delaware limited partnership formed on February 28, 2005.  Prior to July 2007, YA

US was known as Cornell Capital Partners (U.S.), LP.

14.    **YA Offshore Global Investments, Ltd.** ("YA Offshore") is a fund managed by

Yorkville.  YA Offshore is a Cayman Islands company incorporated on November 28, 2001.

Prior to July 2007, YA Offshore was known as Cornell Capital Partners Offshore, Ltd.

15.    **YA Global Investments, L.P.** ("YA Global") is a fund managed by Yorkville.

YA Global is a Cayman Islands limited partnership formed in Delaware on January 2, 2001

which was re-domiciled and registered in the Cayman Islands on January 31, 2007.  Prior to July

2007, YA Global was known as Cornell Capital Partners, L.P.  YA Global is a master fund and

YA US and YA Offshore are its feeder funds.

16.    **Yorkville Advisors GP, LLC** ("YA GP") is the General Partner of YA Global

and YA US.  YA GP is a Delaware limited liability company. Angelo is the majority owner of

YA GP.

## FACTS

### Yorkville's Investment Strategy as Impacted by the Financial Crisis

17.    As described in the offering documents for the Funds and in other promotional

materials, Yorkville claimed to "achieve superior risk-adjusted returns through capital appreciation

primarily by making privately negotiated structured equity and debt investments in public and private

companies."  In particular, Yorkville's investment strategy focused "on providing alternative funding

6

options for microcap and small-cap publicly traded companies." The companies in which Yorkville invested (the "Portfolio Companies") were typically either "start-up" companies or distressed public companies whose stock was not traded on a national securities exchange but rather was quoted on the over the counter bulletin board ("OTC-BB") or "Pink Sheets."

18.     Yorkville used several financing structures to provide loans to these microcap and small-cap publicly traded companies including convertible securities, standby equity distribution agreements ("SEDAs"), convertible or straight debt instruments and convertible preferred securities.

19.     As Yorkville described, in structuring convertible debt instruments, the Fund typically would make a loan to an issuer in return for a debt instrument such as a promissory note or bond. Such loans typically earned interest at a fixed rate. The debt instrument could also be converted to common stock or some other type of equity security on or before a future date. The conversion price typically would be discounted from the then current trading price of such securities in the public market. The Fund might also receive warrants to purchase additional shares as part of the transaction.

20.     Yorkville told investors that the Funds would profit from this strategy by: (1) realizing return from the interest from the loans provided to these companies; (2) exercising and selling the warrants and other shares of stock that it received in connection with these loans; and (3) purchasing stock at a discount to where it sells those shares into the market.

21.     The ability to sell the shares was particularly important to Yorkville, which told investors and potential investors that "a critical element of the investment process is to ensure that the liquidity of the public company's common shares will support an exit from any investment made through the sale of the freely-tradable common shares of the issuer with an investment horizon of 12 to 18 months." The ability to sell shares was crucial because many of the companies in which

Yorkville invested were start-up companies or distressed companies.  Consequently, the ability for these companies to pay Yorkville cash interest on the debt instrument was uncertain.

22.     For many years, in fact, Yorkville was able to trade out of the shares it received in connection with its financing transactions.  Prior to the credit crunch and ensuing financial crisis of 2007-08, a significant portion of Yorkville's income resulted from selling converted shares into the open market.  However, by the fall of 2008 and as market conditions deteriorated further, there was little volume in these securities and Yorkville found itself unable to effectively generate cash by selling the converted shares on the open market.  Consequently, the Funds' returns in 2008 and 2009 consisted primarily of unrealized gains from marked-up investments and accrued (and unpaid) interest payments on the loans issued by the Funds as opposed to trading profits.  These interest payments were accrued because a large number of the Portfolio Companies were in poor financial condition and could no longer make their required interest payments to Yorkville.  In many cases, the Portfolio Companies had defaulted on their obligations to the Funds.

**Yorkville's Entitlement to Collect Fees is Also Impacted by the Financial Crisis**

23.     As described in the offering memoranda for the Funds, Yorkville received a Management Fee of 2% of the net worth of each fund.  Net worth was calculated by adding the value of all of the fund's investments, cash, and other assets, and subtracting the fund's accrued liabilities and expenses.  The net worth was determined on the last business day of the month and Yorkville was paid 1/12 of 2% of the net worth on the first business day of the following month.

24.     In addition, the Funds paid an incentive fee of 20% of their net income (including net unrealized gains), of which 70% was paid to Angelo.

25.     Defendants employed a fraudulent scheme to increase Yorkville's net worth, and thus the fees it charged, by deliberately ignoring obvious decreases in value to certain of its

8

investments, failing to subject those investments to Yorkville's stated valuation policies, and causing those investments to be carried at inflated values.

**Yorkville's Written Policies Required Marking Positions at Fair Value**

26.     In August 2006, Angelo publicly stated that "understanding company valuation is one of the most critical issues facing the fund."

27.     The Funds' Private Placement Memoranda ("PPM") explicitly required Yorkville to follow generally accepted accounting principles ("GAAP") when calculating the net worth of each fund.  GAAP required Yorkville to record its investment assets at fair value.  Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

28.     Yorkville's internal policies also required it to mark the Funds' investments at fair value.  The PPM states that securities and other assets for which recent market quotations are not readily available will be valued at fair value as determined in good faith by the general partner. The PPM, however, states that this method of valuation should only rarely be utilized and only if independent third party valuations cannot be obtained in a timely manner.

