```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3     ------------------------------------X
                                          :
4     SECURITIES AND EXCHANGE COMMISSION, :
                                          : 12-CV-7728 (GBD)
5                    Plaintiff,           :
                                          : December 19, 2013
6              v.                         :
                                          : 500 Pearl Street
7     YORKVILLE ADVISORS, LLC, et al,     : New York, New York
                                          :
8                    Defendants.          :
      ------------------------------------X
9

10      TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY SCHEDULE DISPUTES
                 BEFORE THE HONORABLE HENRY B. PITMAN
11                 UNITED STATES MAGISTRATE JUDGE

12
      APPEARANCES:
13

14    For the Plaintiff:         TODD D. BRODY, ESQ.
                                 STEPHEN B. ESQ.
15                               U.S. Securities and Exchange
                                 Commission
16                               3 World Financial Center, Rm. 400
                                 New York, NY 10281
17

18
      For the Defendants:        JOSHUA S. SOHN, ESQ.
19                               DLA Piper US LLP (NY)
                                 1251 Avenue of the Americas
20                               New York, NY 10020

21

22

23    Court Transcriber:         MARY GRECO
                                 TypeWrite Word Processing Service
24                               211 N. Milton Road
                                 Saratoga Springs, NY 12866
25


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

2

1          THE CLERK:  <u>SEC v. Yorkville</u>.  Counsel, please state

2   your name for the record.

3          MR. BRODY:  Todd Brody and Stephen Holden for the

4   plaintiff, Securities and Exchange Commission.

5          MR. SOHN:  Good afternoon, Your Honor.  Joshua Sohn

6   from DLA Piper for the defendants.

7          THE COURT:  All right.  Good afternoon, all.  We're

8   here today to resolve some discovery disputes that predated the

9   order of reference but my understanding is they're still

10  unresolved.  These are the discovery disputes concerning the

11  plaintiff's second request for the production of documents.

12          In that regard, I have plaintiff's letter dated

13  November 19 and defendant's letter dated November 22.  I take

14  it those are the only -- that's the only correspondence

15  concerning the second request for production of documents?

16          MR. BRODY:  Yes, Your Honor.

17          THE COURT:  Okay.  What I think makes sense is to go

18  through them one by one unless counsel think there's a better

19  way to address the issue.  Does anyone think we should address

20  it in some other fashion?  Okay.

21          All right.  Let's start with one.  Are there any

22  requests as to which there is no issue?  Is there any request

23  that we can take off the list of things to address?  Is there

24  any request that the parties have come to a resolution on?

25          MR. BRODY:  Not that I'm aware of, Your Honor.

3

1          THE COURT:  All right.  Let's start with number one.

2  All documents and information used by the valuation committee

3  to value the YA fund's investment in the portfolio company

4  pursuant to the section of Yorkville's valuation policy

5  entitled valuation of securities not valued by an independent

6  pricing service.

7          Is the principle objection here the time frame?

8          MR. SOHN:  It is, Your Honor.  I think we discussed

9  when we were last here the complaint relates to allegations of

10  misstatements concerning the 2008 and 2009 financial statements

11  and Yorkville has already produced documents through 2010.  So

12  for all of the requests, certainly requests for documents from

13  2011, 2012, and 2013 seem wholly irrelevant to the allegations

14  in the complaint.

15          THE COURT:  What's the SEC's point of view?

16          MR. BRODY:  Sure.  Well, first of all, Your Honor, to

17  say that they produced documents that concern this request is

18  not entirely accurate because their document production to date

19  has been woefully inadequate.  But with respect to the timing

20  issues, many of the --

21          THE COURT:  When do you say the misconduct took

22  place?  From when to when?

23          MR. BRODY:  The misconduct that -- the fraudulent

24  valuations that we're alleging are in 2008 and 2009, but these

25  portfolio companies were owned by Yorkville prior to that

4

1  period of time.  So how they were valuating the companies

2  before that period of time, what documents they were relying

3  upon, what information they were relying upon is highly

4  relevant to when they valued those portfolio companies in 2008

5  and 2009 because the facts changed and they didn't --

6          THE COURT:  How can something they did in 2006, say,

7  bear on its truthfulness in 2008?

8          MR. BRODY:  Well, in 2006, let's say in 2006 they

9  invest in a particular company and they value that investment

10 based on certain criteria.  And I'm not going to sit there and

11 tell Your Honor what those criteria might be because we don't

12 know what criteria they base it on.

13         Now, in 2008 or 2009, either they revalued the

14 security or they didn't revalue the security.  They left the

15 security at the same price at which it was previously valued at

16 2006.  But to the extent that the facts changed in between 2006

17 and 2008, facts that they were keenly aware of, then we need to

18 know on what basis they were valuing those securities when they

19 were initially purchased back in 2006 because that impacts

20 their decision not to revalue those in 2008 or 2009.

21         THE COURT:  But doesn't the value -- I mean isn't the

22 legal requirement that the valuation in 2008 be accurate?

23         MR. BRODY:  Right, that's correct, but you're under

24 the --

25         THE COURT:  I mean I'm not sure how what they did or

5

1  might have done in 2006 affects the accuracy of the

2  representation in 2008.

3           MR. BRODY:  Setting aside --

4           THE COURT:  You know, I presume the valuation is

5  objective and if it's objective, I'm not sure their conduct in

6  2006 affects the accuracy of what they did in 2008, but go

7  ahead.

8           MR. BRODY:  I'm not saying it affects the accuracy of

9  what they did in 2008.  What I'm saying, Your Honor, is they

10 set criteria on how company X should be valued in 2006.

11          THE COURT:  Right.

12          MR. BRODY:  And to the extent that they never changed

13 that valuation even in 2008, we need to know on what basis they

14 were valuing the company in 2006.  If they're valuing the

15 company at 2006, for example, based upon the company's

16 financial condition of 2006, but in 2007, for example, the

17 company declared bankruptcy and in 2008 the company is

18 absolutely worthless, then we need to know on what criteria

19 they originally based the valuation of 2006 so we can --

20          THE COURT:  What difference does it make with respect

21 to 2006 if there's no allegation of wrongdoing with respect to

22 the valuation in 2006?

23          MR. BRODY:  Well, because we would have to know how

24 they value the company to start off with.  There's some

25 assumption, and I think the Court --

6

1          THE COURT:  No, no, no, no.  The value in 2008, isn't

2  that an objective fact regardless of how they valued it in

3  2006?

4          MR. BRODY:  Well, if this was, for example, a stock

5  that was traded on the NASDAQ, for example, the New York Stock

6  Exchange, then you would say okay, the value of that is easy to

7  determine because there's a market price for it.

8          THE COURT:  Yes.

9          MR. BRODY:  But the securities here are not

10 securities, or the investments here are not investments that

11 are marketplace.  So --

12         THE COURT:  But no, but I mean let's take your facts.

13 Let's assume they bought a company in 2006, the company goes

14 bankrupt in 2007 and it's in dissolution in 2007, and in 2008

15 it's valueless, it's going to be valueless regardless of how

16 they valued it in 2006.  And on the other side of the coin,

17 let's assume the company didn't go bankrupt in 2007, let's

18 assume that the company -- the issuer discovered some

19 breakthrough invention in 2007 such that the value of the

20 company has gone through the roof, its value in 2008 post

21 invention is going to be independent of the 2006 valuation.  It

22 just seems to me that valuation is an objective fact and

23 whether they say in 2006 it's worth a gazillion dollars a share

24 or whether they said it's worth a penny a share isn't going to

25 change what the accurate valuation in 2008 was.

7

1          MR. BRODY:  Well, except for the fact, Your Honor,

2    that most of the values remained unchanged from 2006 to 2008

3    and there aren't documents at least that we --

4          THE COURT:  And that doesn't tell you whether or not

5    the 2008 valuation is or is not accurate without additional

6    information.

7          MR. BRODY:  Well, that might be true, Your Honor, and

8    if there was a document that, for example, was created in 2008

9    that says this is how we value the security or the investment,

10    we value it based on these criteria, then you would evaluate

11    the objectiveness or the appropriateness of that valuation

12    based on the criteria that they said in 2008, but those don't

13    exist.  There are documents that were created in 2008 at least,

14    no contemporaneous documents that are created in 2008 to

15    demonstrate how they valued the securities or valued the

16    majority of the securities in their portfolio.  Perhaps the

17    only documents that exist are going to be the documents that

18    demonstrate how they valued it at the time that they purchased

19    it.  And then you know how they value it and then you can judge

20    based on that did the criteria change based upon the

21    information that they themselves were using, and on that basis,

22    you can say okay, well we need to know what the 2006 valuation

23    is because there isn't a 2008 valuation document.  So all you -

24    -

25          THE COURT:  There is a -- I just didn't hear the last

8

1    thing you said.  There isn't a 2008 valuation document?

2            MR. BRODY:  For the vast majority of the securities

3    in the portfolio.  They didn't create contemporaneous memoranda

4    that explain how they were valuing their portfolio holdings.

5    They only did so with respect to a small number of companies

6    and only those that specifically their auditor has asked for.

7            THE COURT:  Well, how far back do you want to go?

8            MR. BRODY:  This isn't a fund that exists, you know,

9    for that --

10            THE COURT:  No, I mean how far back beyond 2008 do

11   you want to go?

12            MR. BRODY:  I think our document requests ask for

13   January 2007 going forward.

14            THE COURT:  And after -- what's the terminal date?

15   What's the -- you want to start at January 2007.  How far do

16   you want to go?

17            MR. BRODY:  I would think through at least the filing

18   of the complaint, Your Honor.  Now, I can explain to you why

19   the documents post 2009 are relevant.  First of all, they

20   concede the documents from 2010 are relevant because it relates

21   to the 2009 audit, and the 2010 audit their auditors told them

22   that these holdings were not valued according to gap.  And so

23   consequently what they did through 2011, which is when that

24   audit ended, through November of 2011, that's relevant.

25            And with respect to 2012 and what they are doing post

9

1  the filing of the complaint is highly relevant towards their

2  scienter, Your Honor, because to the extent that --

3          THE COURT:  Wait.  I thought you told me that your

4  terminal date was the date of the filing of the complaint.

5          MR. BRODY:  That would be correct.

6          THE COURT:  And you just started talking about what

7  they're doing after the filing of the complaint.

8          MR. BRODY:  I'm sorry.  If I said that, that -- what

9  they're doing after 2008 and 2009 is highly relevant to what

10 their scienter is, Your Honor, because to the extent that

11 they're doing things to cover up what their fraudulent

12 valuations are or to the extent they're telling their auditors

13 certain things or they're telling their investors certain

14 things, that's highly relevant to what their scienter was for

15 the actions done for 2008 and 2009 valuations.

16         THE COURT:  All right.  So your time period is

17 January 1, 2007 through October 17, 2012?

18         MR. BRODY:  Yes, Your Honor.  I think that would be a

19 reasonable limitation.

20         THE COURT:  All right.  Anything else you want to

21 tell me before I hear from your adversary?

22         MR. BRODY:  I would just point out, Your Honor, and I

23 think this relates not just to this request, but to all the

24 requests which is that we're not working on a blank slate here.

25 On October 2nd we had a conference with --

1           THE COURT:  Yes.  No, I've read your letter.

2           MR. BRODY:  -- Judge Daniels --

3           THE COURT:  I read your letter.

4           MR. BRODY:  -- and Judge Daniels --

5           THE COURT:  I read your letter and I read the quote

6    from Judge Daniels.

7           MR. BRODY:  Okay.  Thank you, Your Honor.

8           THE COURT:  I must confess though, I'm not sure I

9    understand exactly what all of it means, but all right.  Let me

10   hear from defense counsel.

11          MR. SOHN:  Your Honor, a few points.  One is is that

12   the document request itself asked for documents to the present

13   and I guess I understand that that's been limited now through

14   the date that was just identified.

15          But a couple of things to put it in context, Your

16   Honor.  There have been -- I understand there have been

17   something in the nature of 17 subpoenas already.  We produced,

18   you know, 600 something thousand documents.  We've expended

19   tremendous resources going through this stuff.  And the

20   complaint complains about seven companies out of a portfolio of

21   120, 130 companies.  Complains about those valuations for 2008

22   and 2009.  And I think as Your Honor suggested, those

23   valuations are what's relevant here and either they're right or

24   they're wrong.  And if they're wrong, either they're innocently

25   wrong or they're, you know, fraudulently wrong, but that's what

1  the inquiry is about here.

