```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3      ------------------------------------X
                                          :
4      SECURITIES AND EXCHANGE COMMISSION, :
                                          : 12-CV-7728 (GBD)
5                     Plaintiff,          :
                                          : November 5, 2013
6               v.                        :
                                          : 500 Pearl Street
7      YORKVILLE ADVISORS, LLC, et al,    : New York, New York
                                          :
8                     Defendants.         :
       ------------------------------------X
9

10          TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY DISPUTES
                 BEFORE THE HONORABLE HENRY B. PITMAN
11                 UNITED STATES MAGISTRATE JUDGE

12
       APPEARANCES:
13

14     For the Plaintiff:          TODD D. BRODY, ESQ.
                                   STEPHEN HOLDEN, ESQ.
15                                 U.S. Securities and Exchange
                                   Commission
16                                 3 World Financial Center, Rm. 400
                                   New York, New York 10281
17

18     For the Defendants:         JOSHUA S. SOHN, ESQ.
                                   DLA Piper US LLP (NY)
19                                 1251 Avenue of the Americas
                                   New York, NY 10020
20

21

22     Court Transcriber:          SHARI RIEMER
                                   TypeWrite Word Processing Service
23                                 211 N. Milton Road
                                   Saratoga Springs, NY 12866
24

25


       Proceedings recorded by electronic sound recording,
       transcript produced by transcription service
```

2

1          THE CLERK:   SEC v. Yorkville Advisors.

2          Counsel, please state your name for the record.

3          MR. BRODY:   Todd Brody and Stephen Holden for the

4     plaintiff, SEC.

5          MR. SOHN: Good afternoon, Joshua Sohn and David Sach

6     from DLA Piper for the defendants.

7          THE COURT:   All right.  Good afternoon all.   There

8     are several discovery disputes that have been referred to me

9     by Judge Daniels, the first of which is framed -- well, the

10     first of which is framed in the correspondence from plaintiff

11     dated October 8.  This is the application for the interview

12     notes.  I've got a letter from the plaintiffs dated October 8th

13     and a response from the SEC dated October 11.  Why don't I

14     hear from plaintiff on this first and then I'll hear from the

15     SEC.  I'm sorry.  Why don't I hear from defendant on this

16     first and then I'll hear from the SEC.

17          MR. SOHN: Thank you, Your Honor.  In a nutshell,

18     what we're trying to do is not even level the playing field,

19     just to make it a little bit less uneven.  Certainly in a

20     civil litigation with the SEC the defendant is at a pretty

21     profound disadvantage in terms of flow of information and --

22          THE COURT: I don't know that's the case.

23          MR. SOHN: Well, the SEC here has taken upwards of 40

24     interviews of individuals, has gotten somewhere around a

25     million documents from defendants, has --

3

1       THE COURT: With respect to the documents if they've

2 gotten them from defendants by definition defendants have them

3 too.

4       MR. SOHN: That is undoubtedly true, Your Honor.

5 Certainly in the complaint they have included 18 allegations

6 that are verbatim quoted from interviews with people that the

7 defense hasn't had access to.  There's no way to test the

8 accuracy of those quotes or those allegations.

9       THE COURT: Sure there is.  You can go out and depose

10 those individuals, can't you?

11       MR. SOHN: We may be able to certainly but the

12 problem here, Your Honor, is that the SEC has identified about

13 30 people and essentially it's a chase on the defendants to

14 track all those people down.  Many of them are in Europe, will

15 not certainly voluntarily talk to us as they have with the

16 SEC.  The SEC has --

17       THE COURT: How do we know that?  How do we know that

18 they won't voluntarily talk to you?

19       MR. SOHN: We've reached out to many of them.  More

20 fundamentally the SEC hasn't actually established that these

21 notes are privileged in a way that Judge Dolinger set forward

22 in the SEC v. Thrasher opinion.

23       THE COURT: What was the subject matter of the

24 dispute in Hickman v. Taylor?

25       MR. SOHN: I'm sorry.

4

1          THE COURT: What was the subject matter of -- Hickman

2    v. Taylor, the Seminole case on work product, Supreme Court

3    1947.  Hickman v. Taylor.  You never heard of Hickman v.

4    Taylor?

5          MR. SOHN: I have, Your Honor.  I'm not -- I don't

6    have the facts of that case in my --

7          THE COURT: They were attorney's interview notes.

8    That was the subject matter with respect to which the Supreme

9    Court first recognized the work product doctrine.  So I

10   mean --

11         MR. SOHN: The issue here though, Your Honor, is that

12   as Judge Dolinger said in Thrasher it's not correct that the

13   SEC can just take a position that the notes are privileged

14   without establishing when they were made, how they were made,

15   who made them, all of those -- the fundamental elements,

16   prerequisites of establishing privilege.  That hasn't happened

17   here but there's no way to even test that assertion.

18   Certainly to the extent that they are just factual recitations

19   again as Thrasher holds and as Your Honor is certainly aware

20   the factual information is also not privileged.

21         THE COURT: Wait a minute.  Are you talking about

22   privilege or work product?

23         MR. SOHN: Well, certainly privilege but we haven't

24   gotten --

25         THE COURT: No.  I mean look, if they're not --

5

1   there's a difference between the attorney client privilege and

2   the work product protection.   If I represent the plaintiff in

3   a personal injury action, someone is run by -- run over by a

4   car in front of the courthouse and I'm the attorney and I go

5   out and I talk to the gentleman who runs the coffee wagon in

6   the morning and the gentleman who runs the coffee wagon in the

7   morning tells me -- talks to me and says yeah, the car ran a

8   red light and hit your client, your client had the green

9   light, his statements to me are protected by the work product

10  -- by the work product doctrine.   There's nothing that

11  prevents the attorney for the defendant in this hypothetical

12  case for going out and talking to the same guy and getting the

13  same answers.