29.     Yorkville's Compliance Policies & Valuation Manual ("Compliance Manual") provides that "[a]s a Fiduciary to our clients, Yorkville has adopted the following policy, which requires that all client portfolios and investments reflect current, fair and accurate market valuations."  The Compliance Manual also explains that "[a]s as Fiduciary, our Firm must always place our client's interests first and foremost and this includes pricing processes, which insure fair, accurate and current valuations of client securities of whatever nature.  Proper valuations are necessary for accurate performance calculations and fee billing purposes among others."

30.    The Compliance Manual requires that in situations when market quotations for a security are unavailable, unreliable, or not reflective of the security's market value, Yorkville's Valuation Committee would revalue the holdings based on factors such as:  (a) the cost of the security; (b) analytical data regarding the security; (c) the value of derivative securities or related securities; (d) values of baskets of securities traded on other markets; (e) interest rates; (f) observations from financial institutions; (g) government actions or pronouncements; (h) news events; (i) information with respect to any transactions or offers with respect to the security; (j) price and extent of trading in similar securities or comparable companies; (k) pricing history of the security; (l) relative size of the position in the portfolio; and (m) other relevant information."

31.    The Compliance Manual also provides that Yorkville would utilize independent sources and periodic reviews and testing, and that exception reporting would be required.

32.    Finally, the Compliance Manual requires that the circumstances requiring a special valuation and the reasoning supporting the valuation be documented.

33.    While the Compliance Manual states that the Valuation Committee would meet "at least quarterly," promotional material Yorkville provided to potential investors stated that "Yorkville's Risk/Valuation Committee performs monthly reviews of all portfolio positions." Both Angelo and Schinik were key contributors to the creation of Yorkville's promotional materials that described Yorkville's valuation policy to investors and prospective investors.

**<u>Yorkville's Valuation Practices Deviated from its Written Policies</u>**

34.    From the time of its inception until July 2008, Yorkville based the value of the Funds' convertibles on what it described in its pitch books and due diligence questionnaires ("DDQs") as the "Yorkville Method," which valued the Funds' investments at "the lower of cost

or impaired." Yorkville claimed that its "lower of cost or impaired" valuations approximated

fair value in the aggregate and, therefore, were GAAP-compliant.

35.     On July 31, 2008, Yorkville changed its valuation methodology for certain of its

convertibles from the "Yorkville Method" to a new methodology that Yorkville allegedly based

on the fair value of the convertibles, and not their face value. Yorkville claimed that its new

methodology also complied with Statement of Financial Accounting Standards ("SFAS") 157,

the provision of GAAP that defines "fair value".

36.     In order to portray its valuation methodologies as GAAP-compliant, Angelo and

Schinik represented to McGladrey in connection with the 2008 and 2009 year-end audits, that

"the valuation principles used are appropriate and have been consistently applied and the fair

values are reasonable and supported by the documentation. Market assumptions used were the

most appropriate in the circumstances. Various factors were reviewed in order to make a good

faith determination of a security's fair value. In determining fair value, the General Partner

evaluated whether an impairment of an investment has occurred as a result of a specific adverse

condition affecting the Issuer of a convertible debt or promissory note obligation. . . . In some

cases, the General Partner employed financial models to determine a 'best estimate' valuation or

determine that cost approximates fair value for the particular security."

37.     Contrary to Yorkville's representations, the methodologies Yorkville actually

applied to value its convertibles in 2008 and 2009 did not comport with Yorkville's valuation

policies either as written or as described to investors or to McGladrey and also were not GAAP

compliant. The minutes of the Valuation Committee and other Yorkville documents show that

Yorkville and Schinik (the Chairman of the Valuation Committee) simply valued the vast

majority of the convertibles at their face value rather than at "current, fair and accurate market

valuations." Yorkville and Schinik did not conduct any testing of the Funds' convertibles to determine whether the investment's cost equaled its fair value. Yorkville and Schinik did not know the value of the collateral underlying the convertibles, which purported to protect the Funds from risk of loss and supported the Funds' asset values. Yorkville and Schinik did not use exception reports or independent pricing as described. Yorkville and Schinik did not employ financial models to determine that an investment's cost equaled its fair value. Yorkville and Schinik did not utilize independent pricing services to value their convertible positions in 2008 and did so only to value twelve of the positions in 2009. And Yorkville and Schinik generally ignored obvious negative information concerning many of its investments.

38.     Angelo and Schinik knew that the representations made to McGladrey in connection with the 2008 and 2009 audits concerning Yorkville's valuation methodology were false. For example, Angelo and Schinik knew that Yorkville did not utilize financial models to determine that cost approximated fair value. They also knew that the valuation principles were not applied consistently.

39.     Moreover, the Valuation Committee did not meet every month much less review each position on a monthly basis. Nor did the Valuation Committee document its valuation analysis, other than by cursory statements in meeting minutes. Angelo and Schinik knew that statements made to investors concerning the frequency of valuation meetings, the amount of positions reviewed, and the documentation of valuation decisions were false.