2          THE COURT:  Well, if there's a major change though

3  from 2007 to 2008 and there's nothing in the market -- there

4  were no extraneous facts that justify that change, it may shed

5  light on the valuation in 2008.  If a security is valued at

6  $50.00 in 2007 and in 2008 it's valued at $500.00 and you can't

7  point to some extraneous factor that justifies the change in

8  value, it may -- it suggests that one of those values is out of

9  kilter.

10          MR. SOHN:  That may well be, Your Honor.  We have

11  produced the minutes of the valuation committee, we produced

12  the memos.  And if we're talking about the seven securities,

13  the seven portfolio companies that are at issue in the

14  complaint, it seems that there's probably a relevant way to

15  limit the request to actually look for those particular things

16  that the SEC is looking for.  But to say we need every piece of

17  paper regarding valuation for a six-year period relating to 130

18  portfolio companies does not seem to be a reasonably targeted

19  search or a reasonably targeted request that's likely to lead

20  to what it is that they claim to be looking for.  And certainly

21  --

22          THE COURT:  Portfolio companies -- I don't have the

23  request itself here.   How are portfolio companies defined?

24          MR. SOHN:  I don't believe that they're limited in

25  any way, Your Honor.

12

1          MR. BRODY:  Well, I don't believe they're limited to

2    the companies that are listed in the complaint, Your Honor, and

3    there's a --

4          THE COURT:  How do you get beyond the ones that are

5    listed in the complaint?

6          MR. BRODY:  What?

7          THE COURT:  How do you get beyond the companies that

8    are listed in the complaint?

9          MR. BRODY:  Well, Your Honor, as we told Judge

10   Daniels and I think as Judge Daniels approved which is that the

11   SEC is allowed to prove by example, Your Honor.  So we listed

12   examples of seven companies where there were clearly fraudulent

13   valuations.  But that doesn't mean that our --

14         THE COURT:  No, but you've got allege fraud with

15   particularity, do you not?

16         MR. BRODY:  Yes, but you're allowed to prove fraud

17   with particularity when there's a large reaching fraudulent

18   scheme with examples, and that is clear from the case law, Your

19   Honor, and we cited seven examples of when they did that.  But

20   you're not required to go through every portfolio company and

21   list what the fraud might be with respect to that company.  And

22   in fact --

23         THE COURT:  Does the complaint say that you're

24   proceeding -- that you're claiming that the valuations of all

25   the portfolio companies are fraudulent and that the seven are

13

1   examples?

2           MR. BRODY:  Yes.  The complaint --

3           THE COURT:  Where does it say that?

4           MR. BRODY:  We're not alleging that every --

5           THE COURT:  Where does it say that they're examples?

6           MR. BRODY:  I think we used the specific term as

7   example, Your Honor --

8           THE COURT:  Tell me where.

9           MR. BRODY:  -- when we described it.

10          MR. HOLDEN:  Paragraph 42.

11          MR. BRODY:  Paragraph 42 I think is where it is.

12          THE COURT:  I think he's right on that, isn't he, Mr.

13  Sohn?  I think he's right.

14          MR. SOHN:  In the various conversations that we've

15  had with them over the years we haven't actually understood

16  that to be the strategy here that this is an example that in

17  fact because of the voluminous production of valuation

18  materials over the years and throughout the course of the SEC's

19  investigation it has always been that these were the ones that

20  are being focused on and these are the ones that we're

21  addressing.  It's never been in the context of and every other

22  portfolio company that Yorkville invested in.

23          THE COURT:  Well, he's correct that Paragraph 42 says

24  the ones that they discuss in detail are examples.

25          MR. SOHN:  I understand that, Your Honor, and I think

14

1    that given a plain reading, there are a couple of different

2    ways that that can be interpreted.

3               THE COURT:  These are some, there are others.

4               MR. SOHN:  That is one fair reading, yes, Your Honor.

5               THE COURT:  But I don't think -- is there a fair

6    reading that allows one to interpret that as the exclusive

7    list?

8               MR. SOHN:  Based on the subsequent conversations,

9    that was our understanding.

10              THE COURT:  Okay.  No, but I mean --

11              MR. SOHN:  But I understand your point, Your Honor.

12              THE COURT:  -- the issue here is the pleading.  I

13   mean unless you've got a stipulation --

14              MR. SOHN:  And we don't.

15              THE COURT:  -- limiting it --

16              MR. SOHN:  We don't.

17              THE COURT:  -- the issue here is the relevance to the

18   claims set forth in the complaint and the -- I mean Mr. Brody's

19   clearly correct that 42 says that these are examples.

20              MR. SOHN:  But that certainly doesn't change the fact

21   that whatever the valuations were during the years that are

22   complained of are the years that are complained.  I don't

23   understand the complaint to say for example 2008 and 2009.  It

24   says 2008 and 2009.

25              THE COURT:  Yes.  No, but --

15

1        MR. SOHN:  And in fact, Your Honor, if I may, I have

2    one more point.

3        THE COURT:  Go ahead, go ahead.

4        MR. SOHN:  That the 2010 financial statements have

5    been reviewed by the SEC that hasn't been included in the

6    complaint.  So to somehow lump that in to get to 2011 and then

7    2012 and 2013 doesn't seem to me at least to get you there.

8    The 2008 and 2009 is what this complaint's about and that's

9    where, you know, the focus should be.

10        THE COURT:  No.  You know, look, if the SEC here were

11    going back to -- I think the company started in 2001.  I'm not

12    sure.  I thought I read in the complaint it started in 2001.

13    Maybe I'm wrong.  If the complaint were going back ten years

14    before the events at issue, documents from ten years before the

15    events at issue would -- as you get more temporally remote, the

16    relevance gets more attenuated I think, but as you get closer,

17    it becomes more relevant.  And I think the year before the

18    events in issue where the valuations the year before, which is

19    all the SEC is looking for, does bear some relevance to the

20    validity of the valuations in 2008.  As I said before, if there

21    was a radical change in the value and there was no extraneous

22    factor you could point to to justify the change in the value,

23    it would suggest that one of the valuations is questionable

24    maybe is the best way to put it.  So I think 2007 is a

25    reasonable place, a reasonable terminal at which to draw the

16

1  line.

2          With respect to the conduct after the vents in issue,

3  well, maybe you haven't addressed that.  Mr. Brody says conduct

4  after the events in issue is relevant because if you changed

5  your valuation or there may be facts there that bear on

6  scienter.  You want to comment on that argument?

7          MR. SOHN:  Well, in the first instance I think you

8  get back to whether the 2008 and 2009 are accurate.

9          THE COURT:  Yes.

10          MR. SOHN:  Right?  And certainly if they're

11  misrepresented and the SEC can prove that 2008 or 2009 is

12  misrepresented, I don't understand how 2010, '11, '12, '13 has

13  anything to do with that.

14          THE COURT:  Well, it's not just the objective

15  accuracy.  Isn't there also a scienter element here?

16          MR. SOHN:  There is.

17          THE COURT:  Yes.  So not only -- they've got to prove

18  not only that they're inaccurate but the defendants knew they

19  were inaccurate.

20          MR. SOHN:  At the time that they were made.  So what

21  you do two years later doesn't seem to be relevant at all to

22  whether you acted knowingly, intentionally, recklessly in 2008,

23  2009.  It seems completely attenuated to me, Your Honor, that

24  if we're focusing on 2008 and 2009 and we'll agree that perhaps

25  there was something in 2010, but to go '11, '12, '13, I don't

17

1   see how that --

2           THE COURT:  Well, they're not -- they're going to

3   October 2012.

4           MR. SOHN:  So even 2011, 2012 doesn't bear on the

5   state of mind of the actors in 2008, 2009.  I don't understand

6   how it can.

7           THE COURT:  That may depend on what the documents

8   show.  It may bear on the state of mind.

9           MR. SOHN:  It's hard to conceive of what it could

10  possibly say that would say -- unless there was something that

11  said oh, you know -- I can't even imagine what it would be that

12  in 2011 there's something that shows that in 2009 someone

13  consciously acted in a certain way with scienter relating to

14  the valuations of these portfolio companies.

15          THE COURT:  I don't want to hypothesize on what

16  people could do but I mean I can -- well, all right.  Anything

17  else you want to tell me on number one?

18          MR. SOHN:  There is not, Your Honor.

19          THE COURT:  All right.  With respect to request

20  number one, I'm going to grant the application to compel for

21  the time period from January 1, 2007 through October 17, 2012,

22  the date the complaint was filed.  I believe there's case law

23  that the SEC cites in their letter.  Yes, Footnote 2.  It

24  establishes the relevance of -- at least for discovery purposes

25  establishes the relevance of documents from the period after

the alleged fraud.  The SEC cites SEC v. Gold and SEC v. Lucent

Tech which in turn cites SEC v. Lucent Technologies, which I

think those cases I think are sufficient to establish the

relevance of the documents in '10, '11, and '12.  All right?

So the application to compel with respect to item number one is

granted.

     All right.  Shall we talk about number two, Mr.

Brody?

     MR. BRODY:  Sure, Your Honor.  The individuals that

we name in this request for production are largely fraternity

friends or relatives of the defendant, Mr. Angelo.  And one of

the allegations, or one of the contentions that defendants have

made is that what they would do is they would replace the

management of the companies in their portfolio with individuals

who would then take over the company and run it in a manner

that would benefit the fund.  So consequently, even though

let's say X company was in bankruptcy and even though they had

defaulted on their loans, they were going to be a successful

company and look, they were able to put into place -- they put

in place their own management.  The problem with that

contention is that --

     THE COURT:  I'm sorry, can you say that without the

pronouns?  I'm not sure who all the "theys" are.

     MR. BRODY:  Sure.  Sorry about that.  Yorkville --

when a company defaulted on its loan, Yorkville had the ability

1  to go in and replace management.  And so in some situations

2  what would happen is is that the company would default,

3  Yorkville would put people into place, and Yorkville would say

4  well even though the company's in default and even though the

5  company is in bankruptcy, we have management in place and that

6  management is going to turn this company into a really fine

7  working company and they're going to be able to pay back the

8  loans and we're going to make money off of the collateral that

9  we have in this company.  The problem with that is that the

10  people they were putting into place at these companies had no

11  experience at all running these types of companies and instead

12  were the friends of Mr. Angelo, you know, or relatives of Mr.

13  Angelo.  So they were basically putting into place people that

14  had no background in these types of companies.  One of them I

15  think was a fireman.

16          MR. HOLDEN:  Fireman.

17          MR. BRODY:  One of them was a fireman.  I mean these

18  are wholly unqualified people.  So we're seeking discovery

19  about the companies --

20          THE COURT:  There are some firemen who may disagree

21  with you.

22          MR. BRODY:  Well, that might be --

23          THE COURT:  My understanding is you've got to be a

24  college graduate now to be hired, so --

25          MR. BRODY:  I'm not sure if --

20

1          THE COURT:  And I'm not sure that makes them

2    qualified but I wouldn't paint it with too broad a brush.  Go

3    ahead.

4          MR. BRODY:  I don't disagree, Your Honor.  But

5    basically what we're seeking here is information concerning the

6    companies where they put their own people into place because we

7    think that will demonstrate that in fact it was a total sham

8    and these people were wholly unqualified.

9          THE DEFENDANT:  All right.  Mr. Sohn?

10          MR. SOHN:  Just briefly, Your Honor.  It's hard to

11    understand why they need all information concerning all these

12    companies to determine whether or not valuations were

13    appropriate or not in 2008 and 2009.  It seems beyond over

14    broad.

15          THE COURT:  Well, what scope do you believe is

16    appropriate?  I mean their contention is, their theory is that

17    officers were installed who lacked the experience or the

18    knowledge to run the companies and that that gave rise to rosy

19    predictions that were unjustified.  Perhaps some limitation is

20    appropriate, but what limitation would you propose?