14        The fact that the information may be factual doesn't

15  take it outside the work product doctrine.   It's not a

16  privileged communication because I don't represent the

17  gentleman that runs the coffee wagon so it's not attorney

18  client privilege but it's the same as -- the same facts as

19  were at issue in Hickman v. Taylor.

20        MR. SOHN: Understood, Your Honor, but two

21  distinguishing facts there.   One is just like in Thrasher the

22  SEC hasn't established the basis of either attorney client

23  privilege or work product because we don't know when in the

24  sequence of the investigation these notes were taken, whether

25  it was in fact in anticipation of litigation or something else

6

1    and Judge Dolinger talks about other purposes that the SEC may

2    conduct these interviews and that it may be a policy thing, it

3    may be a recommended administrative action.  It may be all

4    sorts of other things other than in anticipation of

5    litigation.  So we don't know that certainly.  And as far as

6    whether it's privileged or not that's a separate inquiry.

7              So without even knowing --

8              THE COURT: Unless they're asserting that they

9    interviewed clients I don't know how the SEC could have a

10   client but they certainly have work product protection.

11             If the issue here is you want an affidavit

12   concerning the circumstances surrounding the gathering --

13   surrounding the interviews you're probably entitled to that

14   but I'm not sure we're at the stage where production gets

15   ordered.

16             MR. SOHN: Well, I think a couple of things to that,

17   Your Honor.  One is certainly the burden on us to go out and

18   track all these people down around the world to test the

19   assertions versus the ability --

20             THE COURT: That's always the case.  I mean look, if

21   you get work -- but I mean the purpose of the work product

22   doctrine is to encourage attorneys to try and prepare the

23   cases on their own.  It's not on their adversaries.  The fact

24   that you got the burden of going out and talking to the

25   witnesses, if that were enough to pierce the work product

7

1  doctrine the work product doctrine wouldn't exist.

2          MR. SOHN: Undoubtedly, Your Honor, but this is a

3  little bit different in a few ways.  One is when the SEC takes

4  an on the record interview of someone as part of their

5  investigation, there's a transcript and that's exchanged in

6  discovery.  The SEC then can determine whether they're going

7  to do an on the record or off the record and sort of

8  manipulate that process a bit and --

9          THE COURT: As any attorney can.

10          MR. SOHN: Well, the SEC is certainly different than

11  another litigant then.

12          THE COURT: I don't know that's the case.  The

13  statute and the lobby is blindfolded for a reason.

14          MR. SOHN: Well, once we get into this courtroom,

15  Your Honor, but certainly before that point they have a

16  tremendous ability to gather information and to get people to

17  talk to them who would not otherwise talk to other parties.

18          THE COURT: It depends on who the person is.

19          MR. SOHN: That's also certainly true.

20          THE COURT: I suspect Mr. Cohen probably is more

21  willing to talk to his attorney than the SEC.  Some yes, some

22  no.  I'm not sure it's susceptible to that broad a

23  generalization.

24          MR. SOHN: That may be -- the point here is that the

25  burden -- it's a relative burden also.  It's not that -- as I

8

1   understand the standard of a substantial need is not that it's

2   impossible for us to go out and get all of this information

3   and to talk to all these individuals but --

4         THE COURT: No, but you've got to show more than that

5   it's easier to get it from the SEC because if that meets the

6   substantial hardship standard work product ceases to exist.  I

7   agree with you, it doesn't have to be impossible but you've

8   got to show more than just it's easier if we get it from the

9   SEC than if we do our own legwork.

10        MR. SOHN: Absolutely, Your Honor, and I guess there

11  are a couple of things.  One is that we're in a position where

12  the SEC hasn't established the applicability of either work

13  product or attorney client privilege.

14        THE COURT: But their assertion hasn't been

15  challenged until your letter and I agree with you, the burden

16  is on them to prove the elements of the protection.  I agree

17  with you that it's on them to prove the elements of the

18  protection but then I think the remedy at this stage is to

19  order them to produce -- to prepare and submit an affidavit

20  setting forth the circumstances under which the interviews

21  were gathered or conducted.

22        MR. SOHN: Understood.  The one case that -- SEC v.

23  Stenell Management where the Northern District of Illinois

24  ordered the SEC to provide certain notes where the witnesses

25  that were interviewed by the SEC refused to talk to counsel on

9

1    the other side and it's the same situation that we have here.

2            THE COURT: Who has refused to talk to you?

3            MR. SOHN: There are a handful --

4            THE COURT: In that regard I'm not sure the letter

5    makes that record on your behalf.

6            MR. SOHN: Understood, Your Honor.  That's certainly

7    something that we could supplement if it would make a

8    difference.

9            THE COURT: The other question is you can depose them

10   is that an adequate substitute for an interview.

11           MR. SOHN: Well, there's a tremendous cost involved.

12   Certainly having to depose these 30 people and in the interest

13   of streamlining discovery here if we were able to know going

14   in who of those 30 that the SEC has identified have relevant

15   things to say which would be indicated by the factual

16   substance of those notes --

17           THE COURT: Go ahead.

18           MR. SOHN:   -- we would be able to streamline

19   discovery pretty dramatically probably and avoid going around

20   the world taking depositions.