40.     Defendants knew that fair value required that certain investments be marked down. However, Yorkville and Schinik continued to value the investments at or near face value, and Angelo both accepted and utilized these valuations. If Yorkville and Schinik had followed Yorkville's stated and written valuation policies, they would have significantly marked down

12

their holdings in numerous Portfolio Companies. Instead, they vastly overvalued these holdings (in some cases even increasing the values assigned to those holdings) and continued to charge and collect fees from the Funds based on the inflated values for these investments.

41.     Angelo knew that many of the Funds' largest positions could not support their face values because Yorkville employees apprised him of the positions' poor performance. Yet Angelo supported their overstated valuations in meetings with McGladrey.

42.     The following are examples of Portfolio Companies whose carrying values did not reflect "fair value" and should have been marked down by Yorkville:

(a)     FutureMedia PLC. Throughout 2008 and nearly all of 2009, Yorkville valued its investment in FutureMedia PLC convertibles at the full face value of $20,344,746 (plus accrued, unpaid interest of $3,607,728 at December 31, 2008). In documents provided to McGladrey in connection with the 2008 year-end audit, Yorkville stated that the Funds expected to realize their full investment through the sale of the company and projected a sales price of 6.5 to 8 times FutureMedia's earnings, which Yorkville estimated at £1 million, or approximately $1.46 million. The documentation provided to McGladrey thus supported a value of only $9.5 million to $11.6 million for FutureMedia. Yet Yorkville valued the convertible at its full face value, plus accrued interest, when it had no basis to recover that amount.

(b)     Smartire Systems, Inc. At December 31, 2008 and 2009, Yorkville valued its convertible investment in Smartire at its full face value of $17,601,897 and $16,680,233, respectively. In documents provided to McGladrey in connection with the 2008 year-end audit, Yorkville contended that the Smartire investment should remain at its full value

13

because the Funds were going to receive 100% of the proceeds from Smartire's asset sale

to another company.  In reality, Yorkville had sold at least half of its interest to another

entity and therefore was not entitled to the full amount of the proceeds.  Moreover,

Yorkville did not discount its estimate of future proceeds to their net present value as

required by GAAP.  Consequently, rather than the full face value of the convertible, the

convertible positions should have been marked down by at least $9 million at year-end

2008 and by at least $8 million at year-end 2009.  Defendants also did not inform

McGladrey that Smartire had defaulted on all convertibles it had issued to Yorkville.


(c)     Levitz Furniture, Inc.  In August 2007, Levitz issued convertibles to Yorkville

with a face value of $22 million.  Levitz filed for bankruptcy in November 2007 and sold

all of its assets at auction to a company named Hilco.  In December 2007, Yorkville

separately purchased Levitz's brand names and website addresses (the "Levitz IP") from

Hilco for $2 million.  At December 31, 2008 and 2009 Yorkville valued its entire

investment in Levitz (both the convertible and the Levitz IP) at $17,536,250 and

$17,332,058 respectively.  In March 2008, however, Yorkville entered into a settlement

in the Levitz bankruptcy pursuant to which it only received $1.285 million.

Notwithstanding that it had settled the bankruptcy claims (which should have resulted in

a write-down), Yorkville's valuation of the convertible remained unchanged from its pre-

settlement valuation.  While Yorkville also received in the bankruptcy the right to sue

Levitz's former management for fraud, in March 2008, a Yorkville managing director

informed Schinik that assigning any value to the fraud claim would be "premature" prior

to getting the fraud claim assessed by outside counsel, which was not done in 2008. By virtue of the foregoing, the overstated value was approximately $15 million.

(d)     Isonics Corporation. At year-end 2008, Yorkville valued its Isonics convertibles at their full face value of $21,448,808 (plus $3,504,574 in accrued and unpaid interest). In documents provided to McGladrey in connection with the 2008 year-end audit, Yorkville stated that its valuation was justified because it had a "first lien on assets and trading." Isonics had two operating segments. Defendants informed McGladrey that Isonics intended to sell one of its operating segments and had received several letters of intent with purchase prices between $4 million and $7 million. (Isonics actually sold the segment during the pendency of the 2008 year-end audit for only $1.2 million but Defendants did not inform McGladrey of that fact.) In addition, Isonics' October 31, 2008 Form 10-Q indicated management's recent assessment of the fair value of the assets of the expected remaining operating segment to be less than $4 million. Consequently, there was no basis for a nearly $25 million valuation for this investment. Based on the letters of intent and management's valuation of the remaining segment, the maximum valuation for 2008 should have been $11 million. Yorkville's stock ownership did not provide any basis for additional claimed value. At year-end 2008, Isonics traded at $0.003 per share with an average daily dollar volume of $2,467. At that level, Yorkville would have needed nearly 165 years to convert its position into equity and recoup its investment. At year-end 2009, Yorkville valued its Isonics convertible at $15,373,938 (which represented a partial but not a fair-value write-down.) Similarly, in documents provided to McGladrey in connection with the 2009 year-end audit, Yorkville stated that its valuation was justified based on positive EBITDA and the possible sale of the

company. According to Isonics' unaudited financial data for the twelve months ending April 30, 2010, however, the company actually had a negative EBITDA and total assets valued at only $1.28 million. Yorkville's 2009 valuation – even as marked down – was not a good faith fair value valuation.