21          MR. SOHN:  Well, it seems that if all this is going

22    back to whether or not the valuation of that particular

23    portfolio company was accurate or not, or inflated or, you

24    know, unduly rosy, certainly I would think in the first

25    instance it should be information that's related to the

1    valuation of that company.  Perhaps information concerning

2    performance of a particular company.  Something like that.  But

3    all information concerning these companies doesn't seem to be

4    unwieldily and for the most part irrelevant.  And certainly

5    during the time period it would seem again to be if it's 2008,

6    2009, maybe 2010, whatever information within this universe

7    Your Honor determines to be appropriate should also seem to be

8    limited to that time period as well.

9            THE COURT:  Well, the time period, I think the post

10   2009 time period that I outlined before through October 17,

11   2012 is what the terminal date should be.  But let me come back

12   to Mr. Brody.  I mean I understand your theory and I think

13   you're entitled to some documents.  Is there some way this can

14   be limited beyond all -- or to less than all documents?  All

15   documents does seem awfully broad here.

16           MR. BRODY:  Well, first of all, I think that to say

17   this is just about valuation for the company, how Yorkville

18   valued the company is not accurate because there are two

19   aspects to our case, Your Honor.  There's a valuation aspect of

20   our case, but there are also specific misrepresentations that

21   the company made about the overall riskiness of these companies

22   and also about how they were going to value the company and

23   what their risk procedures were.  So to the extent that -- it

24   doesn't just relate to valuations, but I would think that in

25   the first instance we should, you know, we should be able to

22

1   obtain all information that Yorkville has, communications with

2   these individuals, and all documents that relate to the

3   decision to put these individuals into place at those

4   companies.  And that would be a severe limitation of --

5          THE COURT:  Well no, I mean right now the way the

6   request is drafted right now is all documents and information

7   concerning any portfolio company that employed, retained, was

8   controlled by, or was affiliated with John Ruddy [Ph.], George

9   O'Leary, David Dodge or Frank Angelo at any time during the

10  relevant time period.  So it's asking for all documents or

11  information concerning any portfolio company that employed or

12  was affiliated with any of those individuals.  I mean is there

13  any way that can -- it does seem awfully broad.  Do we know how

14  many companies were affiliated with these four individuals?

15         MR. BRODY:  I don't, Your Honor.

16         THE COURT:  Do you know, Mr. Sohn?

17         MR. SOHN:  I do not.

18         THE COURT:  I mean the way it's -- I mean I don't

19  know what kind of -- let me come back to Mr. Sohn for a minute.

20  What kind of information did the defendants have with respect

21  to the portfolio companies?  I mean I presume they didn't have

22  -- I presume they selected the document or there was a limited

23  universe of documents they had with respect to the portfolio

24  companies, documents that would bear on the investments in the

25  portfolio companies.

1          MR. SOHN:  That makes sense, Your Honor.  I don't

2     know the answer and one of the things that I actually wanted to

3     ask is that whatever we come up with, I certainly would

4     appreciate the opportunity to go back and look at what the

5     scope is of the required search because we've -- you know,

6     there's well in excess of a million --

7          THE COURT:  Well, maybe you should have done that

8     before today?

9          MR. SOHN:  Well, the problem is that it is such a

10    time consuming and expensive process to start going through and

11    sifting through all these things which is why we wanted to cut

12    it down in the first place to relevant documents.

13         THE COURT:  Well, I'm loathe to chew the same fat

14    twice.  I mean you got my attention now and my time now.  I'm

15    loathe to come back and revisit this in the future, but --

16         MR. BRODY:  Your Honor --

17         THE COURT:  -- let's put that to the side for a

18    moment.

19         MR. SOHN:  Certainly --

20         THE COURT:  On reflection, the more I think about

21    this the more I think I will think that Yorkville advisors

22    would only have documents concerning the portfolio companies

23    that bear on their valuation or their performance or their

24    expected performance.  I mean I presume that Yorkville would

25    not have something like the copier contract of one of the

24

1   portfolio companies.  I mean there's a lot of minutia documents

2   that would probably be irrelevant but they're probably not the

3   kind of documents that Yorkville would have.

4           MR. SOHN:  I think that's right, Your Honor, although

5   I could imagine circumstances where they're more actively

6   involved and there may be much more.  But in the first

7   instance, certainly the categories of documents that you

8   suggest makes a lot of sense.

9           THE COURT:  Well, I mean usually if you're going to

10  suggest burden as an objection, you've got to make a particular

11  showing in response to the document request.  Usually we don't

12  have serial conferences to discuss, you know, multiple layers

13  of objections.  Usually all the objections are put out at one

14  conference and they're discussed and resolved in one

15  conference.

16          MR. SOHN:  The issue here, Your Honor, is there's

17  over a million and a half documents that we have collected.

18          THE COURT:  Yes.

19          MR. SOHN:  And we've spent --

20          THE COURT:  That's not a lot by today's standards.

21          MR. SOHN:  Well, but that's also not including the

22  2012, 2013 and some of the other things.  That was just to

23  respond to the first 17 subpoenas in the first document

24  request.  So you know, there's a certain amount of reinventing

25  the wheel that's going to be involved here to go through that

25

1   as well as collecting more to the extent that Your Honor

2   determines that these requests are appropriate.  And certainly,

3   given all the information that had been provided to the SEC so

4   far and all the time and expense that's been incurred doing it,

5   you know, there are certainly tremendous imposition of time and

6   resources going forward to do it in incremental it seems

7   information additions here where we've already produced

8   information about these companies, but certainly things that go

9   to valuation and those types of things within a reasonably

10  restrictive time period would seem to make a lot more sense.

11          THE COURT:  Do you want to tell me anything else on

12  number two, Mr. Sohn?

13          MR. SOHN:  I don't, Your Honor.

14          THE COURT:  Did you want to say something else on

15  number two, Mr. Brody?

16          MR. BRODY:  No, Your Honor.  You addressed it.

17          THE COURT:  I'm sorry?

18          MR. BRODY:  You addressed it.  I don't need to

19  address it.

20          THE COURT:  All right.  With respect to number two I

21  think the documents sought are relevant.  It's a broad request

22  but I don't think we can read the request in a vacuum.  I don't

23  know what the nature of the operations of the portfolio

24  companies were, but given Yorkville's relationship to the

25  portfolio companies as an investor or as a creditor, presumably

26

1   Yorkville did not have a lot of -- had to only get documents

2   that were relevant to the valuation of the portfolio company or

3   the financial performance of the portfolio company.  There are

4   a lot of documents a company might generate, time records with

5   respect to the custodian and the receptionist, you know,

6   contracts for the copier companies, for the copy, but

7   presumably a lot of those kind of documents which would be --

8   those documents would be irrelevant.  It's unreasonable to

9   believe that Yorkville would have those kind of documents.  So

10  I think the kind of documents Yorkville has with respect to the

11  portfolio companies are the documents that would be relevant to

12  the allegations here.  It just doesn't seem reasonable that

13  Yorkville would have documents that at such a granular level

14  that they would be irrelevant.

15          So with respect to number two, I'm also going to

16  grant the motion to compel.

17          MR. SOHN:  Your Honor, through the 2012 date?

18          THE COURT:  Yes.

19          MR. BRODY:  May I be heard on that?

20          THE COURT:  No.  I said before -- I asked you before

21  whether there was anything else you wanted to tell me and you

22  said no.  And before I said that I told you I thought the

23  October 2012 date was a valid terminal date.  So I gave you the

24  chance to address it.

25          All right.  Let's turn to number three.  All

27

1  communications including emails, instant messages, and any

2  other electronic communications including through Bloomberg LP

3  accounts by, to, or concerning any investor, prospective

4  investor, or person acting on behalf of an investor in YA

5  funds.  Mr. Brody?

6          MR. BRODY:  Sure.  This request here really goes to

7  the heart of our complaint which is that we're alleging they

8  made miscommunications to investors.  So what we're seeking

9  here is essentially the communications that they had with their

10  investors.  I think that this is -- I can't think of anything

11  that would be more relevant to the allegations of the complaint

12  than this particular request.

13          And again, I think that we may have said with respect

14  to some of the other -- we may have limited our requests with

15  respect to some of the others.  I'm not sure about this one.

16  But to the extent that there was a personal communication

17  between someone who worked at Yorkville and someone -- an

18  investor outside.  We don't care about a personal email.

19          THE COURT:  You're not looking for happy birthday

20  cards --

21          MR. BRODY:  Right.

22          THE COURT:  -- or Christmas cards or this kind of

23  stuff.

24          MR. BRODY:  Right.  Or participating in the fantasy

25  football draft.  That's not what we're looking for, you know.

28

1   So we're really looking for, you know, concerning the business

2   of Yorkville.

3              THE COURT:  Mr. Sohn?

4              MR. SOHN:  In the first instance, that certainly

5   isn't what it said, and when we tried to narrow it, we didn't

6   get that limitation.  But we've already produced what's called

7   a fund runner database which is where Yorkville logs every

8   communication with investors.  Part of the difficulty here is

9   figuring who's a potential investor, who's someone acting on

10  behalf of an investor versus, you know, those who actually are

11  investors.  So what search would like if you search every

12  email, instant message, every document, every everything,

13  presumably it's everything that's ever been sent to anybody who

14  could be a potential investor.  And again, the time period.

15             THE COURT:  Well, I'm not sure that's what the SEC

16  intends.  I guess in a theoretically – you know, look, I guess

17  theoretically if someone sends out a lunch order to a deli, I

18  guess theoretically the counterman at the deli is a potential

19  investor, but I don't think that's what the SEC intends.

20  You're not asking for the orders for the chicken salad sandwich

21  because the counterman may decide to invest.

22             MR. BRODY:  No.

23             THE COURT:  No.

24             MR. BRODY:  If an investor came to them or if they

25  identified an investor and they sent that person

29

1  communications, then a received communication --

2          THE COURT:  You're looking for communications to

3  individuals that they intend - who they seek to have invest.

4          MR. BRODY:  That's right.  And the counterman is

5  excluded because they're selling their fund to an unaccredited

6  investor anyway, so you're only talking about certain types of

7  people anyway.

8          THE COURT:  Well, you don't know who's a counterman

9  either.  You've got a lot of assumptions --

10          MR. BRODY:  Again --

11          THE COURT:  -- maybe you shouldn't be making.

12          MR. BRODY:  You're right.  You're right, Your Honor.

13          MR. SOHN:  So Your Honor, the burden here is I don't

14  know how you do it without looking at virtually email.  So what

15  we have produced so far is a log that identifies every contact

16  between the fund and the investors and it logs those

17  communications.  And certainly, you know, that's something that

18  makes sense and is relatively, you know, easy to find.  But

19  certainly now we've talked about -- we've excluded the personal

20  things, so it's things -- if there were a way to identify

21  actually and maybe this is something we can work together on --

22          THE COURT:  Well, did Yorkville send out

23  solicitation, I mean solicit investors?

24          MR. SOHN:  There are emails from certainly some

25  people, sure.

1          THE COURT:  No, I mean, you know look, this is what

2    concerns me.  I mean the fact that there may be some

3    individuals around the fringe where it's difficult to determine

4    whether they're investors or potential investors I don't think

5    invalidates the request as a whole.  If Yorkville solicited

6    investors, you know, whether or not those individuals - if

7    Yorkville solicited investors, presumably you can identify the

8    prospective investors from the individuals who got the

9    solicitations.

10          MR. SOHN:  I think that that makes sense, Your Honor.

11    Again, the issue here with the later half of the time frame,

12    again, I don't understand how solicitations to investors or

13    communications with investors in 2011, 2012 have anything to do

14    with representations or valuation in 2008 and 2009.

15          THE COURT:  Well, if they're inconsistent with the

16    valuations in 2008 and 2009 it tells you something is out of

17    kilter I think.  And I don't know whether it's the 2010

18    communication that is out of kilter or the 2008 communication

19    is out of kilter, or there's some deficiency in it.  But I

20    think it's probably sufficiently relevant for discovery.

21          MR. SOHN:  Well, wouldn't that --

22          THE COURT:  I mean you're telling investors that a

23    company is worth, you know, 10X in 2008 and that it's worth,

24    you know, half an X in 2010 and there are no factors to justify

25    the change, it tells you that something is odd, one of the

31

1  valuations is odd.