21           THE COURT: Haven't 26(a)(1) disclosures been made

22   here?

23           MR. SOHN: Yes, they have.

24           THE COURT: So they've indicated who they're going to

25   rely on already in the 26(a)(1).  They've identified the

10

1    witnesses they're going to rely on to support their claims in

2    the 26(a)(1).

3              MR. SOHN: They've identified people that they

4    believe have knowledge.

5              THE COURT: 26(a) -- let's look at 26(a)(1).

6                        [Pause in proceedings.]

7              THE COURT: 26(a)(1)(A), except as exempted by Rule

8    26(a)(1)(B) or as otherwise stipulated or ordered by the court

9    a party must without awaiting a discovery request provide to

10   the parties -- provide to the other parties the name and if

11   known the address and telephone number of each individual

12   likely to have discoverable information along with the

13   subjects of that information that the disclosing party may use

14   to support its claims or defenses unless the use would be

15   solely for impeachment.

16             So I mean they've got an obligation to disclose the

17   witnesses they're going to rely on to support their claims.

18   So you already know -- I mean you should already know that.

19   26(a)(1) disclosures have been made.

20             MR. SOHN: Your Honor, we do have a list of 27 people

21   that they've identified as having knowledge.

22             THE COURT: Right.

23             MR. SOHN: I don't know that these are the universe

24   that they intend to rely on all 27 of these people, if it's a

25   sub-universe or whatever else.

1          THE COURT: If they're not disclosed they're

2   precluded from calling them.

3          MR. SOHN: Understood but there may be -- they may

4   intend to rely on less than all certainly and in the interest

5   of streamlining discovery it would be great if we could

6   certainly know that fact but understood who of these people

7   have some information versus who they're going to rely on, who

8   they're quoting in the complaint here so that we can also test

9   those allegations that are quoted verbatim from supposedly

10  these interview notes.

11         THE COURT: Well, go out and talk to them.

12         MR. SOHN: We've reached out.

13         THE COURT: How many of the 27 have you reached out

14  to and how many of the 27 have refused to speak with you?

15         MR. SOHN: We have reached out to -- one second, Your

16  Honor.

17                   [Pause in proceedings.]

18         MR. SOHN: We've reached out to so far eight of the

19  18 and no one has called us back.

20         THE COURT: Eight of the 18 or eight of the 27?

21         MR. SOHN: Eight -- there are 18 allegations in the

22  complaint that are attributed with quotations to individuals

23  who are these notes of interviews for.  So we've reached out

24  to eight of them and have yet to have any of them agree to

25  talk to us.

1          It just seems, Your Honor, that if the SEC is going

2    to quote them verbatim in a publicly filed document and then

3    say well, you can't see the notes where those quotations came

4    from that seems certainly unfair.

5          THE COURT: Well, anything else you want to tell me

6    before I hear from the SEC?

7          MR. SOHN: That's it, Your Honor.  Thank you.

8          MR. BRODY: Your Honor, before addressing some of the

9    substance I just want to address some of the facts of what he

10   said.  Mr. Sohn is relatively new to the case and he may not

11   know exactly what's happened in this litigation but relatively

12   shortly after our complaint was filed defendant's counsel

13   asked us to identify the individuals who we quoted in the

14   complaint and we did so.  That's not a list of 17 people or 26

15   people.  It's a short list, Your Honor.  Moreover --

16         THE COURT: How many people are -- is it eight people

17   quoted in the complaint?

18         MR. HOLDEN:  I think it's less than that.

19         MR. BRODY: I think less.  I thought it was like six.

20   Of the quotations that appear in the complaint, the vast

21   majority, I think except one are not from interview notes.

22   They're from documents that we produced and documents that

23   were identified to the defendants where the defendants took

24   notes -- sorry, where investors took notes of conversations

25   they had with the defendants, and we're quoting from those

13

1   documents, not from witness interview notes.

2           So to the extent that Mr. Sohn is saying that

3   they're entitled to challenge what's in our witness interview

4   notes it has no bearing on the quotations that are in the

5   complaint because the quotations in the complaint aren't from

6   interview notes.  That's kind from a factual standpoint.

7           I think there's a general agreement between the

8   parties that lawyer interview notes are privileged.  We

9   certainly take that position and they've taken that position

10  because they've argued that when we asked for the production

11  of documents concerning an internal investigation.  They said

12  they're not going to turn over interview notes because those

13  interview notes are privileged.

14          So it's not just -- so the fact that they've come in

15  here to this court and said turn over your interview notes

16  when at the same time they refused to provide their own

17  interview notes seems ridiculous.

18          THE COURT: More importantly -- as I was telling Mr.

19  Sohn I mean more importantly from my point of view in Hickman

20  v. Taylor the subject were lawyer's interview notes and the

21  Supreme Court has held that lawyer's interview notes were work

22  product and --

23          MR. BRODY: We agree with you, Your Honor.  There's

24  no question.

25          THE COURT: No offense but the Supreme Court is more

14

1  compelling to me than what attorney says.

2          THE COURT: There's no question that's the case.  So

3  why we're here arguing about interview notes seems a little

4  silly to us but with respect to need they've never

5  demonstrated that witnesses are available, dead or sick.

6  They've never demonstrated that memories have faded and

7  outside of this representation here where they've come into

8  court and said they've tried to reach people and those people

9  haven't gotten back to them that's the only claim they've ever

10  made that somehow they have a need.