(e)      Wentworth Energy, Inc.  At year-end 2009, Yorkville valued its convertible investment in Wentworth Energy, Inc. at $12,471,397 (plus $2,311,237 in accrued, unpaid interest). Notwithstanding that Wentworth defaulted on its payment obligations to Yorkville on October 1, 2008, January 1, 2009, and April 2, 2009, Yorkville's valuation represents the full face value of the Wentworth convertibles. In documents provided to McGladrey in connection with the 2009 year-end audit, Yorkville justified its valuation based upon a plan to exit the position by converting its debenture into common stock (which it anticipated would occur within 24 to 48 months). At year-end 2009, however, Wentworth traded at only $0.003 per share with an average daily dollar volume for the previous six months of only $898. Consequently, Yorkville would need over 65 years to exit its Wentworth position if it sold 100% of Wentworth's average trading volume into the market each day. Yorkville also attempted to justify its valuation based on Wentworth's purported proven hydrocarbon reserves (purported net present value of $8.3 million.) However, according to Wentworth's 2009 Form 10-K, its proven gas reserves had a net present value of only $6.2 million. Moreover, Wentworth had issued over $40 million in secured convertibles to other debt holders with claims equal to Yorkville's Funds' claims. Thus, the Funds had a claim on only 23.19% of the company's proven reserves. Even if Wentworth's $10.3 million of unproven reserves are included in a

calculation of Wentworth's reserves, the Funds' share of the total reserves amounts to less than $4 million.  Because the Funds' proportionate claim on Wentworth's reserves (proven and unproven) was less than $4 million and Wentworth's stock was essentially worthless, Yorkville overstated its valuation by at least $10 million.

(f)      Falcon Natural Gas Corp. / Mountain Eagle  At year-end 2009, Yorkville valued its Falcon Natural Gas convertibles at $32,923,150.  In documents provided to McGladrey in connection with the 2009 year-end audit, Yorkville justified its valuation based solely on the net present value of the cash flows from its oil and gas reserves described in a 2008 report provided by Falcon to Yorkville.  While the documents provided to McGladrey noted that a significant reserve loss occurred in 2009 due to a damaged well, the Valuation Committee made no adjustment to Falcon's 2008 reported reserves based upon those losses.  Notwithstanding that Yorkville and Schinik told McGladrey that Yorkville did not have sufficient information to evaluate the position, the Valuation Committee inexplicably *marked up* its Falcon investment from its 2008 value. The Valuation Committee also utilized outdated 2008 oil and gas prices in its 2009 calculations.  In 2009, Yorkville had no ability to realize its Falcon investment apart from the alleged value of Falcon's oil and gas reserves.  Falcon could not pay back the interest and principal due on its convertibles because it had no revenue and its stock was essentially worthless.  Falcon's stock averaged only $0.0069 per share, with an average dollar volume for 2009 of only $404 per day, indicating that Yorkville would need over 326 years to realize the Falcon investment by converting the Falcon convertibles into

shares and selling 100% of their trading volume on the market every day. Yorkville thus overstated the value of its Falcon convertibles by at least $3 million at year-end 2009.

(g)     NewGen Technologies, Inc.  In January 2006, NewGen issued $7.7 million of convertibles to Yorkville.  At year-end 2008, Yorkville valued the convertibles at $4,221,522 (plus accrued, unpaid interest of $96,428).  While NewGen was no longer operating by year-end 2008, and its obligations to Yorkville had been released through bankruptcy, documents provided to McGladrey in connection with the 2008 year-end audit attempted to justify the valuation based on a default judgment against NewGen's former president, who at the time resided in the U.K. and maintained all of his personal assets there.  Yorkville informed McGladrey that "our attorney sees high likelihood of some recovery." The attorney's actual opinion letter stated, however, that "it is difficult to state with certainty the likelihood of any recovery by [Yorkville]." Because of the uncertainty of collection on the default judgment, Yorkville should have written down the investment by at least $2.3 million in order to reflect fair value.  In fact, for this very reason, Yorkville marked down the position by this amount for 2009 before the 2008 financial reports were even issued.

43.     Yorkville overvalued the investments identified above by at least $50 million as of December 2008 and $47 million as of December 31, 2009.  The Defendants' own supporting documentation or otherwise publicly available information evidenced the overstated values.  Furthermore, at year-end 2010, the Funds' current auditor required Yorkville to make additional mark-downs for certain of the above-identified investments, plus other investments, of

over $108 million.  In total, the Funds' current auditor required Yorkville to mark-down the

Funds' portfolio by 21% at year-end 2010 because its valuations were not GAAP-compliant.

**Misrepresentations Concerning the Collateral Securing Yorkville's Investments**

44.     From at least 2007, Yorkville and Angelo solicited prospective investors by

describing Yorkville as an "institutional-grade" firm, meaning a firm with high quality internal

controls and investments that would attract pension funds and other institutional investors.

45.     From April 2008 through July 2009, Yorkville and Angelo made written and oral

misrepresentations to Yorkville's investors and prospective investors that Yorkville protected the

Funds from downside risk by securing collateral in the assets of its Portfolio Companies that was

worth significantly more than the value of its convertibles and promissory notes.  Yorkville and

Angelo made these misrepresentations regarding the extent of the Funds' collateral in order to

assure investors and prospective investors that they faced little risk of loss by investing in the

Funds.