2  　　　　MR. SOHN:  Well certainly it's a big if but then it

3  sort of begs the question, and I think that information would

4  be in that category one university of information and a much

5  more discreet universe of information certainly than all of the

6  emails for 2011, 2012.

7  　　　　THE COURT:  Well, how did Yorkville solicit

8  investors?  I'm trying to see if there's some way we can put a

9  little bit more of a definite handle on the category of

10  prospective investors.  How did Yorkville solicit investors?

11  　　　　MR. SOHN:  I don't know the answer to that, Your

12  Honor.

13  　　　　THE COURT:  I mean I thought -- I mean did they have

14  lists of prospects?

15  　　　　MR. SOHN:  My understanding, Your Honor, is it's

16  mostly relationship driven.  I don't think that this is from a

17  cold calling operation.

18  　　　　THE COURT:  How many individuals were employed at

19  Yorkville?

20  　　　　MR. SOHN:  Between 2007 and the present,

21  approximately 100.

22  　　　　THE COURT:  And how many were involved - how many of

23  the hundred were involved in contact with investors?

24  　　　　MR. SOHN:  I don't know the answer to that, Your

25  Honor.

32

1          THE COURT:  Can you ball park it?  Estimate it?

2          MR. SOHN:  I do not know.

3          THE COURT:  Can you say whether it was the majority

4  or the minority?

5          MR. SOHN:  I would think it was less than more, but I

6  don't know the answer.  I don't know the number.  I can

7  certainly find out.

8          THE COURT:  Yes, go ahead.

9          MR. BRODY:  Your Honor, we may have a way of solving

10  this problem.  I think that to the extent that Yorkville sent a

11  prospectus or an offering memorandum to someone whether or not

12  they invested in the fund would identify those persons as a

13  prospective investor.  Likewise, to the extent that they sent a

14  due – a response to a due diligence questionnaire, and I think

15  that Yorkville also had, you know, one page information

16  memoranda.  So to the extent that Yorkville sent that kind of

17  documentation out to individuals, those people can probably be

18  identified as prospective investors.  I mean their investor

19  list is a known list.  Is the question --

20          THE COURT:  Yes.

21          MR. BRODY:  -- on the prospective investors.  So to

22  the extent that they sent those documents out to people and

23  they probably – I would think they would have some control list

24  over who they did that with presumably since they claim that,

25  you know, that all this material is confidential.  I would

1  think they would try to keep track over who they sent this

2  stuff to.

3          THE COURT:  And I'm going to hear from you in one

4  second.  We're talking about, this is a document request, so

5  obviously we're only talking about written communications, not

6  oral communications.  But what you're proposing, Mr. Brody, in

7  request number three is in lieu of the terms of prospective

8  investor or personal acting on behalf of an investor, you're

9  suggesting substituting recipients of prospectuses for due

10  diligence questionnaires?

11          MR. BRODY:  Well, I think that's how we can identify

12  who prospective investor or person acting on behalf of the

13  investor is.

14          THE COURT:  Yes.

15          MR. BRODY:  So and I would just --

16          THE COURT:  Yes.  So we'd substitute that term for a

17  prospective investor or person acting on behalf of an investor.

18          MR. BRODY:  Right.  So someone who received a

19  prospectus or due diligence questionnaire --

20          THE COURT:  Yes.

21          MR. BRODY:  -- or the one page kind of information

22  memorandum they sent them.

23          THE COURT:  What did you want to say, Mr. Sohn?

24          MR. SOHN:  Well, Your Honor, one of the things that

25  we have produced already is what's called a fund runner report.

1          THE COURT:  Yes, you mentioned that.

2          MR. SOHN:  Right.  Which is this log.  And one of the

3    things on here is it identifies who a potential investor is or

4    an actual investor and keeps track of the communications among

5    and between that person and Yorkville.

6          THE COURT:  Can I see it?  Why don't you show it to

7    Mr. Brody for a second?

8          MR. SOHN:  Well, we produced this one already.

9          THE COURT:  All right.  Can I just see what it looks

10   like?

11         MR. SOHN:  Sure.  As my handwriting on there

12   indicates --

13         THE COURT:  I can't read your handwriting. And these

14   are summaries of oral conversations?

15         MR. SOHN:  It's summaries of whatever contact and

16   that's already been produced.

17         THE COURT:  And were -- and this is a log of

18   communications with investors and prospects?

19         MR. SOHN:  Yes, Your Honor.  You see, I think the

20   first one on there says something -- the email market -- the

21   requested marketing materials or something like that.

22         THE COURT:  Yes.  The first one says, "Emailed us

23   from marketing materials," which is from someone at Advanced

24   Portfolio Management which seems to suggest that the individual

25   here was contacting Yorkville for marketing materials.  And if

35

1  something was sent out to an investor or prospective investor,

2  it would show up -- it would be listed on this fund runner

3  report?

4          MR. SOHN:  Correct, Your Honor.

5          THE COURT:  Is this what -- what's the difference

6  between the fund runner report, Mr. Brody, and what you're

7  looking for?

8          MR. BRODY:  Well, first of all, the fund runner

9  report we know is incomplete because when we spoke with

10 investors, investors told us about communications that they had

11 with Yorkville that clearly aren't on this document.

12         THE COURT:  Written communications?

13         MR. BRODY:  Oral communications.

14         THE COURT:  Well, your document request by definition

15 isn't going to reach an oral communication.

16         MR. BRODY:  Well, it will have a -- if there was an

17 email memorializing a communication or if there's an internal

18 memo at Yorkville that summarizes a communication, that's

19 clearly called for in this request.

20         THE COURT:  How many instances -- well, let me ask

21 you this.  Did the investors you spoke with have documentary

22 communications that were not reflected in the fund runner

23 report?

24         MR. BRODY:  Yes.  And I'll give you one example, Your

25 Honor.

36

1          THE COURT:  And how -- go ahead, give me the example.

2     Then I was going to ask you what the numbers are.

3          MR. BRODY:  Well, I don't know if --

4          THE COURT:  I mean go ahead, give me the example

5     first.

6          MR. BRODY:  I don't know if there's a way of doing

7     that.

8          THE COURT:  Pardon?

9          MR. BRODY:  We didn't receive the document in what I

10    would call the native format.  We received this gigantic

11    printout, you know, unlike the documents that we produced to

12    them which are searchable.  The documents they produced to us

13    are not.  So --

14         THE COURT:  Give me the example first.

15         MR. BRODY:  So for example, we have one investor who

16    was told about what the cash position was in the funds.  Right?

17    And that information is not reflected in this report.  It was a

18    false misrepresentation made directly by Mr. Angelo, and that's

19    not contained there.  The idea that somehow on this fund runner

20    report Yorkville is going to write down what fraudulent stuff

21    they said to their investors is highly unlikely.  The more

22    likely source of fraudulent misrepresentation --

23         THE COURT:  Well, if they said it, I'm not sure

24    you're going to get it through the document request.

25         MR. BRODY:  Well, but if it's reflected in a

37

1   communicative memo --

2          THE COURT:  Well, if they're not going to put it in

3   the fund runner report, they're not -- memo to file, I called

4   up Joe Blow and lied to him about X, Y, Z Company.

5          MR. BRODY:  Obviously, we're don't anticipate there

6   being something along those lines, you know, but if someone

7   says we told them that the position was, you know, $100 million

8   was our cash position --

9          THE COURT:  If they're - look, again, I'm not making

10  any finding here as to wrongdoing or the absence of wrongdoing,

11  but if they're going to exclude the communication from the fund

12  runner report because they think it might constitute a smoking

13  gun, why would they draft a memo to file with that information?

14         MR. BRODY:  I don't know who writes down the fund

15  runner report and I don't know how the information is contained

16  within that report.  What I do know is that we have certainly

17  an example of a communication that doesn't exist in the fund

18  runner report and it has long been my experience that emails

19  are a better source of fraudulent misstatements then something

20  that was produced at a later period of time as a log of

21  communications.

22         MR. SOHN:  Your Honor, if I may?

23         THE COURT:  Yes.

24         MR. SOHN:  Just on that last point, to whatever

25  communication from Mr. Angelo has been referred to, we also

1   produced all emails from Mr. Angelo, Mr. [indiscernible] and

2   Mr. [indiscernible] from 2007 to 2010, so presumably it's – you

3   know, if there's an email that slipped through the cracks and

4   wasn't reflected that were sent by the gentleman that is

5   alleged to have said that, the SEC already has those emails

6   too.

7              MR. BRODY:  What I will tell you that has never been

8   produced to us, Your Honor, are any of the emails that come

9   from the investor relations department of Yorkville which we

10  asked for during the investigation which weren't produced to us

11  during the investigation and which still haven't been produced

12  to us notwithstanding the fact that we're still subject to the

13  subpoena.

14             THE COURT:  Let me tell you what I'm thinking about

15  and you can tell me –– and I'll get both sides responses.  I'm

16  wondering if maybe –– you know, the fund runner report, this

17  excerpt, the sample of fund runner report that I've been handed

18  seems to have exactly what the SEC is looking for, and I

19  understand what the SEC is saying though about there being

20  communications that are not included in the fund runner report.

21  I'm wondering if an appropriate resolution here might be to

22  order the production of the emails, instant messages, or other

23  electronic communications for say seven or eight months rather

24  than the entire period and to compare those to the fund runner

25  report and see whether or not the fund runner report is

39

1  accurate.  I'm wondering if that may be a less burdensome

2  alternative here that will give us some idea as to whether or

3  not the fund runner report is complete or not.  What are the

4  SEC's thoughts?

5          MR. BRODY:  In the abstract, I think that's not a bad

6  idea, but we would want to get the native version of the fun

7  runner report as oppose to the printout because sitting there

8  and going through that printout would be totally unwieldy.

9          THE COURT:  What are your thoughts, Mr. Sohn?

10          MR. SOHN:  Your Honor, I think that sounds like a

11  reasonable way to proceed.

12          THE COURT:  And is there any objection to producing

13  the fund runner report in a searchable format?

14          MR. SOHN:  Your Honor, standing here today, I don't

15  know what formats we have it in but certainly if Your Honor

16  directs it and we're able to do it, that's what we'll do.

17          MR. BRODY:  If it's an Excel spreadsheet, then they

18  could just put the Excel spreadsheet.  It wouldn't seem to be

19  that complicated to do that.

20          THE COURT:  All right.  Mr. Brody, do you want to

21  give me eight months right now?  Can you pick eight months at

22  random?

23          MR. BRODY:  July 2008 through March 2009?

24          THE COURT:  7 '08 through March '09?

25          MR. BRODY:  Sure.

40

1          THE COURT:  That's nine.

2          MR. BRODY:  Oh, end of February.  Sorry about that.

3          THE COURT:  Okay.  Math is not my --

4          THE COURT:  I always make the same mistake.  Here's

5    to communications.  All right.  And the defendant -- so the

6    defendant has to produce the communications.  You can both be

7    seated, gentlemen.  So the defendant is ordered to produce the

8    communications, emails, instant messages, and any other

9    electronic communications including through Bloomberg LP

10   accounts by, to, or concerning any investor, recipient of a

11   prospectus or recipient of a prospectus due diligence

12   questionnaire or -- what was it, information sheet I think you

13   said?

14         MR. BRODY:  Informational memo.  I think it's a --

15         THE COURT:  Informational memo for the period July

16   '08 through February '09 inclusive.  Defendant is also to

17   produce the fund runner report in its entirety in an

18   electronically searchable format.  And this order is without

19   prejudice to the plaintiff making a renewed application with

20   respect to request number three based on what a comparison of

21   the fund runner report to the communications for that eight-

22   month period shows.

23         Number for, all -- yes, what did you want to say?

24         MR. BRODY:  Oh, I thought you wanted me to address

25   number four.

41

1          THE COURT:  Yes.  No, I just wanted to read it first.

2   That's okay.  All communications including email, instant

3   messages and any other electronic communications including

4   through Bloomberg LP accounts, 52 or a copy of any of the

5   individuals listed in Section 1 of defendant's initial

6   disclosure submitted on November 27, 2012.  Maybe you can start

7   by telling me about Section 1 of the defendant's initial

8   disclosures.