11          We would note that these witnesses are their

12  investors who are particularly within their control and we

13  know that they reach out to these investors all the time

14  because when we served depo -- when we served document

15  subpoenas on them they immediately turned around and sent

16  letters to all those investors encouraging those investors not

17  to send documents to us misquoting the complaint and

18  misstating what Judge Daniels opinion were.  So we know they

19  reach out to their investors all the time.

20          Any prejudice in this case --

21          THE COURT: Let me ask you a question.  Do we agree

22  that at least at this point the -- again, the issue hasn't

23  been raised until defendant's October 8 letter but do you

24  agree that you bear the burden of establishing the elements of

25  work product protection and that part of that is showing that

1   these interviews were in fact conducted in contemplation of

2   litigation?

3           MR. BRODY: I think any -- I agree we have the burden

4   but I think as a prima facie case, Your Honor, all

5   documents -- all interviews that we do in the course of an

6   investigation --

7           THE COURT: You don't come in here with any

8   presumption.  I make no assumption as to why anyone is

9   interviewing anybody.

10          MR. BRODY: Sure.

11          THE COURT: I mean we start at ground zero.

12          MR. BRODY: Okay.  If Your Honor wants -- if Your

13  Honor thinks that an affidavit from us saying that the

14  interviews were taken during the course of an investigation

15  that led up to the filing of this complaint we can provide

16  such information but I think it's clear that upon that showing

17  the notes are covered by the work product privilege and

18  nothing more is required.  I think that to the extent there's

19  a burden that's the burden that the SEC would have to reach in

20  this case.  That's clearly the -- what courts in other cases

21  involving SEC interview notes have held.

22          So I think if what Your Honor wants from us is an

23  affidavit saying that these are interviews taken during the

24  course of the investigation and when they were taken we can

25  provide that information but I think at that point the burden

16

1   -- that's the extent of the burden that we would have to meet

2   and at that point they would have to demonstrate that there's

3   some need and they cannot make -- there's no possible way that

4   they can make that showing, Your Honor.

5            THE COURT: I don't know if all the interviewees are

6   still alive or if they've been hit by 16 ton weights or

7   something else.  I don't know.  I can't say they can't make

8   the showing of substantial need.

9            MR. BRODY: Well, you're right.  If someone died

10  perhaps they can make the showing but I don't think they've

11  never come in and said that anyone has died in this case.  Any

12  memories that may have faded are the result of the fact that

13  they sat here for the past -- for over a year, sought a stay

14  from the court precluding that discovery -- of third party

15  state claims.

16           THE COURT: We may be getting ahead of ourselves in

17  that regard.

18           Mr. Sohn, is there anything else you want to tell

19  me?

20           MR. SOHN: Not on this topic, Your Honor.

21           THE COURT: With respect to the interview notes, if

22  the interviews were conducted in contemplation of litigation

23  as they were in Hickman v. Taylor they are protected by the

24  work product doctrine.

25           With respect to non opinion work product there are

17

1    circumstances under which non opinion work product can be

2    gotten if a party shows substantial need.

3           But with respect to both the applicability of the

4    privilege and with respect to the applicability of any

5    exceptions to the privilege the court needs more than

6    counsel's proffer that each side has to make a factual

7    showing.  The proponent of the protection, in this case the

8    SEC, has to make a factual showing of the elements -- that the

9    elements of the work product doctrine are met and if defendant

10   wants to try to pierce that protection the defendant has to

11   make a factual showing of -- a specific factual showing of

12   substantial need.

13          At this point I think what the SEC -- admittedly the

14   SEC hasn't submitted factual evidence up to this point because

15   up until defendant's letter of October 8th there was no

16   challenge to the assertion of work product and no reason for

17   the SEC to submit the affidavit.  But I think at this point it

18   is incumbent upon the SEC to submit an affidavit setting forth

19   the facts necessary to establish that the interview notes are

20   in fact protected by the work product doctrine.

21          How much time does the SEC want to do that?

22          MR. BRODY: 21 days, Your Honor.  The only reason I'm

23   asking for that is because I have a hearing that's about to

24   start in another matter.

25          THE COURT: All right.  So the SEC is to -- you don't

18

1  have to file it but -- well, maybe it's better you file.

2  Serve and file an affidavit by November 26th establishing the

3  factual bases for the assertion of work product.

4          I presume you're not -- I shouldn't presume.  You're

5  not asserting attorney client privilege with respect to any of

6  these interviews, are you?

7          MR. BRODY: To the extent that our opinions are

8  reflected in those documents, Your Honor, and those were

9  opinions that were presented to our client and we have a

10 client, our client is the Commission.

11         THE COURT: But these are witness -- we're talking

12 about witness interview notes.  We're not talking about one

13 SEC attorney talking to another SEC attorney or a member of

14 the Commission.

15         MR. BRODY: I understand that but to the extent that

16 our opinion -- that things beyond facts are written in those

17 interview notes and those opinions were then transmitted to

18 our client those would be covered by the attorney client

19 privilege as well.

20         THE COURT: Wait a minute.  You're telling witnesses

21 what you're telling -- you're hearing communications?

22         MR. BRODY: No, our notes.

23         THE COURT: No, no.  First of all, this is about the

24 first time you've done it.

25         MR. BRODY: Sorry.

19

1          THE COURT: Don't speak over me, please.  Okay?

2          MR. BRODY: Sorry, Your Honor.

3          THE COURT: Don't do it.

4     Are you telling me you've told witness -- you shared

5  with witnesses privileged communications with your client?