46.     These statements were false and misleading.  At the time Angelo made these

misrepresentations, the Portfolio Companies for approximately half of the Funds' largest

investments had secured assets valued at nearly $200 million less than the amount Yorkville's

Valuation Committee had assigned to the investments.

47.     Furthermore, during the time that Yorkville and Angelo misrepresented the

Funds' collateral coverage, no one at Yorkville even kept complete and accurate records of the

value of Yorkville's collateral, and the data that Yorkville did keep showed that its portfolio was

significantly *under*-collateralized.

48.     Specifically, in February 2008, a Yorkville investor relations staff member

discussed with Angelo an email she received from a Yorkville senior vice president that stated

the Funds' investments had a loan-to-value ratio of 234%, "because we do not have values for the collateral (if any) in the database and because many of our companies have no assets." Despite knowing that that Yorkville did not have values for its collateral, that many of its Portfolio Companies did not have assets, and the Funds' investments' loan-to-value ratio was 234% (i.e. that the loans were more than 2.3 times the amount of the collateral), Angelo told a prospective investor in an April 11, 2008 meeting that the Funds' investments' loan-to-value ratio was 33% (i.e. that the collateral was more than three times the amount of the loans).

49.    In or about December 2008, Angelo repeatedly misrepresented the extent of the Funds' collateral in connection with several investors' requests to redeem their investments in the Funds.  Specifically, Angelo told the fund manager for one pension fund that the Funds' portfolio was "widely over-collateralized."  He told the investment manager for an individual investor that the Funds had "lots of collateral" behind each "note," and that if a Portfolio Company couldn't pay off a "note," then the Funds would get 100% of the money back because they had secured collateral.  And he told an investment manager for several individual investors that the value of the Portfolio Companies' assets, and the Funds' collateral in their assets, all supported the value of the Funds' portfolio.

50.    These statements were all false.  As the Funds' portfolio manager, "responsible for overseeing all aspects of the Funds' day-to-day operations from deal structuring to investment decisions," Angelo knew or was reckless in not knowing that as of December 2008, the issuing Portfolio Companies for 50% of the Funds' largest convertible positions had secured assets worth $196 million less than the amount that Yorkville's Valuation Committee had placed on the positions.

51.     Similarly, during an April 14, 2009 meeting, Angelo again told the manager of the pension fund that the collateral underlying the Funds' convertible investments was "in good shape" and the convertible investments were "well covered."

52.     This statement is false and misleading.  In April 2009, the issuing Portfolio Companies for 46% of the Funds' largest convertibles had secured assets worth approximately $184 million less than the amount that the Valuation Committee placed on the positions. Angelo, as the Funds' portfolio manager, knew or was reckless in not knowing that 46% of the Funds' largest investments were not "well covered," but actually had secured assets worth significantly less than the amount that the Valuation Committee placed on the positions.

53.     On July 22, 2009, Yorkville's director of investor relations told a prospective investor in a new fund Yorkville managed ("Fund Two"), that 95% of the Funds' convertibles have first liens on Portfolio Company assets worth 200% of the loan's value.

54.     This statement is false.  As of July 22, 2009, Yorkville's own internal data showed only 76% of Yorkville's convertibles (by value) were secured by first liens.  In addition, only 21% of these loans were made to Portfolio Companies with reported assets of 200% or more of the loan's value.

**Yorkville and Angelo Provided a Misleading Collateral Data Report to Certain Investors**

55.     Between July 31, 2009 and August 7, 2009, a Yorkville investor relations employee (at Angelo's request) distributed a report containing false and misleading information regarding the nature and value of the collateral securing the Funds' investments (the "Collateral Data Report") to three investors, including two of the Funds' largest investors.

56.     Specifically, the Collateral Data Report stated that the investments listed in the report were collectively over-collateralized by $232 million.  This statement was false and

misleading because, for example, Yorkville included in its calculation: (a) $73 million of "collateral" from a company that no longer owed any money to the Funds; (b) $80 million of "secured" collateral from one company that was, in fact, unsecured; (c) $10.1 million of "secured" collateral from a second company that was also unsecured; (d) $8 million of "collateral" in intellectual property already owned by the Funds; and (e) over $100 million of excess "collateral" in companies whose assets the Funds had already obtained and for which the Funds no longer held any convertibles or notes.

57.     Angelo discussed the Collateral Data Report in a telephone conversation with the investment manager for one investor to demonstrate that Yorkville's collateral supported the value of its portfolio, and that the Funds were fully collateralized.

58.     If Yorkville had not falsely inflated its collateral coverage, investors would have known that the investments listed in the Collateral Data Report were not over-collateralized by $232 million. Instead, according to the data collected by Yorkville, the investments were *under-*collateralized by at least $66 million, or over 10% of the listed convertibles' alleged total market value of $649 million.

**Yorkville, with Substantial Participation from Angelo and Schinik, Misrepresented the Valuation Committee's Review of the Collateral Securing the Funds' Investments**

59.     Beginning in February 2009, Yorkville misrepresented in its due diligence questionnaires ("DDQs") that "the Valuation Committee meets each month to re-evaluate the asset value of the underlying collateral of each of the Fund's positions."