9          MR. BRODY:  Sure.  Section 1 of the initial

10  disclosures was defendant's list of the names of individuals

11  likely to have discoverable information.

12         THE COURT:  But they were -- I mean 26(a)(1) in its

13  current iteration is limited to witnesses that the producing

14  party may call in support of a claim or defense.

15         MR. BRODY:  That may be the case but this is how they

16  identified them in their --

17         THE COURT:  All right.

18         MR. BRODY:  -- initial disclosure as they identified

19  these people as individuals likely to have discoverable

20  information.

21         THE COURT:  All right.

22         MR. BRODY:  So since they're likely to have

23  discoverable information, we think it's likely that we're going

24  to take their deposition in this case and consequently we would

25  like their communications files whether or not --

42

1          THE COURT:  How many individuals were listed?

2          MR. BRODY:  I think more -- setting aside the people

3    at the SEC that they listed on there, I think probably about

4    between 25 and 30 I would think.

5          THE COURT:  Was the substance of their knowledge

6     also set forth?

7          MR. BRODY:  Yeah, it is.  They have an Exhibit A

8    which lists what the subjects that they might have knowledge

9    about.  Now, I guess to the extent that Your Honor wants to

10   limit this request, it can be limited to the subject matters

11   which Yorkville has disclosed they have knowledge about.

12         THE COURT:  All right.  Anything else you want to

13   tell me before I hear from Mr. Sohn?

14         MR. BRODY:  No, Your Honor.

15         THE COURT:  Okay.  Mr. Sohn?

16         MR. SOHN:  Your Honor, again we have the time frame

17   issue.  Again, these are -- if we're talking again about what

18   happened in 2008, 2009 it would seem -- 2010, it would seem

19   that that would be a reasonable time frame.  A lot of emails

20   have already been produced to the SEC for a number of these

21   people.

22         THE COURT:  You know, I think they said in their

23   letter though that they're not looking for what you've already

24   then produced.  I mean that's an overall exclusion that is in

25   intended with respect to all the document requests.  They're

43

1   not looking to get a second copy of whatever they would have

2   gotten.  So I mean is that the only objection, the time frame?

3            MR. SOHN:  That is the objection, yes, Your Honor.

4            THE COURT:  All right.  The time frame objection is

5   overruled for the reason previously stated and I'm going to

6   direct that the documents be produced.  The documents are

7   limited to the subject matters disclosed in 26(a)(1)

8   disclosure.

9            Number 5, all communications including emails,

10  instant messages, and any other electronic communications

11  including through Bloomberg LP accounts by, to, or copying

12  James Carr or Michele Amodio [Ph.].  You can both remain

13  seated.  You can --

14           MR. BRODY:  Yes, thank you, Your Honor, although I

15  was getting a lot of exercise going up and down, so that was

16  good.

17           James Carr and Michele Amodio were two people who we

18  identified as having relevant information but who aren't listed

19  in defendants 26(a) disclosures.

20           THE COURT:  Who are they?

21           MR. BRODY:  Mr. Carr was a VP who we understand

22  drafted several evaluation memos including Smart Tire, Future

23  Media, and Falcon.  Ms. Amodio is -- I guess she's an

24  accountant internally who did a lot of work with Pluris [Ph.].

25  I'm sorry, Amodio also was involved in calculating the age of

44

1   the portfolio which is one of the misrepresentations that we

2   describe in our complaint.

3            THE COURT:  The subject matter that you disclosed for

4   Carr and Amodio were what?

5            MR. BRODY:  I'm sorry, Carr was involved in -- I

6   think Carr was a banker, was one of the bankers so he was

7   involved with --

8            THE COURT:  You disclosed subject matter for these

9   individuals under 26(a)(1)?

10           MR. BRODY:  We did not, Your Honor.  We don't know

11  what information these people had.  This is what we believe

12  they have.  We didn't disclose -- they're not disclosed in our

13  26.

14           THE COURT:  Mr. Sohn?  You can remain seated also.

15           MR. SOHN:  It's a reflex at this point.

16           THE COURT:  Okay.

17           MR. SOHN:  In the first instance, we have the similar

18  date issue and I have an inkling as to where that's going to

19  come out.

20           THE COURT:  Yes.

21           MR. SOHN:  And we've also already produced about

22  11,000 emails for these two, 17 or 18,000 [indiscernible]

23  documents.  And to go back now -- with all of these, if they're

24  a particular category for particular things that they think

25  were missing, we're certainly open and willing and amenable to

45

1    figuring that out.  But to run these huge searches all over

2    again and try to figure out what it is that they think that we

3    haven't given them --

4              THE COURT:  Well, when you ran the search before, did

5    you filter out certain categories of documents?

6              MR. SOHN:  Well, we had search terms that we had

7    discussed with the SEC and they, you know, had certainly

8    reserved their rights to ask for more.  But the initial

9    searches were the product of collaborative conversations where

10   we said here are the search terms we're going to use and they

11   gave us more, and we ran the searches, you know, and gave them

12   the results.  And here we are.

13             THE COURT:  So in other words, if a prior search may

14   have yielded, you know, James Carr and XYZ, but it wouldn't be

15   just James Carr?  In other words, the prior searches were not

16   limited to name only.

17             MR. SOHN:  Correct.  There were pages of search

18   terms, you know, the subject matter, the portfolio companies,

19   the issues that the SEC was interested in which is true for

20   everything we produced which is some of the frustration of, you

21   know, here we are again.

22             THE COURT:  Look, is it easier for the defendants

23   just to do a name search for these two individuals and not

24   bother trying to filter out what's already been produced?

25             MR. SOHN:  Well, the problem with that, Your Honor,

46

1   is privilege issues.  All right.  So to pull up --

2           THE COURT:  Do you have a claw back agreement?

3           MR. SOHN:  No, and we've had some issues with that.

4           THE COURT:  And is the SEC adverse to a claw back

5   agreement?

6           MR. BRODY:  We're not adverse to a claw back

7   agreement, Your Honor.

8           MR. SOHN:  But in our experience thus far we have

9   identified a couple of documents that were inadvertently

10  produced and they refused to --

11          THE COURT:  Well, you know --

12          MR. SOHN:  But that's --

13          THE COURT:  They don't have the last word on it.  I

14  think I do since the order of reference, so --

15          MR. SOHN:  But against that background we're

16  certainly reluctant to go down that path.

17          THE COURT:  Well, no, but I mean you're going to have

18  to do a privilege review no matter what.

19          MR. SOHN:  To the extent we have to produce

20  additional documents, absolutely.

21          THE COURT:  Yes.

22          MR. BRODY:  Your Honor, it seems --

23          THE COURT:  No, just one second.  Beyond the date

24  issue though, I'm not sure -- so the objection is burden?

25  Beyond the date issue, the objection is burden, that you've

47

1   already produced some documents from these individuals?

2           MR. SOHN:  Correct.  And I think the date issue,

3   although certainly Your Honor has ruled on it a few times in

4   different contexts, I think for the different custodians and

5   the different categories the different temporal periods may

6   have different significance or no significance.  And certainly

7   again, if we're focused on what happened in 2008 and 2009 and

8   these are people -- and 2010 arguably, and these are people

9   that were on the ground doing these things, that would seem to

10  be the relevant period.

11          THE COURT:  Well, you know, one thing I do take away

12  from Judge Daniels' comments that are quoted in plaintiffs's

13  letter though is that I think Judge Daniels, absolutely correct

14  and certainly not for me to debate, but respect to a fraud

15  claim I think the plaintiffs are entitled to some discovery

16  before and after the relevant period.  And I think that, you

17  know, the period 2007 to 2012, which gives one year before and

18  two years after, seems like a reasonable limitation to me.  So

19  I'm not inclined to revisit the issue of the time period.

20          I mean look, to suggest that relevant documents don't

21  have to be produced because the burden of doing a privilege

22  review is an argument that has sort of monstrous consequences -

23  -

24          MR. SOHN:  That's not the argument, Your Honor.  The

25  argument is more that we did a search where we went through

48

1  search terms and we discussed and we collaborated on what it

2  is, and at a certain point a reasonable search --

3          THE COURT:  Right, but I thought -- I'm sorry, I

4  didn't mean to cut you off.  You finish.  Go ahead.

5          MR. SOHN:  I just think at a certain point it's

6  reasonable to say that a diligent and reasonable search has

7  been conducted and there may certainly be some documents in a

8  universe this large that maybe we miss, and that's, you know,

9  the unfortunate product of having millions of pages and

10  millions of emails and all that other stuff and necessarily

11  when you go through what search terms are agreed upon it's, you

12  know, it's --

13          THE COURT:  Maybe I misunderstood you but I thought

14  you said earlier though that when you did the prior search

15  there was an agreement with the SEC that those search -- that

16  that was not -- that that was -- that they had the right to

17  come back and ask for a -- that the SEC had the right to come

18  back for additional searches.  I thought you were saying --

19          MR. SOHN:  Well, that --

20          THE COURT:  I thought you were saying there was an

21  agreement that those searches would not be the universe, that

22  they had the right to come back and ask for more.

23          MR. SOHN:  I think there's an agreement to disagree.

24  I'm not that certain that the SEC took the position that by

25  agreeing to this and, you know, they can certainly come back

49

1   and always ask for more which I would expect them to take that

2   position frankly because you never catch everything.  But at a

3   certainly point the burden outweighs the benefit.

4           THE COURT:  No, I understand that and that's why

5   frequently the parties disagree on the -- you know, I

6   appreciate the cost and burden of doing a search for

7   electronically stored information and that's why frequently the

8   parties try to arrive at a definitive list before the search is

9   done so that the producing party knows that it's only going to

10  be doing the search and production once.  And sometimes when

11  they can't arrive at a definitive list, they come -- you know,

12  I've had cases where they've come before me to resolve the

13  dispute so that they do have a definitive list to do the search

14  so that they know they're only going to be doing it once.  I

15  mean it sounds like there was no agreement that there was a

16  definitive list.  And in the absence of an agreement that there

17  was a definitive list -- well, let me put it another way.  Did

18  the defendants at some point before these prior searches were

19  done tell the SEC this is the only search were going to do so

20  make sure you have everything you want?

21          MR. SOHN:  Well, we didn't, Your Honor, and part of

22  the reason for that is it was in the context of an

23  investigation.

24          THE COURT:  Yes.

25          MR. SOHN:  You know, so the rules of the road are a

50

1   little different.

2           THE COURT:  Everybody wants to play nice, or at least

3   the subject wants to play nice.

4           MR. SOHN:  Right.

5           THE COURT:  Yes.  I mean there's not -- it doesn't

6   sound like there's a solid record or even a substantial on

7   which to conclude that the prior search was intended or

8   understood to be the be all and end all of electronic searches.

9           MR. SOHN:  I think that's fair to say, Your Honor,

10  but I guess now would be a good time to ask whether we can,

11  given whatever order comes out of the Court today for these

12  searches, that we can agree that we're going to do that for

13  this next round.

14          THE COURT:  Well, it sounds like with respect to

15  number five, they want everything that went to or from Mr. Carr

16  and Ms. Amodio.

17          MR. SOHN:  And I think they --

18          THE COURT:  So that sounds like it's a one term

19  search.

20          MR. SOHN:  Except they agreed to limit it to the

21  subject matter, the action, which you know, I guess is probably

22  open to some debate what that means or what that would

23  encompass.  So I would certainly suggest --

24          THE COURT:  Well, let me come back to Mr. Brody for a

25  minute.  I mean can we come up with a definitive and final list

51

1   for the car and Amodio communication?

2          MR. BRODY:  Your Honor, my understanding is that the

3   view today is that search terms are generally not an efficient

4   way of doing searches through electronic documents and that

5   there are more efficient ways of doing searches that deal with

6   algorithms.  I don't --

7          THE COURT:  You're talking about selective coding?

8          MR. BRODY:  Yeah, I guess.

9          THE COURT:  Yes, the jury is still out on that.

10          MR. BRODY:  I don't know enough about it but I do

11   know that with --

12          THE COURT:  I think search terms are still used --

13          MR. BRODY:  -- search terms, garbage in, garbage out.

14          THE COURT:  -- in the majority of cases but --

15          MR. BRODY:  Search terms, garbage in, garbage out.

16   So you know, you come up with some terms and you know, if you

17   miss something that's a little off, you don't get it.