6          MR. BRODY: No, Your Honor, I'm not saying that at

7  all.

8          THE COURT: Then what are you --

9          MR. BRODY: What I'm saying is that attorney notes --

10  of attorney interviews don't necessarily only reflect what a

11  witness said during that interview.  It also may reflect the

12  attorney's own thought processes and the attorney's own

13  opinions about what was said which information was provided to

14  our client, the Commission.

15          THE COURT: Well --

16          MR. BRODY: So to the extent --

17          THE COURT: Opinion work product is not discoverable

18  under any circumstances but if a witness says Joe Blow killed

19  Richard Roe and the attorney who's conducting the interview

20  says it looks like Joe Blow is guilty of murder in the second

21  degree that's opinion work product and is not discoverable

22  under any circumstance but it's not an attorney client

23  communication.  It's not an attorney client communication.

24  Again, we're talking about theoretical things.  The attorney's

25  opinion, the interviewing attorney's opinion is not an

20

1   attorney client communication even if he subsequently gives it

2   to the client but it's protected for a different reason.  It's

3   still not discoverable but it's not because it's an attorney

4   client communication because it's not an attorney client

5   communication.

6           None of the witnesses -- you're not asserting any of

7   the witnesses that you spoke with are clients of the SEC, are

8   you?

9           MR. BRODY: No, Your Honor.

10          THE COURT: Okay.  So you're going to submit your

11  affidavit on the 26th.

12          MR. BRODY: Yes, sir.

13          MR. SOHN: Your Honor, one more point on that.  If we

14  can just ask that in the affidavit the SEC confirm that all

15  those notes were kept confidential and not shared with anyone

16  outside of the agency, that sort of thing that would --

17  because they're not appearing on a privilege log as it stands

18  right now.  Just to make sure that --

19          THE COURT: The waiver rules for work product are

20  different than the waiver rules for attorney client and even

21  if they're disclosed outside of the SEC that does not

22  necessarily result in a waiver.  Work product is waived when

23  either a testimony or use is made of the work product notes

24  itself -- themselves or if they're disclosed in a manner that

25  increases the risk of disclosure to a party of adverse

1  interest.  The waiver by disclosure rules are different for

2  work product than they are for attorney client.

3          MR. SOHN: Understood, Your Honor.  I just -- it

4  seems like something that they should include in that

5  affidavit.

6          THE COURT: Don't you have a -- isn't there an index

7  of documents being withheld on the ground of privilege?

8          MR. SOHN: There is, Your Honor, and the way that

9  it's been put together so far there's absolutely nothing in

10  there that suggests that it includes these notes.  There are

11  no entries that I've seen.  There's a category that says email

12  and then there's a parenthesis that says 82, there's 82

13  emails.  It doesn't really say what it is, who it is, anything

14  like that.

15          So to answer your question we do have privilege logs

16  but there's nothing in it that would give us any clue as to

17  where those notes fall.

18          THE COURT: Just one second.

19                  [Pause in proceedings.]

20          MR. BRODY: Yes, Your Honor.  This case in addition

21  to being governed by the federal rules is also governed by the

22  pilot rules on complex litigation and there are certain

23  documents that presumptively don't have to be listed on a

24  privilege log and that includes internal memoranda.  So

25  internal memoranda such as this which would be interview notes

22

1   do not need to be included on a privilege log which is why

2   they don't appear on our log, and that has been explained to

3   the defendants.

4           THE COURT: Well, the affidavit probably should

5   include anyone outside of the SEC to whom the notes have been

6   disclosed and it may be a null list but if they've been

7   disclosed to anyone outside of the SEC that should also be

8   included in your affidavit.

9           MR. BRODY: Your Honor, when you say disclosed,

10  disclose the existence of them or disclose them in substance?

11  I don't quite -- for example --

12          THE COURT: Well, disclose the substance of them.

13          MR. BRODY: Thank you.

14          THE COURT: I mean -- okay?

15          MR. BRODY: Yes.

16          THE COURT: Anything else on the witness notes from

17  either side?

18          MR. SOHN: Not from us, Your Honor.

19          MR. BRODY: No, Your Honor.

20          THE COURT: The next issue is the 30(b)(6) notice.

21  In that regard I have a letter from the SEC dated October 29

22  and a letter from DLA Piper dated November 1.  I take it

23  that's the universe of correspondence with respect to the

24  30(b)(6) notice.

25          MR. BRODY: Yes, Your Honor.

1          THE COURT: Why don't I hear from the SEC first on

2    this issue and then I'll hear from defense counsel.

3          MR. BRODY: Thank you very much.

4          THE COURT: It might be helpful if you start by

5    telling me a little bit about the aberrational performance

6    inquiry tool.  Maybe you can give me two or three minutes on

7    what the API does and what -- that might help me.  Go ahead.

8          MR. BRODY: Mr. Holden is going to address that, Your

9    Honor.

10          THE COURT: Okay, fine.

11          MR. HOLDEN: Your Honor, the aberrational performance

12    inquiry -- I'll give a high level description.  I don't want

13    to get into anything that might be part of the deliberative

14    process privilege but it's an initiative brought on by the

15    enforcement division of the SEC to identify hedge funds whose

16    reported performance fell outside of their expected returns

17    based on their peer groups using a number of analyses and

18    statistical metrics.  The enforcement division along with

19    other divisions of the SEC made recommendations to senior

20    officials in the enforcement division regarding hedge funds

21    that fell outside of their expected norms.