60.     Both Angelo and Schinik reviewed Yorkville's DDQs before Yorkville distributed them to investors and prospective investors, and they knew that this statement was false.

61.    Schinik, as the chairman of the Valuation Committee, knew that the Valuation Committee reviewed Portfolio Companies for only six months of 2008, and when it did meet in 2008 and 2009, it did not review each of the Funds' positions.  Angelo, for his part, had no basis to believe that the representation made in the DDQs was accurate and he should have ensured that the information in the DDQs was, in fact, accurate before it was disseminated.

**Yorkville and Angelo Misrepresented the Funds' Liquidity**

62.    Although Yorkville reported positive returns throughout much of 2008, it faced a chronic cash shortage because most of its Portfolio Companies had not repaid their loans in cash, but rather in stock that was not actively trading.

63.    Angelo knew as early as August 2008 that Yorkville faced a cash flow problem. In an email dated August 11, 2008, regarding investor redemptions, Schinik told Angelo that paying July 1, 2008 redemptions would leave Yorkville with "about 27mm in cash of which 13mm would be readily available."  Yorkville's low cash balance persisted through late 2008; the Funds' asset reconciliation statement for November 30, 2008 shows a cash and cash equivalent balance of approximately $32 million, and it reported in promotional materials a cash position of 3.7% of the Funds' assets under management (totaling approximately $37 million).

64.    On December 2, 2008, however, Angelo told an investor that "the fund has about $100 million in cash," and that Yorkville was continuing to receive "follow-on" investments from "Investor A" (one of Yorkville's largest investors).  In fact, Yorkville had not received any money from Investor A since April 1, 2008.

65.    On December 3, 2008, Angelo told another investor that Yorkville maintained a cash position of approximately 8% of its assets under management (totaling approximately $75 million.)

23

66.     Yorkville similarly stated in a January 23, 2009 investor letter that the Funds maintained a cash position of 7% of the Funds' assets under management at year-end 2008 (totaling approximately $69 million.)

67.     These statements were false.  Bank and brokerage statements show that Yorkville and the Funds held a total cash position of $9 million, and U.S. Treasury notes totaling $25 million on December 2, 2008 and December 3, 2008.  At year-end 2008, the Funds had cash and cash equivalents of only $7 million and U.S. Treasury notes of approximately $3 million.

68.     Angelo knew or was reckless in not knowing that Yorkville held far less cash and cash equivalents than the $75-$100 million he told investors.  Angelo reviewed the Funds' monthly asset reconciliation statements, which included the Funds' cash position.  Furthermore, as Yorkville's portfolio manager and as signatory for Yorkville's and the Funds' bank accounts, Angelo knew or was reckless in not knowing exactly what the Funds held in cash and cash equivalents in December 2008, when he made misstatements about the Funds' cash position.  Likewise, Yorkville had no basis to claim that the Funds had approximately $69 million in cash at year-end 2008 when they only had cash and Treasury notes totaling approximately $10 million.

**Yorkville and Angelo Misrepresented the Age of Yorkville's Convertibles**

69.     From at least July 2008 through 2009, Yorkville, Angelo, and others made false statements to investors and prospective investors who specifically asked about the age of the investments in the Funds' portfolio.   This information was important to investors and prospective investors because as investments of this kind age, the likelihood diminishes that the Funds would receive a positive return on their investment.

70.    During a July 22, 2008 conference call with a prospective investor, Angelo represented that 75% of the Funds' portfolio was less than 18 months old and 90% of the portfolio was less than two years old.

71.    Similarly, Yorkville's director of investor relations told a prospective investor that 75% of the Funds' investments were less than 18 months old, and that 100% of the Funds' investments were less than 24 months old.

72.    These statements were false.  On July 22, 2008, 43% of the investments in the Funds' portfolio were over two years old and on August 25, 2008, 45% were over two years old.

73.    Angelo had direct involvement in the purchase of these aged investments.  As Yorkville's portfolio manager and Executive Committee chairman, Angelo made each investment decision in the portfolio.  Furthermore, Angelo signed documents on the Funds' behalf when the Funds entered into many of these investments.

74.    Angelo also reviewed the Funds' monthly positions.

75.    Angelo knew or was reckless in not knowing that there were a significant number of investments in the Funds' portfolio that were older than 18 months or two years.  Angelo thus knowingly or recklessly misstated the age of the portfolio to investors.

**Defendants Misrepresented Yorkville's Use of a Third-Party Valuation Agent**

76.    From October 2008 through January 2010, Yorkville, Angelo and Schinik misrepresented to investors, prospective investors, and the Funds' auditor that Yorkville was utilizing valuations provided by a consultant named Pluris Valuation Advisors, LLC ("Pluris") to fair value Yorkville's convertibles when, in fact, this was not the case.

77.     On August 14, 2007, Schinik retained Pluris to value Yorkville's convertibles. Over the next twelve months, Schinik and his staff worked with Pluris's CEO and other Pluris staff to create a model that would estimate the fair value of Yorkville's convertibles.