18          THE COURT:  That's an over simplification though.  I

19   mean we've all used Westlaw and Lexis for several decades.  I

20   don't know about the SEC, but the Government won't even buy the

21   Court Digest anymore, if anybody even still remembers what

22   digests are.  So you know, and Lexis and Westlaw are search

23   terms driven and we use those with some success, so --

24          MR. BRODY:  Right, but there are -- Westlaw and Lexis

25   are a lot less idiosyncratic because judges tend to write using

52

1   certain words of law and there are headnotes and there's all

2   types of other things that allow you to do searches through

3   those databases that obviously this doesn't.

4          THE COURT:  Well --

5          MR. BRODY:  I mean one of the things that I know that

6   defendants are complaining about --

7          THE COURT:  You know, even with selective coding, I

8   mean selective coding is an iterative process.  Are you

9   familiar with it?

10         MR. BRODY:  Only vaguely, Your Honor.

11         THE COURT:  I mean my understanding is rudimentary

12  and maybe counsel may have a better understanding.  My

13  understanding is that you sort of give the search engine a seed

14  set of what you're looking -- of the kind of documents you're

15  looking for.  It runs a search and comes back with a set of

16  documents and you look at that and you determine if that's what

17  you want, and if it's not what you want, you've got to refine

18  the seed set to make sure you're getting what you want.

19         MR. BRODY:  Right.

20         THE COURT:  So I mean that's -- you know, there is no

21  panacea that's a perfect solution here.  But it does seem to me

22  that -- well, let me just come back to Mr. Sohn for one second.

23  Do we have any idea of how many documents would be generated if

24  you did a search, an electronic search for Carr without

25  limitation and Amodio without limitation?

1          MR. SOHN:  I don't have those numbers but obviously

2   that's something that I can find out relatively quickly.  And

3   we can certainly follow up with each other and try to narrow it

4   somehow or agree on parameters or something in the hope of

5   doing this efficiently.

6          MR. BRODY:  One of the things that the defendants had

7   pointed out is that, you know, they produced a lot of documents

8   already perhaps relating to Carr and Amodio, and it always

9   seems to be that one of the earliest technologies was deduping

10  technology so that to the extent that the document has been

11  produced, it's fairly easy to go through the new documents and

12  pull that out.  So that wouldn't be something that would

13  require a lot of effort because there are programs that do

14  that.

15         THE COURT:  Well, the issue is not deduplicating.

16  I'm not sure that's the issue.

17         MR. SOHN:  Your Honor --

18         THE COURT:  You know, it seems to me that you're

19  entitled to the communications to or from Carr and Amodio, but

20  I'm trying to look down the road though.  I think though that

21  the defendant though is entitled to do this once and not to do

22  it on multiple occasions.  And what I'm inclined to do is to

23  direct counsel to meet and confer and come up with a complete

24  set of search terms for the documents that you're looking for

25  with respect to Carr and Amodio so that if the Carr and Amodio

54

1   search that's done with respect to request number five is the

2   final search for Carr and Amodio documents.

3              MR. BRODY:  We can do that, Your Honor.

4              THE COURT:  Any objection to that on your part, Mr.

5   Sohn?

6              MR. SOHN:  There's not and I also would ask Your

7   Honor that we do that for whatever searches were directed to

8   undertake as a result of the conference here just to make sure

9   that --

10             THE COURT:  Well, we need to take them one at a time.

11  I'm not sure I can -- I don't want to agree to that unless I

12  know what other issues are coming up with respect to electronic

13  searches, so --

14             MR. SOHN:  Okay.  You know, and then it may be that

15  we can -- I need to go back and take a look at what the

16  universe of documents looks like that is potentially responsive

17  to these categories that we've talked about today and then I

18  can certainly reach out to the SEC and we can proceed in good

19  faith and hopefully we can work it out.

20             MR. BRODY:  Your Honor, with respect to Amodio and to

21  Carr, I think we can probably come up with a limited, you know,

22  limited view of searches.  But with respect to some of the

23  other individuals, for example --

24             THE COURT:  I haven't agreed to do it with respect to

25  any --

55

1          MR. BRODY:  Right.

2          THE COURT:  -- of the others so you're --

3          MR. BRODY:  That's what I'm saying.

4          THE COURT:  -- arguing something that you haven't

5   lost on.

6          MR. BRODY:  Okay.

7          THE COURT:  If you want to convince me to change my

8   mind, I'll hear you.

9          MR. BRODY:  No.  I just don't want to have to revisit

10  the issue, you know, in a week.

11          THE COURT:  You've already won.  You can only mess it

12  up if you keep talking.

13          MR. BRODY:  Sealing my mouth.

14          THE COURT:  All right.  Number six.  All documents

15  concerning the International Organization of security

16  commissions hedge funds oversight and principal for the

17  valuation of hedge fund portfolio reports, the alternative

18  investment management associations guide to sound practices for

19  hedge fund valuations, the best practices for the hedge fund

20  industry report of the asset managers committee to the

21  president's working group on financial markets.  There's a

22  mouthful.  The Managed Funds Association's soft practices for

23  hedge fund managers.  Mr. Brody?

24          MR. BRODY:  Yeah, starting I think in 2007 a number

25  of organizations started putting out best practices for hedge

56

 1   funds that related to valuation, to risk management, to

 2   operations, controls, and I think they're collectively those

 3   best practices really set what the standard was for how hedge

 4   funds were supposed to comply.  And in fact, there's at least

 5   one communication that Yorkville sent out to its investors

 6   stating that they were in compliance with at least one of these

 7   practices.  I think it was the Managed Fund -- maybe it was the

 8   Managed Fund Association, but it may have been one of the

 9   others.  So to the extent that Yorkville is looking at these

10   best practices and deciding whether or not they want to follow

11   them or whether they don't want to follow them, or what they're

12   telling people about them, I think that's relevant to whether

13   or not their valuation procedures were appropriate or whether

14   or not they were absolutely reckless.

15           THE COURT:  Well, be careful what you wish for.  Do

16   any of these organizations have the imprimatur or the approval

17   of the SEC or of the Court?

18           MR. BRODY:  Well, one of them I think the SEC was

19   involved with and I don't remember which one of these SEC --

20           THE COURT:  Involved with how?

21           MR. BRODY:  That they were a consultant I think on

22   the -- or an advisor on the working group.  One of them is the

23   president's working group, so I don't know -- that's the

24   president of the United States as opposed to the president of

25   some other organization.  So, and I think the Managed Fund

57

1  Association is an organization to which Yorkville was a member.

2  So to the extent that Yorkville is a member of an organization

3  that's telling funds how they should be handling their

4  valuation policies, that's clearly relevant.

5          In our proposed amended complaint that we've

6  submitted to Judge Daniels, we actually set forth how Yorkville

7  was not in compliance with these policies in numerous ways, but

8  Judge Daniels says it wasn't necessary --

9          THE COURT:  No, it's just -- well --

10         MR. BRODY:  -- for us to amend.

11         THE COURT:  Just in most contexts where there's a

12 legal standard compliance or noncompliance with a trade

13 association's group standards is not material.  I mean if you

14 have to build reasonably safe cars, the fact that the

15 association of -- Greater Association of Car Manufacturing says

16 do X, Y, and Z doesn't tell you whether or not the car is

17 reasonably safe.

18         MR. BRODY:  Right.  The SEC didn't have policy or

19 best practices it issued to hedge funds saying this is what

20 you're supposed to be doing or this is what you should be

21 doing, or these are the best practices.  Instead, that was --

22 there was an industry standard.

23         THE COURT:  No, but isn't the issue here though

24 compliance with the Securities Act and the Exchange Act, not

25 whether or not there's compliance with best practices?

58

1          MR. BRODY:  Right.  But if you're telling people that

2   you are following best practices and you're telling people that

3   you're following what these organizations are saying that --

4          THE COURT:  I see.

5          MR. BRODY:  -- you should do and you don't --

6          THE COURT:  Is that what happened here?

7          MR. BRODY:  Well, like I said before, in at least one

8   instance they told investors they were following the guidelines

9   I think of the Managed Funds Association.  It was in one of

10  their quarterly newsletters, but it's not true.

11         THE COURT:  Mr. Sohn?

12         MR. SOHN:  A couple of points, Your Honor.  In the

13  first instance, I don't know what all documents concerning

14  these things means.

15         Second, the point that Your Honor made about whether

16  or not I guess you comply with these standards or not has

17  really nothing to do with whether or not you're violating the

18  securities laws.  To the extent that these standards exist, the

19  SEC certainly is familiar with them, can get them from whomever

20  they want and then judge Yorkville's conduct against them, you

21  know, and argue that they either violated or they didn't.  And

22  you know, we go to the time issue again but I just don't see

23  what these have to do with anything.

24         MR. BRODY:  If I may, Your Honor.  I believe that in

25  their motion to dismiss they make a lot of claims about their

59

1    valuation committee and what their valuation committee was

2    doing, and how there were former members of the SEC on their

3    valuation committee and they were really acting as a top notch

4    fund with all these controls in place.  And judging whether or

5    not they were acting in accordance with what the industry

6    standard is is relevant to that.  And these set --

7            THE COURT:  Hold on a second, hold on a second.  Is

8    the industry standard the standard of legality here?  I hope

9    not.

10           MR. BRODY:  If you're not -- if you don't even meet

11   the bar of what the industry standard is, then that I think

12   goes to whether or not you're acting in a reckless fashion.

13   For example --

14           THE COURT:  Well, maybe yes, maybe no.

15           MR. BRODY:  Well, I'll give you one example, Your

16   Honor.  One of the things that they tout is the fact that Mr.

17   Angelo wasn't on the valuation committee.  And in fact, if you

18   look at -- if you read through these standards you would see

19   that would be something that the standards would suggest is the

20   best practice.  However, there are all these other things that

21   they did with their valuation committee that they weren't

22   doing.  So to say that on one hand you've kept Mr. Angelo off

23   the committee while on the other hand not doing all these other

24   things --

25           THE COURT:  No, but I'm not sure compliance --

60

1   compliance or noncompliance with best standards, I'm not sure

2   what that means.  And I mean even the point that you were

3   raising before that if you don't comply with at least the

4   industry standards is evidence of recklessness, well you could

5   -- I suppose in many fields one might be reckless and that does

6   not necessarily give rise to a cause of action.  And I'm sure,

7   look, I mean you know, I'm sure every day there are people who

8   drive under the influence but by the grace of God they don't

9   hit anybody and they make it home okay.  You know, that's

10  probably the height of recklessness but, you know, for better

11  or for worse no harm, no foul.  And I suspect there are

12  probably people in the securities industry who may make

13  recommendations or may act recklessly but by the grace of God

14  the investment pays off and nobody sues and nobody had any

15  injury they recognize.  So --

16          MR. BRODY:  Unfortunately in this case there was

17  injury.

18          THE COURT:  You know, I'm not sure.  I'm just

19  concerned here because usually in most fields that are

20  regulated, compliance with industries, with trade association

21  standards is immaterial.  It's a question of whether or not you

22  meet the legal standard, not whether you comply with, you know,

23  the standards of, you know, the Amalgamated Car Manufacturer's

24  Association with respect to braking systems or airbag systems.

25  So I'm not sure, you know, I have a problem with compliance or

61

1   noncompliance with industry standards.  And you know, sort of

2   the precedential problem that it faces is will this create an

3   incentive for trade groups to start setting the standards

4   lower?

5           MR. BRODY:  Well, first of all, while the securities

6   industry is heavily regulated, hedge funds weren't.  And in

7   fact when the SEC saw it at the time to regulate hedge funds,

8   the DC circuit said we couldn't do it.  So to the extent that

9   there are standards in this industry, they're not standards

10  that are set by the Government.  They're only set in the

11  industry.  Now --

12          THE COURT:  Well, except to the extent that the 34

13  Act, the 33 and the 34 Act set standards.

14          MR. BRODY:  Right, but these aren't those standards.

15  Right.  The question about how you have to separate your

16  bankers from the people who are doing the valuation decisions,

17  that isn't something that you would find in the 33 Act or the

18  34 Act.  That would be, you know, evidence of -- that would be

19  found in probably what's good business practices --

20          THE COURT:  Yes, but if it's not set forth in a

21  statute, why is it a legally operate -- how is it a legally

22  operative standard?