22          THE COURT: Is it fair to say that the product of the

23    API yields entities of potential interest?

24          MR. HOLDEN: I would say that's a very fair

25    characterization.  The very purpose of the API was to identify

24

1   hedge funds that should be the subject of increased

2   investigations by the enforcement division staff.

3           THE COURT: I've looked at the complaint and I just

4   want to make sure I'm understanding the situation.  I think I

5   understand it but do we agree that there -- well, I presume

6   there's no dispute that because an entity triggers a positive

7   response under the API that that without more doesn't prove

8   anything?

9           MR. HOLDEN: That's correct, Your Honor.

10          THE COURT: So, in other words, you would never file

11  a complaint saying this entity should be subject to sanctions

12  or some conduct because they've come up as a positive hit on

13  the API?

14          MR. HOLDEN: That's correct, Your Honor.  The

15  complaint doesn't reflect any of that.

16          THE COURT: Sure.

17          MR. HOLDEN:  The complaint reflects the fact that

18  they falsely valued their investments and they made false

19  representations to their investors.

20          THE COURT: All right.  Go ahead.  Why don't I hear

21  from you on the 30(b)(6).  Go ahead.

22          MR. SOHN: Okay, Your Honor.

23          THE COURT: No, no.  Let me finish with the SEC on

24  the 30(b)(6) and then I'll -- I'm not sure the SEC has told me

25  everything they want to tell me.

1          MR. HOLDEN:  Thank you, Your Honor.  As we stated in

2    our letter because of the fact that the API doesn't concern

3    any of the claims that we brought nor does it concern any of

4    defenses that exist in this action it's simply not relevant

5    and therefore there should be no deposition on this case.

6          I would refer the court to a decision of Magistrate

7    Gary Brown in the Eastern District which was decided on March

8    24th of 2013 in which he decided a similar issue where the

9    defendants in that case requested that the SEC put on a

10   30(b)(6) witness to -- on the issue about whether the SEC had

11   brought the action within 180 days of a Wells notice as the

12   Dodd Frank says that the SEC should do.  So Magistrate Brown

13   when looking at that said well, it doesn't refer to any of the

14   claims in the complaint and it doesn't refer to any of the

15   possible defenses in this case because the failure to comply

16   with that 180 day rule that's not a statute of limitations and

17   consequently the case wouldn't be dismissed even if the SEC

18   didn't meet that standard.

19         So as a consequence Judge Brown said that --

20   quashed, granted the SEC's motion to quash that 30(b)(6)

21   deposition saying that it simply had no bearing on the case.

22   I think that is quite relevant and quite applicable to this

23   case where what the API showed or did with respect to

24   Yorkville has no bearing on the allegations of the complaint.

25   As I said before, the allegations of the complaint concern the

1   fraudulent valuations that were done by Yorkville and the

2   individuals and the fraudulent misrepresentations.  It would

3   be one thing if we came into court or if our complaint said a

4   prima facie case of fraud is made because they didn't meet

5   certain matrices and their performance is aberrational but we

6   don't allege anything along those lines.  We allege that they

7   just inflated their numbers and they made false

8   representations.

9          So it has nothing to do with this case.  All this is

10  really is a -- is the defendant's -- part of their continual

11  process to have the SEC do unnecessary work in this case and

12  to bog down the discovery process.  In addition --

13         THE COURT: The SEC is not going to be offering any

14  evidence concerning the API I presume.

15         MR. HOLDEN: We are not.

16         THE COURT: Okay.  Go ahead.

17         MR. HOLDEN: In addition, we think that the materials

18  concerning the API which -- and their application to Yorkville

19  are both covered by work product.  This was done by the

20  enforcement division.  The API is part of the enforcement

21  division.  It's not like some of their other cases for example

22  that they cite in their letter that relate to the Office of

23  Compliance and Inspections who performs a role that is

24  different from the role of the Division of Enforcement at the

25  SEC.  So we don't think those cases are applicable.

1          Moreover, it also involves the deliberative process

2     privilege and the concept of why the SEC decided to go forward

3     with an investigation about Yorkville is part of that

4     deliberative process that is also privileged, Your Honor.

5          I don't think I have anything further.

6          THE COURT: Okay.

7          MR. SOHN: Your Honor, this is going to come as no

8     surprise but we disagree.  First, the case about the testimony

9     on the 18 days from Wells I don't know what that has to do

10    with this case at all.  This case as we say in our November 1st

11    letter the SEC has issued press releases tying together their

12    complaint against Yorkville and the API.  The complaint

13    alleges that there is this fraudulent valuation.  The

14    complaint alleges a handful of portfolio companies that

15    Yorkville has alleged to have misrepresented the values of and

16    suggest that there are others.  We don't know what those are.

17         This API, whatever the analysis is there would

18    certainly seem relevant to whatever it is that gets to the

19    heart of whatever the SEC is complaining about and --

20         THE COURT: Well, isn't the compliance or violation

21    of both the statutes -- what's the SEC -- isn't that what the

22    SEC is complaining about?

23         MR. SOHN: Certainly.

24         THE COURT: If they have an investigative tool to

25    target entities of potential interest -- I mean the issue if

28

1  the case goes to trial is not going to be whether or not the

2  defendants here rang the bell under their investigative tool.

3  The issue is going to be whether or not the securities laws

4  were violated.

5          MR. SOHN: No question about it, Your Honor, but --

6          THE COURT: So I'm not sure how the details of their

7  investigative tool make a difference here.