78.     Beginning in July 2008, Angelo, Schinik, and Schinik's staff told Pluris that they disagreed with Pluris's valuations of Yorkville's convertibles because Pluris had not considered the collateral Yorkville held in the Portfolio Companies.  As such, Defendants believed that Pluris's valuations were too low.  For example, on July 25, 2008, Schinik emailed Pluris's CEO that "In many cases, I am reluctant to write down a convertible to your fair value when we know internally that at a minimum the collateral supports keeping the value at face."  While Defendants complained about Pluris's failure to value the underlying collateral, at the same time Schinik failed to disclose to Pluris's CEO that no one at Yorkville actually had accurate information about the value of collateral securing the Funds' investments.

79.     On or about July 31, 2008, Angelo, Schinik, and others at Yorkville decided to ignore Pluris's valuations.  On August 5, 2008, Schinik informed Pluris's CEO in an email that Pluris's valuations "[are] probably not going to work."

80.     Pluris's CEO decided to stop working on a model that would estimate the fair value of the Funds' investments because Yorkville failed to provide Pluris with reliable, accurate information about the value of the assets that purported to secure the Funds' convertibles.

81.     Even though Yorkville believed that Pluris's work through July 2008 did not reflect the convertibles' fair value, and even though Pluris would not provide conclusive valuations of the Funds' convertible portfolio, from October 2008 through at least January 2010, Yorkville, Angelo and Schinik falsely represented to Yorkville's investors and prospective investors that Pluris had valued its convertible portfolio.

82.     For example, in an October 2008 response to an investor's due diligence questionnaire, Yorkville represented that "[a] decision to write down or impair a position was always made by our internal Valuation Committee.  This will change within the next couple of months since a third party, Pluris Valuations, will soon be responsible for valuing our convertible book as well as our warrants."

83.     Similarly, in a "2008 Year-End Questionnaire" that Yorkville sent to one of its largest investors in or about March 2009, Yorkville stated:  "In the summer of 2008, Yorkville engaged a third party, Pluris Valuations, to independently price our loan book.  We still work with Pluris and our administrator … to arrive at fair value each and every month."

84.     On March 23, 2009, a Yorkville investor relations employee emailed a due diligence "short list" questionnaire to a third investor that stated:  "Convertible securities are privately traded and do not have an independent pricing source, although the Firm uses Pluris as an independent pricing source."  Angelo subsequently told this investor during an April 14, 2009 conference call that Yorkville used Pluris to value its convertibles and that Pluris valued Yorkville's convertibles at a higher amount than Yorkville itself.  As late as January 6, 2010, Angelo told this investor that Pluris valued Yorkville's entire convertible portfolio up to that point in time.

85.     Schinik made similar misrepresentations.  During an October 13, 2009 conference call with a prospective investor, Schinik stated that Pluris initially valued the Funds' entire portfolio much higher than Yorkville's own valuation, and in subsequent months valued the Funds' portfolio at an amount similar to Yorkville's own methodology.

86.     Each of these statements is false.  Angelo and Schinik knew that Pluris did not provide Yorkville with final valuations of its convertibles.  They both knowingly made false

statements to investors when they said Pluris valued Yorkville's entire convertible portfolio, and at an amount higher than or similar to what Yorkville valued the same convertibles.

**Defendants Misrepresented Pluris's Role to the Funds' Auditor**

87.     At year-end 2008, Yorkville recorded $11,751,471 of unrealized income by marking up certain of the Funds' convertibles to reflect the convertibles' alleged "fair value."

88.     YA Global's 2008 audited financial statements stated that YA Global "engages a third party. . . [that] is used to assess the reasonableness of [YA Global's] fair value." The third party referred to in the financial statements was Pluris.

89.     Schinik told McGladrey's audit partner during the 2008 year-end audit that Pluris's analysis supported the reasonableness of Yorkville's fair value mark-ups. Schinik provided the audit partner with a memo and a Yorkville-created report that allegedly contained Pluris's analysis. In the memo, Schinik misrepresented that, "the total of the results obtained in the Pluris report" for December 31, 2008 showed that "Pluris's analysis" valued Yorkville's portfolio at $4,902,890 *more* than Yorkville's own calculation.

90.     Pluris's actual convertible valuation report for December 31, 2008, the existence of which Schinik never disclosed to the audit partner or other McGladrey staff, listed total valuations of $21,029,581 *less* than Yorkville's year-end valuations for the same convertibles. In addition, the Yorkville-created report implied that Pluris valued certain convertibles at over $42 million, when in fact Pluris did not value those convertibles at all because their underlying stock traded too infrequently and their share price was too low to warrant assigning any value to them.

91.     Schinik knew that information he provided McGladrey's audit partner was false and misleading. He worked with Pluris from August 2007 through July 2008 and knew that Pluris consistently calculated valuations at an amount less than Yorkville's own valuations.

Furthermore, Schinik knew that his own staff, and not Pluris, conducted the "analysis" that resulted in total convertible valuations of $4,902,890 more than Yorkville's valuations.

92.    Angelo and Schinik also represented to McGladrey in a July 1, 2009 management representation letter that during the 2008 audit Yorkville provided McGladrey with "all information relating to contracts with and results of work with specialists." Despite this representation, during the course of the 2008 year-end audit Schinik did not provide McGladrey with any of Pluris's convertible valuation reports. Each of Pluris's 2008 reports showed total convertible valuations that were millions of dollars less than the total face value of the convertibles (and thus lower than the value that Yorkville calculated).