23          MR. BRODY:  Because if you're not following the

24  minimum industry standard or what the experts in the industry

25  which include --

62

1          THE COURT:  But the minimum industry standard has no

2   legal support.

3          MR. BRODY:  Well, but it demonstrates recklessness.

4   If you're not following what the best minds in the industry

5   say, and some of the people who --

6          THE COURT:  Who says this is promulgated by the best

7   minds in the industry?  Wasn't Bernie Madoff the president of

8   NASDAQ?

9          MR. BRODY:  It includes -- you know, some of the

10  people on these committees included Yorkville's own lawyers.

11  And these are -- you know, I'm sorry that I don't have copies

12  of these here, but if you took a look at these you would see

13  that these are not -- these are, you know, multi hundred page

14  documents that actually spend a lot --

15         THE COURT:  Yes, it doesn't make them accurate.  It

16  doesn't give them truth.  I mean the fact that it's long

17  doesn't mean that it's valuable.

18         MR. BRODY:  But they're not just long, they're well

19  thought out in terms of understanding where the conflicts of

20  interest arise and how to address those potential conflicts

21  which is one of the main issues with valuation is the conflicts

22  of interest, and that's where a lot of these things were geared

23  towards resolving in a fashion that was equitable.  So to the

24  extent that they're not following procedures that they said,

25  they told their investors they're going to follow, or to the

63

extent that they're claiming now in this litigation that look,

our valuation committee was acting on the highest standards so

much so that we even had two former SEC attorneys working on

this committee, well then we should be able to demonstrate

whether or not they were following what the industry thought

was the good ideas of how to comprise a valuation committee and

what your valuation policy should be.

       THE COURT:  Is there any case that has said that

compliance or noncompliance with the industry standards set

forth in the document you've identified in request number six

bears on liability?

       MR. BRODY:  I've never seen any case that describes

these documents.

       THE COURT:  Yes.

       MR. BRODY:  But I believe there are cases, and we

could brief this for Your Honor if Your Honor wants, where

failure to follow set industry standards would be considered to

be reckless.

       THE COURT:  When you say set industry standards, what

does that mean to set?  What does that mean?

       MR. BRODY:  That's a good question, Your Honor.

       THE COURT:  Your term.

       MR. BRODY:  And I will tell you that these four best

practices differ in certain ways so they're not, you know,

entirely consistent with each other.  But to the extent that

64

1    there are consistencies there and they're not following them or

2    to the extent they're discussing these internally and saying

3    well God, we can't do this, this would be too hard for us to do

4    this, or we shouldn't do this or we should do this.  That goes

5    to whether or not they are acting in the manner which they told

6    their investors they were going to act.

7            THE COURT:  All right.  I think I'd like briefing on

8    number six.  I'm very troubled by number six because you

9    started making -- it just seems to me that if you start making

10   compliance or noncompliance with what are really trade group

11   recommendations, you're starting down a dangerous path.

12           MR. BRODY:  Well, Your Honor, I think it's somewhat

13   similar to the securities fraud cases where they say that the

14   failure to follow GAP isn't proof of fraud but it's evidence

15   about whether or not someone committed fraud or whether someone

16   was reckless.  I think in this case the failure to follow in

17   and of themselves isn't necessarily fraud but it's evidence

18   about whether or not they were acting recklessly or not, but

19   we're happy to brief it.

20           THE COURT:  Well, you know, if the Bernie Madoffs of

21   the security industry get together and start promulgating very

22   low standards, can defendants start pointing to their

23   compliance with those low standards and say hey look, we're

24   good guys?

25           MR. BRODY:  I think they already do that.

65

1          THE COURT:  Pardon?

2          MR. BRODY:  I think they already do that.  I think --

3          THE COURT:  They already do that.

4          MR. BRODY:  I think the defendants in many cases say

5    look, we did what -- we followed what the standard practice of

6    the industry.  You know, there are scores of expert witnesses

7    who will come on and testify as to what the industry standards

8    are and they say they meet them and therefore they didn't act

9    with scienter.  If I follow industry practice, how can it be

10   said that I acted with scienter.  But if I didn't follow

11   industry practice, then I think that goes to scienter.

12         THE COURT:  All right.  I think I'd like some

13   authority from both sides on number six.  I'm very troubled by

14   it.  When do you want to -- can you submit a letter brief on

15   it, Mr. Brody?

16         MR. BRODY:  We can, Your Honor.

17         THE COURT:  Look, I know the holidays are coming up

18   and I'm not trying to make anybody's life miserable.  When do

19   you -- when can you comfortably submit something?  And I'm

20   certainly not looking for anything in the next two weeks.

21         MR. BRODY:  Okay.  How about the --

22         THE COURT:  Do you want a calendar?

23         MR. BRODY:  End of the second week in January, Your

24   Honor?  The only reason I ask for that is because --

25         THE COURT:  It's fine.

66

1          MR. BRODY:  -- my daughter's Bat Mitzvah is next

2    Saturday and so I'm kind of stressed about that.

3          THE COURT:  I'm not trying to make anybody's holidays

4    miserable here.

5          MR. BRODY:  I think the end of the second week in

6    January we can file a brief, Your Honor.

7          THE COURT:  All right.

8          MR. BRODY:  Or letter.

9          THE COURT:  I just want to make sure I understand

10   which week you're talking about.  The first full week in

11   January ends January 10th.  The second full week in January ends

12   January 17.  Which date did you have in mind?

13         MR. BRODY:  I think we can do the 10th.

14         THE COURT:  Okay.

15         MR. BRODY:  I don't anticipate this being a long

16   letter, Your Honor.

17         THE COURT:  And how much time do you want to respond,

18   Mr. Sohn?

19         MR. SOHN:  A week.

20         THE COURT:  That's all?

21         MR. SOHN:  Or longer.

22         THE COURT:  Well --

23         MR. SOHN:  Actually, I'm going to be away that next

24   week so if we could have two weeks.

25         THE COURT:  Well, you're not going to have Mr.

67

1  Brody's letter until the 10th, so you won't have anything to

2  respond to until --

3              MR. SOHN:  Right.

4              THE COURT:  So what date do you want?  You want the

5  17th?  The 24th?

6              MR. SOHN:  Can we do the 24th?

7              THE COURT:  Fine.

8              MR. SOHN:  Thank you.

9              THE COURT:  Okay to keep going?  We've been going for

10  about an hour and 45 minutes.  Does anybody need five minutes,

11  ten minutes?

12              MR. BRODY:  I think we're almost finished with --

13              THE COURT:  We're almost done but does anybody --

14              MR. SOHN:  There is, Your Honor, there's one other

15  issue which I thought we were going to give argument today.

16              MR. BRODY:  We can take a break --

17              MR. SOHN:  So we may want to take a break.

18              THE COURT:  Hold on.  Does anybody need a five minute

19  break?  Does anyone need to go to the bathroom?

20              MR. BRODY:  No, I'm good.

21              THE COURT:  All right.  Let's move on to number

22  seven.  All transcripts of any testimony or interview of any

23  Yorkville managing member, officer, director, employee, agent,

24  accountant, attorney, or general partner, or limited partner

25  given before any person, officer, or tribunal whether sworn or

68

1   unsworn related to Yorkville, the YA funds, or any portfolio

2   company.  Do we know whether any such documents exist?  My

3   question I guess is to Mr. Sohn first.  I mean it's looking for

4   transcripts.  Do we know if any such transcripts exist?

5           MR. SOHN:  Well, I believe there are.  Testimony has

6   been given at some point in time related to something, you

7   know, by Yorkville --

8           THE COURT:  Well, it's got to be related to

9   Yorkville, the YA funds, or any portfolio company.

10          MR. SOHN:  Right.

11          THE COURT:  Presumably if, you know, someone's

12  interviewed on some extraneous topic, they're not looking for

13  that.  How many transcripts, do we know roughly how many

14  transcripts we're talking about?

15          MR. SOHN:  I don't know, Your Honor.  The request

16  just seems so far afield of anything remotely relevant to the

17  case.

18          THE COURT:  Well, I presume what they're really

19  looking for are transcripts related to the YA funds or any

20  portfolio company.

21          MR. BRODY:  I think that's right, Your Honor.

22          THE COURT:  Are there more than a dozen such

23  transcripts of these people giving interviews and testimony all

24  over the place?

25          MR. SOHN:  I don't know the answer to that, Your

69

1    Honor.

2             MR. BRODY:  Your Honor, I think there may be some

3    bankruptcy actions where they've testified about portfolio

4    companies.  In addition, we understand that there was testimony

5    that was given down in the Cayman Islands, Your Honor, that

6    related to a dispute with one of their investors in the

7    Caymans.

8             THE COURT:  And you're only looking for transcripts

9    of testimony or interviews regarding investments?

10            MR. BRODY:  Or the manner in which the fund was run I

11   think, the valuation of the other internal policies.  For

12   example, I don't think we're looking for if someone brought a

13   sexual discrimination case against --

14            THE COURT:  Yes.

15            MR. BRODY:  We're not looking for employment, you

16   know, unless somewhere during that transcript they started

17   talking about, you know, "Well, you know, they fired me because

18   I valued these things, you know, in the right way."

19            THE COURT:  Well, if a plaintiff did that she would

20   have just cut the legs off of her Title 7 action.  That's not

21   class based discrimination.

22            MR. BRODY:  Well, it's a pretext.  You know, she was

23   fired for being a woman but she has the pretext was -- I'm

24   being a little flippant, Your Honor.  I apologize.

25            THE COURT:  I'm not -- we didn't fire her because she

70

1  was a woman, we fired her because she wouldn't let us

2  perpetrate our fraud?

3         MR. SOHN:  I think it's the other way around is what

4  we'd suggest.

5         MR. BRODY:  I have no reason to believe that such a

6  thing exists, Your Honor.

7         THE COURT:  I'm sorry?

8         MR. BRODY:  I have no reason to believe that such a

9  transcript exists.

10         THE COURT:  Yes, I don't think -- that seems kind of

11  far fetched.

12         MR. BRODY:  The point that I was trying to make is

13  that generally we don't care about something like --

14         THE COURT:  Sure.

15         MR. BRODY:  -- an employment action.

16         THE COURT:  Sure.  All right.

17         MR. BRODY:  But there may be instances, for example,

18  where a portfolio company sued Yorkville or Yorkville sued a

19  portfolio company and in those instances that would be highly

20  relevant to the issue of valuation because it most likely

21  relates to whether or not they are compliant with the loan

22  provisions that existed.

23         THE COURT:  Is there anything else you want to tell

24  me on number seven, Mr. Sohn?

25         MR. SOHN:  Again, I'm going to sing my date song.

1  That's certainly -- for it to be relevant in any way it would

2  have to be during facts that happened during a time period

3  that's in some way relevant to this case.  And certainly, Your

4  Honor, I agree with your suggesting that employment cases,

5  things of that nature, certainly would have nothing to do with

6  anything here.  So to the extent that perhaps it would relate

7  to a dispute with a portfolio company that bears on valuation

8  in some way or something else related to valuation, you know,

9  but it needs to be tied in some way to the allegations in this

10  case.

11          THE COURT:  I'm going to grant the request to compel

12  number seven, the documents sought in number seven, but the

13  transcripts are going to be limited to transcripts dealing with

14  investments or how the funds will run or disputes with

15  portfolio companies regarding valuation.

16          MR. BRODY:  And disputes with investors, Your Honor,

17  too?  Is that included within that?

18          THE COURT:  All right.  And disputes with investors.

19  I think that would probably be subsumed within investments but

20  --

21          MR. SOHN:  Is there a time frame on that?

22          THE COURT:  Yes, the same time frame.

23          MR. SOHN:  And disputes with investors about

24  anything?