8          MR. SOHN: Well, because it may certainly lead to the

9  discovery of admissible evidence about what else it is they're

10  complaining about, other portfolio companies.  If, for

11  example --

12          THE COURT: Other portfolio companies aren't involved

13  here.

14          MR. SOHN: I don't know that that's the case, Your

15  Honor.  I don't know that we're going to get all the way to

16  the end of this thing and they're never going to raise anybody

17  else.  They say in addition to others.

18          THE COURT: Well, what other companies are involved

19  in 12-CV-7728, this case?

20          MR. SOHN: In this case here?

21          THE COURT: Yes.

22          MR. SOHN: Well, the --

23          THE COURT: It's got to be relevant to this case to

24  be discovered.

25          MR. SOHN: The complaint doesn't say that we're only

1  looking at the seven portfolio companies that we've alleged

2  and you've misrepresented.  In fact, the discovery requests

3  that counsel for the SEC alluded to before that we've raised

4  an issue with asked for everything under the sun, every

5  portfolio company that Yorkville has a position in.  So we

6  don't know and that's what I was talking about before, Your

7  Honor, that it's different when you're against the SEC.  In a

8  normal civil case you can depose the plaintiff and say what

9  are you upset about, what are you -- how did we hurt you, what

10  are your damages, all of the elements of your cause of action.

11  Here we can't do that.  So we can only nibble around the edges

12  and say well, here's this metric which you've gone out to the

13  public in your press releases and said this is how we found

14  Yorkville, this is what tells us that Yorkville did something

15  wrong and we're going to go after them and we think that we're

16  entitled to understand that, to understand what it is that

17  triggered it.

18            THE COURT: If all they've proved is that Yorkville

19  rang the bell under the API, that it triggered whatever event

20  triggers an API score that warrants further investigation, if

21  that's all they prove have they proved anything that's going

22  to subject the defendants to liability here?

23            MR. SOHN: They haven't proven anything certainly,

24  Your Honor, but --

25            THE COURT: So whether you ring the bell or don't

1   ring the bell under the API doesn't impact the outcome of the

2   case.

3            MR. SOHN: Well, but it actually allows us -- if we

4   were to be able to obtain discovery about this it allows us to

5   understand their theory of the case better possibly.  It may

6   lead to discovery of other evidence and things that the SEC is

7   complaining about has issues with -- say, for example, that we

8   ring the API bell and it says that we're -- I don't know,

9   we're four percent off from our peers.  I don't quite

10  understand how that works but something like that and if you

11  look through the seven portfolio companies that they've

12  disclosed that would only get us to two percent.  So clearly

13  there's more in the wings and I would think that we're

14  entitled to know that.

15           THE COURT: But isn't still the question at the end

16  of the day whether you violate the securities laws?

17           MR. SOHN: Absolutely, Your Honor, and that's --

18           THE COURT: So I'm not sure -- what I'm trying --

19  what I don't understand is whether the API is a good tool, a

20  bad tool, whether you ring -- whether you do in fact ring the

21  alarm bell under the API or don't ring the alarm bell under

22  the API, whether they've applied the API properly or

23  improperly.  At the end of the day does any of that bear on

24  liability?

25           MR. SOHN: The short answer is I don't know because

31

1   we don't know anything about it but we do know that they're

2   out in public outing the API as some great indication of

3   something.

4           THE COURT: Well, but that doesn't make it relevant.

5           MR. SOHN: Understood but I think that in the context

6   of what we're talking about here it very well may lead to the

7   discovery of admissible and relevant information because it's

8   about whatever it is that they're doing to analyze whatever

9   the returns are which is exactly what they're complaining

10  about that we improperly inflated our returns and that's

11  exactly what they're focused on with the API.

12          THE COURT: Well, if you want to ask them -- if you

13  want to take discovery with respect to how they claim that

14  returns are improperly inflated can't you do that directly

15  without reference to the API?  I'm not -- I'm just not sure

16  how the API bears on liability here.

17          MR. SOHN: I'm not either but they seem to -- they

18  seem to keep telling the public in press releases that it does

19  somehow and that's what we're trying to figure out also.

20          So on the one hand they're going out into the public

21  domain and saying here's this API, it shows that Yorkville is

22  bad, they did all these things, we're relying on API.  Now

23  they're saying well, API has nothing to do with anything.  You

24  can't get discovery about that.

25          THE COURT: But what counts here is what they're

1    going to offer in evidence, not what they're telling the

2    public.

3              MR. SOHN: Understood but they're connecting them.

4    We're not.  This whole connection between their allegations

5    against Yorkville and API came from them, not from us.  So it

6    seems that we should be entitled to explore that a little bit

7    and to understand exactly what seems to be perplexing Your

8    Honor.

9              THE COURT: What's per -- what's perplexing me is how

10   it's relevant.  Administrative agencies or law enforcement

11   agencies make public statements about a lot of things for a

12   lot of different reasons but what's relev -- what is important

13   for discovery determination is whether it's relevant to the

14   material issues in the case and the material issue in the case

15   is whether or not the defendants violated any of the

16   securities laws, not whether they ring an alarm bell under the

17   API.  I think we agree that whether or not -- if all they

18   prove is that the defendants here rang the alarm bell under

19   the API it's defendant's verdict.  Agreed?