93.    Angelo knew or was reckless in not knowing when he signed the management representation letter that Schinik did not disclose the full extent of Pluris's convertible valuation work. Angelo was involved in the decision to terminate Pluris's convertible valuation engagement. Yet the notes to YA Global's 2008 Audited Financial Statements state that YA Global "engages a third party to either independently determine values or is used to assess the reasonableness of [YA Global's] fair value." If Angelo had provided Auditor with Pluris's actual valuation reports, the reports would not have supported the alleged "reasonableness" of the Funds' fair values.

### FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Yorkville, Angelo, and Schinik)

94.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 93.

95.    Defendants Yorkville, Angelo and Schinik, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of securities, by use of the means or instruments of

transportation or communication in interstate commerce, or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities.

96.     By reason of the foregoing, Yorkville, Angelo and Schinik, singly or in concert, directly or indirectly, have violated Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Yorkville, Angelo, and Schinik)

97.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 93.

98.     Defendants Yorkville, Angelo, and Schinik, directly or indirectly, knowing or recklessly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon persons, in connection with the purchase or sale of securities.

99.     By engaging in the conduct alleged above, defendants Yorkville, Angelo, and Schinik violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a),

(b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

## THIRD CLAIM FOR RELIEF
**Control Person Liability under Section 20(a) of the Exchange Act for Violations of
Section 10(b) of the Exchange Act and Rule 10b-5
(Angelo)**

100.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 93.

101.    By engaging in the conduct alleged above, Yorkville violated Exchange Act

Section 10(b), and Rule 10b-5 thereunder.

102.    Angelo is a control person of Yorkville.

103.    Angelo did not act in good faith and, directly or indirectly, induced the acts

constituting Yorkville's violations.

104.    Angelo had actual knowledge of Yorkville's violations of Section 10(b) of the

Exchange Act, and Rules 10b-5 thereunder, and Angelo was a culpable participant in these

violations.

105.    By reason of the foregoing, under Section 20(a) of the Exchange Act [15 U.S.C. §

78t], Angelo is jointly and severally liable as a control person for violations by Yorkville of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c)

thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].

## FOURTH CLAIM FOR RELIEF
**Violations of Sections 206(1) and 206(2) of the Advisers Act
(Yorkville and Angelo)**

106.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 93.

107.    Yorkville, and Angelo, at all relevant times, were investment advisers within the

meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

108.   As investment advisers to the Funds, Yorkville and Angelo owed the Funds duties of utmost good faith, fidelity, and care to make full and fair disclosure to them of all material facts – including the value of the Funds' investments – as well as the duty to act in the best interests of the Funds, and not to act in Yorkville's and Angelo's own interests to the detriment of the Funds.

109.   Defendants Yorkville and Angelo, directly or indirectly, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce:  (a) employed devices, schemes, or artifices to defraud clients and prospective clients; or (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

110.   By reason of their actions alleged herein, Yorkville and Angelo violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### FIFTH CLAIM FOR RELIEF
**Violations of Section 206(4) and Rule 206(4)-8 of the Advisers Act
(Yorkville and Angelo)**

111.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 93.

112.   By engaging in the conduct described above, Yorkville and Angelo, directly or indirectly, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce: (1) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to investors or prospective investors in the Funds; and (2) otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive or manipulative

with respect to investors or prospective investors in the Funds.

113.   By reason of their actions alleged herein, Yorkville and Angelo violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (Angelo and Schinik)

114.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 93.

115.   By engaging in the conduct described above, Angelo and Schinik knowingly provided substantial assistance to Yorkville and aided and abetted Yorkville's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Violations of Advisers Act Sections 206(1) and (2)
### (Angelo and Schinik)

116.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 93.

117.   Angelo and Schinik at all relevant times were associated persons of Yorkville, an investment adviser.

118.   By engaging in the conduct described above, Angelo and Schinik knowingly provided substantial assistance to Yorkville and aided and abetted Yorkville's violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and (2)].

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Violations of
### Advisers Act Section 206(4) and Rule 206(4)-8 thereunder
### (Angelo and Schinik)

119.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 93.

120.    Angelo and Schinik at all relevant times were associated persons of Yorkville, an investment adviser.

121.    By engaging in the conduct described above, Angelo and Schinik knowingly provided substantial assistance to Yorkville and aided and abetted Yorkville's violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Yorkville, Angelo and Schinik from future violations of the federal securities laws as alleged in this complaint;

### II.

Ordering Yorkville, Angelo and Schinik to disgorge any ill-gotten gains from their violative conduct alleged in this complaint, plus prejudgment interest;

### III.

Ordering Yorkville, Angelo and Schinik to pay civil monetary penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]; and

### IV.

Granting such other and further relief as the Court may deem just and proper.

Dated: October 17, 2012
    New York, New York

SECURITIES AND EXCHANGE COMMISSION

By:                           
        Bruce Karpati
        Chief, Asset Management Unit
        New York Regional Office
        3 World Financial Center
        New York, NY  10281
        (212) 336-1100
        Attorney for Plaintiff

Of Counsel:
Valerie A. Szczepanik
Todd D. Brody
Stephen B. Holden