25          THE COURT:  Well, look, if you have a transcript

1  because -- if you have a transcript arising out of --

2          MR. BRODY:  Slip and fall.

3          THE COURT:  -- you know, a secretary pulling into the

4  parking lot and ramming into the back of the investor's car and

5  the investor sues because, you know, his Volvo has a scratched

6  bumper or something, I doubt very much Mr. Brody's going to be

7  interested in that.  I mean if you have -- if something

8  extraneous comes out, why don't you call Mr. Brody, you know,

9  or if an investor slips and falls in the hallway or scalds

10 himself on a cup of coffee, or herself on a cup of coffee, I'm

11 sure Mr. Brody has no interest in that.  But I'm not sure

12 you're going to find those kinds of things.

13         Last but not least, to the extent not produced

14 pursuant to requests one through seven, all documents and

15 information identified in Section 2 of the initial disclosure

16 submitted on November 27, 2012.  Section 2 is the

17 identification of documents?

18         MR. BRODY:  Yes, Your Honor.

19         THE COURT:  I mean those, usually parties produce

20 those.  Is there -- this is Section -- the 26(a)(1) disclosure,

21 Section 2 of the 26(a)(1) disclosures?

22         MR. BRODY:  26(a)(1), (a)(2).

23         THE COURT:  Yes.  Is there any objection to that?

24         MR. SOHN:  Again, the only objection here really is

25 that it's a time frame issue because these --

73

1          THE COURT:  No, but these are documents you've

2    identified.

3          MR. SOHN:  Yeah, absolutely, but I think it's the

4    wording of this request.  We've identified categories of

5    documents, right?  So we have certainly produced all the

6    documents within those categories that we would rely on, but

7    there may be more documents broadly construed within that

8    category from a different time period or something else.

9          THE COURT:  But it's however you identify the

10   category.  I mean you're asking for the documents you've

11   identified in your 26(a)(1) disclosures.

12         MR. SOHN:  Yes, and it's a time frame issue because

13   we, for example --

14         THE COURT:  But you control what you identify in your

15   26(a)(1) disclosures.

16         MR. SOHN:  Yes, Your Honor, but we didn't say

17   documents between 2007 and 2011.  We said documents evidencing,

18   for example, Yorkville's accounting policies.  So --

19         THE COURT:  Well, if you want to take the position

20   now that what you identified were documents between date A and

21   date B, you can do that.

22         MR. SOHN:  Okay.

23         THE COURT:  But they're asking for the documents

24   you've identified as relevant.  It's difficult to -- I think

25   you have a difficult time arguing with that.

74

1          MR. SOHN:  Agreed.  It's just purely sort of a

2  definitional thing and I think we're probably okay and I think

3  we've actually produced everything that fits within this --

4          THE COURT:  All right.

5          MR. SOHN:  -- actually.

6          THE COURT:  All right.  Was there another issue that

7  -- I think Mr. Sohn suggested there might be something else

8  percolating.

9          MR. SOHN:  There was, Your Honor.  We had written the

10  Court raising some issues also on November 19th.  We wrote to

11  Judge Daniels about the two privilege logs that the SEC

12  provided.

13          THE COURT:  I don't have that letter.

14          MR. SOHN:  You don't have that.

15          THE COURT:  I don't.

16          MR. SOHN:  I do have copies of the correspondence and

17  of the privilege logs if Your Honor would like to do it on the

18  fly.  We can certainly come back.

19          THE COURT:  Let me see what you've got, please.

20  Judge Daniels didn't forward everything to me so if it's not --

21  I was not aware that there was this issue.  Were these letters

22  docketed do you know?

23          MR. SOHN:  I believe they were.

24          MR. HOLDEN:  Docketed?  No.

25          MR. SOHN:  No?

75

1          MR. HOLDEN:  No.

2          MR. BRODY:  No, they were just faxed to the Court.

3          THE COURT:  Okay.  Yes, this goes back to Mr. Sohn.

4   Okay.  Oh boy.  Quite honestly, I feel very uncomfortable

5   trying to read and digest nine single spaced pages of text and

6   come to a resolution.  I mean the defendant's letter here is

7   three pages.  The SEC's letter -- I take that back, it's three

8   pages.  I was looking at the attachment.

9          MR. SOHN:  Your Honor, ultimately it's about five

10  pages of privilege log, but we certainly can come back for --

11  if you want to take a look at the privilege log.

12         THE COURT:  I feel uncomfortable trying to read this

13  and do it on the fly.  Give me a second.

14                    [Pause in proceedings.]

15         THE COURT:  I mean looking at -- I'm looking at

16  plaintiff Securities and Exchange Commission's privilege log in

17  response to defendant's first request for the production of

18  documents dated January 25, 2013.  Is the issue the adequacy of

19  the description?

20         MR. SOHN:  It is, Your Honor.  We don't think that

21  they've established their entitlement to these protections.

22         THE COURT:  Subject matter, Yorkville advisors.

23  Subject, YA global -- I'm looking at now the index dated

24  February 15, 2013.  I don't think these descriptions are

25  sufficient.  I mean it doesn't allow for an intelligent

1   assessment as to whether or not the privilege is validly

2   asserted.  I mean the way, you know -- you know, I'm looking at

3   the first one on the January 25th index.  For all I know, that's

4   an email from one paralegal to another paralegal saying,

5   "Attached is a copy of the complaint we filed in SEC v.

6   Yorkville," which clearly would not be a privileged

7   communication.

8           MR. BRODY:  I'm not sure that's correct, Your Honor.

9   This is not the attorney-client privilege that we're talking

10  about here.  We're talking about a privilege that exists

11  between communications between law enforcement agencies and --

12          THE COURT:  I'm sure an email from a paralegal at the

13  SEC to a paralegal of the US Attorney's saying, "Attached is a

14  copy of the complaint that we filed in SEC v. Yorkville --"

15          MR. BRODY:  We are --

16          THE COURT:  -- I'm hard pressed to see how that fits

17  within any privilege.

18          MR. BRODY:  We are severely limited in our ability to

19  describe anything in these communications pursuant to various

20  statutes and treaties including the multilateral memorandum of

21  understanding which is entered into by members of the

22  International Organization of Securities Commissions.

23          THE COURT:  Well, if you want to brief it, that's

24  fine, but I'm governed by the Federal Rules of Civil Procedure.

25          MR. BRODY:  Yes, and the Federal Rules of Civil

77

1   Procedure are very explicit that a privilege log only needs to

2   -- should not reveal information itself privileged or

3   protected.  And so consequently --

4           THE COURT:  No, but you know, you can have something

5   like analysis of -- for descriptions, you know, I'm talking

6   hypothetically.  I don't know what the documents say, but you

7   know, analysis of legal issues under the 34 Act, analysis of

8   legal issues under the 33 Act, or analysis of Yorkville's

9   compliance with the 33 Act.

10          MR. BRODY:  If we're having --

11          THE COURT:  That doesn't disclose to them anything

12  more than what's already in the complaint and it allows for an

13  intelligent assessment of whether or not the document is

14  privileged.  And you know, I'm -- and I think, you know, the

15  individuals who are the authors and recipients needs to be

16  provided.

17          MR. BRODY:  Your Honor, with respect to the names of

18  the individuals and --

19          THE COURT:  Yes.

20          MR. BRODY:  First of all, they never came to us and

21  said we want the names of the individuals in the Netherlands or

22  in the UK who were involved in this.  But I can't see, and I've

23  thought about this a lot, I can't see how possibly the name of

24  an individual who works for some financial, you know,

25  securities organization in the Netherlands is going to have a

78

1  bearing on what the privilege is.  If the email --

2          THE COURT:  Well, it may have a bearing on the

3  attorney-client privilege if you disclose it --

4          MR. BRODY:  But we're not asserting the attorney-

5  client privilege.

6          THE COURT:  If you disclose it to someone outside the

7  attorney-client relationship, usually the attorney-client

8  relationship disappears.

9          MR. BRODY:  Right, but we're not asserting the

10  attorney-client.  This is not the attorney-client privilege

11  that we're asserting.  It's for the most part though --

12          THE COURT:  Well, some of them you've got the

13  attorney-client privilege.

14          MR. BRODY:  I think there's a work product doctrine

15  but I don't --

16          THE COURT:  Yes.  And if you disclose it to a person

17  --

18          MR. BRODY:  -- see attorney-client privilege,

19          THE COURT:  -- if you disclose it to person of

20  adverse interest, that usually blows the work product

21  protection.

22          MR. BRODY:  Right.  But how is disclosure to any

23  other foreign regulatory organization submitting it to --

24          THE COURT:  Look, if you want to fly with -- if you

25  want to go with what you have, you know, I will rule on it

79

1  based on what you have.

2           MR. BRODY:  I mean I --

3           THE COURT:  It doesn't seem sufficient to me.

4           MR. BRODY:  With respect to the -- we are happy to

5  put the names of the individuals, but with respect to the

6  subject matter of what the emails refer to, what the

7  communications refer to, we would respectfully request further

8  briefing on this issue, Your Honor, because this is a highly

9  sensitive subject and there are numerous statutes that are in

10 play, and those statutes are implicated by the Federal Rules

11 which govern privilege.

12          THE COURT:  Well, if you want to brief it, you can

13 brief it.  Tell you what, let's have formal motion practice on

14 the adequacy of the privilege log.  All right.  You want to

15 move on it first?

16          MR. SOHN:  Certainly.

17          THE COURT:  Okay.

18          MR. SOHN:  Do we need the same schedule that we did

19 on the other?

20          THE COURT:  Whatever you want to make it.

21          MR. BRODY:  Yeah, we'd respect --

22          THE COURT:  Whenever you want to make it within the

23 discovery schedule, okay?

24          MR. SOHN:  Okay.

25          MR. BRODY:  We'd respect additional time with that,

1  Your Honor, beyond those two weeks.

2          THE COURT:  They're going to move first.

3          MR. SOHN:  All right.  So we'll move and --

4          MR. BRODY:  Fine.

5          MR. SOHN:  -- we'll notice it and we'll make it

6  before Your Honor?

7          THE COURT:  Yes, I've got it for GPT so it's going to

8  be before me.

9          MR. SOHN:  Okay.

10         THE COURT:  All right.  So they're going to make --

11 the defendant's going to make the motion and is going to make a

12 formal motion and then the SEC will have a chance to respond.

13         MR. BRODY:  Thank you, Your Honor.

14         THE COURT:  Okay?  All right.  Mr. Hampton, these go

15 back to Mr. Sohn.  I think they go back to Mr. Sohn.  I'm not

16 sure who handed them up.  Maybe some came from the SEC --

17         MR. SOHN:  They came from me but --

18         THE COURT:  -- and some came from -- okay.  All

19 right.

20         There is a treatise entitled "Civil Practice in The

21 Southern District of New York which addresses the issue of

22 privilege logs and the adequacy of privilege logs which I'm

23 sure your libraries have.

24         All right.  Anything else from the SEC?

25         MR. BRODY:  One other thing, Your Honor, while we're

81

1   here.  We received a call this week from a lawyer, counsel

2   representing one of the individual investors who informed us

3   that defendants had reached out to him to set a deposition

4   date.  We would respectfully request that the depositions don't

5   take place until we've received the documents from the

6   defendants so that -- because otherwise we're going to be

7   taking this person's deposition twice.  We'd like to get the

8   document discovery before we do the depositions, Your Honor.

9              THE COURT:  What's the discovery cutoff set in this

10  case?

11             MR. BRODY:  I think November of next year.

12             THE COURT:  Mr. Sohn?

13             MR. SOHN:  I think that we can work this out.

14             THE COURT:  Have you discussed it with Mr. Sohn

15  first?

16             MR. BRODY:  No.  We just learned about this from --

17             THE COURT:  Why don't you discuss it with Mr. Sohn

18  and see if you can come up to some agreement.  If you can't,

19  you can send me a letter and I'll resolve it.

20             MR. BRODY:  Thank you, Your Honor.

21             THE COURT:  Okay.  Hope you all have a good holiday,

22  good New Year's.

23             MR. SOHN:  You too.

24                         *  *  *  *  *  *

25

82

1        I certify that the foregoing is a court transcript from an

2    electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5                        _____

6                                    Mary Greco

7    Dated:   December 27, 2013