20             MR. SOHN: I certainly hope so, Your Honor.

21             THE COURT: So I'm not sure how the details of the

22   API really relate to any material issue in the case.

23             MR. SOHN: Well, even just looking at that blocked

24   quote in our November 1st letter, the SEC says performance that

25   is flagged as inconsistent with the funds investment strategy

1  or other benchmarks forms a basis for further investigation

2  and scrutiny.  So certainly whatever those warning bells are,

3  those flags are would certainly I think be relevant to what it

4  is that they're complaining about, what the elements of their

5  case are.

6          THE COURT: Yes, but it's not laid out in the 34 page

7  complaint?

8          MR. SOHN: It identifies some portfolio companies but

9  like I said it also suggests that there are more and other

10  things that they're complaining about.

11          THE COURT: If they don't disclose what else they're

12  complaining about in discovery I don't think Judge Daniels is

13  going to let it in.  I agree you're entitled not to be

14  surprised at trial.  You're entitled to understand what their

15  case is about but there's a 34 page complaint that lays out

16  their theory -- that lays out how they think you violated the

17  securities laws and that -- what triggers the investigation

18  here I'm hard pressed to see how that's relevant to anything.

19          Whether or not an investigation is triggered for

20  good cause or not good cause really doesn't make a difference.

21  What makes the difference is whether or not the defendants

22  violated the securities laws and even if -- let's assume for

23  purpose of argument that the API is baseless as a tool for

24  identifying targets.  Let's assume for purposes of argument

25  that it has assumptions built into it, however it works, and

34

1    that it's really not a good tool to identify targets or

2    entities of interest for further investigation.  The issue at

3    the end of day is still whether or not the defendants violated

4    the securities laws, not whether or not the facts that

5    initiated or the reasons that initiated the investigation were

6    valid reasons or not.

7            MR. SOHN: Well, actually, Your Honor, with that

8    example I would think -- I know that personally I would want

9    to know that.  If the matrix that the API relied on was

10   totally flawed that that would certainly be something that

11   would be relevant to our defense of the case and it would

12   probably be a way to get to resolution of this case because we

13   could point out to them --

14           THE COURT: How would it be a defense of the case?

15           MR. SOHN: Well, let's assume that whatever their

16   assumptions are about valuation and they're coming to us

17   saying you fraudulently misrepresented the value of this and

18   that is the product of the API calculator and it rang the bell

19   and said well, you've overstated your valuation by X and

20   you've taken incentive fees and all this that are derivative

21   of that.  But what we find out when we actually get into how

22   the API works is totally wrong and then in fact we haven't

23   miscalculated anything.  I would think that that certainly is

24   a relevant fact for --

25           THE COURT: Isn't the defense that you haven't

1    miscalc -- isn't your defense there that you haven't

2    miscalculated anything, not that the API is a bad tool?

3              MR. SOHN: Well, but it's both, Your Honor, because

4    here these are value securities that are not really traded and

5    there's a lot of assumptions built in.  So this is a difficult

6    case in that way.  So if we're able to knock out the

7    assumptions that lead them to conclude that they're misvalued

8    in the first place I would think it's absolutely relevant to

9    establishing liability at the end of the day.  If it's not

10   privileged I don't see why we can't get there.

11             THE COURT: There may be a privilege there too.

12   There may be an investigative law enforcement type privilege

13   there too but --

14             MR. SOHN: There may be but it seems clear the

15   evidence [inaudible] this point either.

16             THE COURT: Anything else you want to tell me?

17             MR. SOHN: That's all I have, Your Honor.  Thank you.

18             THE COURT: It seems to me that the API here really

19   is irrelevant.  What counts here is whether or not -- what's

20   important here is whether the defendants violated the

21   securities laws, not the validity of whatever mechanism the

22   SEC uses to identify targets of interest.  Whether or not the

23   API is valid, is flawed, is a good indicator of targets of

24   interest, is a bad indicator of targets of interest, none of

25   that really makes a difference.  What really makes a

36

1  difference at the end of the day is whether or not the

2  defendants violated the securities laws as I said before.

3  It's not whether or not they ring the bell under the API or

4  trigger an investigation under the API.

5          The situation is sort of analogous to what might

6  trigger a police investigation of a crime.  In commencing an

7  investigation -- in proving a defendant's guilt in a criminal

8  trial what counts is not the nature of the tip or the nature

9  of the source of the information that led law enforcement to

10 commence its investigation.  What counts is whether or not the

11 defendant committed the crime.  Even if the investigation is

12 started on the most flimsy of rumors, and I'm not saying the

13 API is or is not a flimsy tool here, but even if law

14 enforcement commences an investigation on the flimsiest of

15 rumors but the investigation leads to proof of guilt the fact

16 that it started on the flimsiest of rumors doesn't make a

17 difference and it's really immaterial and the flimsiness of

18 the rumors is not exculpatory.  What counts at the end of the

19 day is whether or not there is in a fact a violation of the

20 rule.  The reasons for the commencement of the investigation I

21 believe are irrelevant.

22          There may also be an issue here as to privilege but

23 I don't think I need to reach a privilege issue.  It seems to

24 me that the API and how the API was applied here and why the

25 SEC commenced the investigation really is irrelevant and I'm

37

1    going to quash the 30(b)(6) notice on relevance grounds.

2              Anything else from either side on any of the issues?

3              MR. BRODY: No, Your Honor.

4              MR. SOHN: No, Your Honor.

5              THE COURT: Thank you all.

6                        *  *  *  *  *

38

1      I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                              _____

6                                   Shari Riemer

7   Dated:  May 15, 2014

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25