UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :

                        Plaintiff,     :

                                :

         -against-            :

                                :

YORKVILLE ADVISORS, LLC, MARK    :
ANGELO, and EDWARD SCHINIK,     :

                                :

                Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM
DECISION AND ORDER**

12 Civ. 7728 (GBD)

GEORGE B. DANIELS, United States District Judge:

      The Securities and Exchange Commission ("SEC") brings this action against Defendants

Yorkville Advisors, LLC ("YA"), Mark Angelo, and Edward Schinik (collectively, "Defendants"),

asserting eight causes of actions in its complaint for alleged violations of: (1) Sections 17(a)(1),

17(a)(2), and 17(a)(3) of the Securities Act (against all Defendants); (2) Section 10(b) of the

Exchange Act and Rule 10b-5 (against all Defendants); (3) control-person liability under Section

20(a) of the Exchange Act (against Defendant Angelo); (4) Sections 206(1) and 206(2) of the

Investment Advisers Act (the "Advisers Act") (against YA and Defendant Angelo); (5) Section

206(4) and Rule 206(4)-8 of the Advisers Act (against YA and Defendant Angelo); (6) aiding and

abetting liability under Section 10(b) of the Exchange Act and Rule 10b-5 (against Defendants

Angelo and Schinik); (7) aiding and abetting liability under Sections 206(1) and 206(2) of the

Advisers Act (against Defendants Angelo and Schinik); and (8) aiding and abetting liability under

Section 206(4) and Rule 206(4)-8 of the Advisers Act (against Defendants Angelo and Schinik).

      The SEC asserts that, mainly between 2008 and 2009, Defendants fraudulently

misrepresented the value of fifteen of YA's investments and made a series of other fraudulent

misrepresentations concerning YA's internal procedures and financial health. On December 17,

2012, Defendants moved to dismiss the SEC's complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(6). (Mot. to Dismiss, ECF No. 15.) Defendants' motion was denied. (*See* Mot. to Dismiss Order, ECF No. 38.) Defendants now move for summary judgment under FRCP 56, (Mot. for Summ. J. ("MSJ"), ECF No. 189), and to preclude the testimony of the SEC's expert witness under Federal Rules of Evidence 702 and 403. (Mot. to Preclude, ECF No. 186.)

Defendants' motion to preclude is GRANTED with respect to those portions of the expert's testimony that constitute opinions of value, and DENIED in all other respects.

Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Defendants' motion for summary judgment is DENIED with respect to all claims against Defendant Schinik. However, the SEC may only proceed against Defendant Schinik for the Pluris Engagement Representation (*see infra* Section IV.C.ii.a.) Defendants' motion for summary judgment is GRANTED with respect to all claims against Defendant Angelo, except those claims requiring merely proof of negligence (Sections 17(a)(2), 17(a)(3), 206(2), 206(4), and Rule 206(4)-8) (collectively, the "Negligence-Based Claims"). However, the SEC may only proceed against Defendant Angelo for the December 2 Cash Statement (*see infra* Section V.B.iii.) and the Pluris Engagement Representation. Defendants' motion for summary judgment is DENIED with respect to all claims against YA. However, because YA's liability derives from that of Defendants Schinik and Angelo, the SEC may only proceed against YA on the same bases, as provided for in this Order, as it may against both Defendants Schinik and Angelo.

# I.   FACTUAL BACKGROUND[1]

## A.   Yorkville Advisors

YA is a New Jersey-based investment manager of a series of funds:  (i) YA Global Investments, L.P. (the "Fund"); (ii) YA Global Investments (U.S.) LP ("LP"); and (iii) YA Offshore Global Investment, Ltd. ("Ltd."). (Defs.' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), ECF No. 191 ¶ 15; Pl.'s Rule 56.1 Statement ("Pl.'s 56.1 Stmt."), ECF No. 206 ¶¶ 316, 319–20.) The Fund operates as the main fund, with LP and the Ltd. acting as the "feeder funds" that invest substantially all of their investment capital in the Fund. (Pl.'s 56.1 Stmt. ¶ 321.)  Yorkville Advisors GP, LLC ("GP") functions as the general partner of the Fund and LP. (*Id.* ¶¶ 317, 319.)

Defendant Angelo co-founded YA in January 2001, and has been its President and portfolio manager ever since. (*Id.* ¶ 322; Defs.' 56.1 Stmt. ¶ 17.) As portfolio manager, Defendant Angelo "is responsible for overseeing all aspects of the Fund's day-to-day operations from deal structuring, to investment decisions, to business development to trading, while continuing his emphasis on the preservation of the Fund's capital with low volatility." (Decl. of Caryn Schecthman in Support of MSJ ("Schecthman Decl."), ECF No. 192-24, at YAHV 000620.) Defendant Angelo is also the President and the Managing Member of the GP. (Pl.'s 56.1 Stmt. ¶ 371.)  In the period relevant to this action (2008 and 2009) (the "Relevant Period"), Defendant Angelo owned approximately 70% of YA and the GP. (Defs.' 56.1 Stmt. ¶ 18; Pl.'s 56.1 Stmt. ¶ 317.)  Defendant Schinik joined YA in December 2005 and serves as its Chief Financial Officer, Chief Operating Officer, and Chairman of its Valuation Committee ("VC"). (Defs.' 56.1 Stmt. ¶ 19, 21.)  He is also responsible for YA's accounting department and operational infrastructure. (Pl.'s 56.1 Stmt. ¶ 329.)

---

[1] All facts are not materially disputed unless otherwise noted.

During the Relevant Period, other key employees of YA included Jerry Eicke (Managing Member, responsible for YA's transaction pipeline and its team of corporate finance professionals), Troy Rillo (Senior Managing Director, involved in all aspects of portfolio management, deal structuring, and business development), Les Garrett (Managing Director and Head of YA's energy group), and James Carr (Vice President assigned to YA's special situations group). (*See* Pls.' 561. Stmt. ¶¶ 330, 331, 333, 335.)

**B.     YA's Investment Strategy**

YA focuses "primarily on providing alternative funding options for micro-cap and small-cap publicly traded companies, and to a lesser extent, private companies . . . ." (Schechtman Decl., Ex. 1 ("YA 2007 Private Placement Memorandum (PPM)"), ECF No. 192-1, at YAHV 003549.) The companies that YA generally invests in are either "start-up" companies or distressed public companies whose stocks are not regularly traded on securities exchanges. (*See id.* at YAHV 003564–68.) YA typically provides loans to these companies in exchange for straight equity, debt, and/or convertible instruments, including warrants, convertible debentures, and convertible preferred securities. YA profits from this strategy primarily by realizing return from the interest on the loans, and exercising its warrants and convertible instruments and selling them in the market. (*See id.*) Because YA's investment strategy centers on investing in distressed businesses in exchange for illiquid securities, its business inherently entails substantial valuation and financial risk, which YA makes known to prospective investors through numerous disclosures. (*See, e.g., id.*)

In exchange for managing the Fund, YA receives a management fee of 2% of the net worth of the Fund, and an incentive fee of 20% of the Fund's net income, which is paid to the GP. (Pl.'s 56.1 Stmt. ¶ 326.) The Fund's net worth is equal to the value of the Fund's investments, cash and

other assets, less its accrued liabilities and expenses. (YA 2007 PPM at YAHV 003556.) As a 70% owner of the GP, Defendant Angelo is entitled to receive 70% of the incentive fee. (*See, e.g.,* Schechtman Decl., Ex. 24 ("YA 2008 Due Diligence Questionnaire (DDQ)"), ECF No. 192-24, at YAHV 000617.) Defendant Schinik is paid a salary and a biannual discretionary bonus based on the performance of the Fund. (*Id.*)

During the Relevant Period, YA's investment process proceeded in the following manner: first, YA's in-house bankers would identify and source investment opportunities for the Fund, which they would then present to the Investment Committee. (*Id.* at YAHV 000629.) If the Investment Committee approved an opportunity, YA's legal team would conduct due diligence. (*Id.*) The Executive Committee would then review the opportunity and make the final determination as to whether YA should invest in the opportunity. (*Id.*) Defendants Angelo and Schinik were members of the Executive Committee, but not the Investment Committee. (*Id.* at YAHV 000627, 000629.)

## C.   The Fund's Fifteen Positions

During the Relevant Period, the Fund represented that it had investments in approximately 265 different companies ("Portfolio Companies") with close to $1 billion in assets under management. (Defs.' 56.1 Stmt. ¶ 16.) At the heart of this dispute are fifteen of those 265 positions (the "15 Positions") that the SEC claims YA fraudulently overvalued. (*See generally* Compl.; Pl.'s Opp'n to MSJ ("Opp'n"), ECF No. 196.) The 15 Positions accounted for approximately 7% of the total number of positions in the Fund, but 33% of the YA's total assets during the Relevant Period. (*See* Defs.' 56.1 Stmt. ¶¶ 24–25.)

During the Relevant Period, the majority of the Fund's investments, including the 15 Positions, were comprised of privately negotiated, customized securities ("Hard-to-Value

Assets"), such as convertible debentures, that were difficult to value because they were not publicly traded and had little to no market activity. (Defs.' 56.1 Stmt. ¶¶ 39–40.) Some of the 15 Positions were secured by collateral, while others were not. (*Id.* ¶ 41.)

## D.    YA's Valuation Committee

The VC had "overall responsibility for [YA's] valuation policy, determining pricing sources, pricing practices, including any reviews and re-pricing practices to help insure fair, accurate and current valuations." (Schechtman Decl., Ex. 39 ("YA 2008 Compliance Manual"), ECF No. 192-39, at VI-4; *see also* Schechtman Decl., Ex. 40 ("YA 2009 Compliance Manual"), ECF No. 192-40, at VI-4.) During the Relevant Period, Defendant Schinik was the Chairman of the VC, which also included Eicke and, at different times, either David Fine or Eric Hansen (YA's Senior Legal Counsel). (Defs.' 56.1 Stmt. ¶ 56.) YA's Chief Compliance Officer, Steven Goldstein, also attended VC meetings as an observer. (Pl.'s 56.1 Stmt. ¶ 355.) Defendant Angelo, however, was not a member of the VC.

In its compliance manuals, which were provided to investors and made available for access in a data room on YA's website, YA represented that the VC "meet[s] periodically but at least once a quarterly [sic] to review and monitor [YA's] valuation of its client's accounts." (YA 2008 and 2009 Compliance Manuals at VI-4.) In its DDQs, YA also represented that the VC "meets each month to re-evaluate the asset value of the underlying collateral of each of the Fund's positions . . . ." (*See, e.g.,* YA 2008 DDQ, at YAHV 000630.) The VC did, in fact, meet on a monthly basis to review at least a third of the Fund's positions, including the 15 Positions, and

reviewed all of its positions at least quarterly.[2]  (Defs.' 56.1 Stmt. ¶ 63.)  All VC members attended

every meeting of the VC, and the VC took regular minutes of its meetings.[3]  (*Id.* ¶¶ 68–69.)

YA's compliance manuals also stated that the Chairman of the VC (Defendant Schinik)

would "be responsible for the day-to-day monitoring of compliance with the pricing policy."

(YA 2009 and 2009 Compliance Manuals at VI-4.)  For securities for which independent pricing

information was readily available, "[YA] w[ould] utilize one or more independent pricing

services [such as a securities exchange or national securities market] . . . [i]n obtaining the

necessary values to calculate each client's Net Asset Value ('NAV')[.]"  (*Id.*)

For securities for which market quotations were not available, reliable, or reflective of the

security's market value, or where the agreed-upon valuation methodology for the security was not

appropriate, the Chairman and/or Portfolio Manager would request a revaluation of the security.

(*Id.* at VI-6.)  Whenever such a special valuation was necessary, the "Committee [would] convene

or appoint a third party valuation consultant to revalue the holdings in accordance with its policies

and procedures and such factors as they deem relevant . . . ."  (*Id.* at VI-6.)

**E.     YA's Valuation Policy for the Fifteen Positions**

Prior to 2008, YA valued its assets at the "lower of cost or market [value] until gains [were]

realized."  (Defs.' 56.1 Stmt. ¶ 80.)  This meant that YA recognized unrealized losses but not

unrealized gains in the value of its securities.  (*Id.* ¶ 81.)  Upon the adoption of the Financial

---

[2] The SEC argues that the VC did not conduct a "meaningful" review of the Fund's positions.  (Pl.'s 56.1 Stmt. ¶ 64.)  However, the SEC's evidence, consisting mainly of the deposition testimony of two YA employees, does not support its contention.  (*See id.*)  Further, neither YA's compliance manuals nor its DDQs during the Relevant Period made any representations regarding how "meaningful" the VC's review would be.

[3] The SEC argues that there is no evidence that the Chief Compliance Officer documented the circumstances requiring a special valuation and the reasoning supporting the valuation assigned by YA, as required by YA's compliance manuals.  (Pl.'s 56.1 Stmt. ¶ 69.)  However, even if this were true, the SEC fails to point to sufficient evidence that Schinik or Defendant Angelo knew that this was occurring, let alone that they instructed anyone not to document the special valuations.

Accounting Standards Board Statement of Financial Accountant Standard 157 – Fair Value Measurements ("FAS 157") in 2008, the Fund changed its valuation policy to value its investments at "fair [market] value." (*Id.* ¶ 82.) YA's updated valuation policy was reflected in YA's 2008 and 2009 financial statements. (*See id.* ¶ 88.) But valuing the majority of the Fund's positions, including the 15 Positions, at fair value was more of an art rather than a science, due to their low to non-existent market activity. (Pl.'s 56.1 Stmt. ¶ 378.) It required significant management judgment and estimation, which YA disclosed to investors through, for example, its financial statements. (Defs.' 56.1 Stmt. ¶¶ 87–88.) FAS 157 required YA to use the "best information [available] in the circumstances" to value these types of securities. (*Id.* ¶ 86.)

In valuing the Fund's positions, the VC considered information from a variety of sources, including the Fund's unrealized gains and losses reports, third-party appraisals, internal and third-party financial models, third-party valuation reports, and public filings. (*Id.* ¶¶ 93–94, 97.) All members of the VC had the opportunity to provide input, and valuations were agreed upon by consensus. (*Id.* ¶¶ 74, 76.) As a result of its review, the VC regularly impaired and wrote down many of the Fund's positions. (*Id.* ¶ 105.) During the Relevant Period, the VC wrote down sixty-six of its 265 different Portfolio Companies, including six of the 15 Positions. (*Id.* ¶ 106.)

The value of the Funds' assets were listed and described in various documents distributed to investors. These included "one-pagers," which were distributed monthly and provided an overview of the Fund's previous month's performance, quarterly letters, annual audited financial statements, and DDQs, which were provided to potential as well as current investors. (Pl.'s 56.1 Stmt. ¶¶ 344–50.) These documents listed the overall value of the Funds' assets, but never listed the value of the 15 Positions individually. (*See id.*)

Defendant Schinik never discouraged discussion of any valuation decisions; nor did he instruct anyone to withhold material information from the VC. (*Id.* ¶ 78.) Defendant Schinik did not instruct anyone to delay any write downs of any positions or to inflate the valuations for any of the 15 Positions. (*Id.*) Defendant Angelo, who was not on the VC, did not determine the valuations for any of the 15 Positions or any other Fund portfolio position.[4] (*Id.* ¶ 72.) He also did not instruct anyone to delay any write downs or inflate the valuations for any of the 15 Positions. (*Id.* ¶ 73.)

## F.   Pluris

In order to assist the VC in valuing the Fund's Hard-to-Value Assets, YA engaged several third-party valuation consultants, including Pluris Valuation Advisors, LLC ("Pluris"). YA first retained Pluris in 2007 to value the Fund's warrant portfolio. (*Id.* ¶ 120.) YA rejected Pluris's first attempt at valuing the warrant portfolio because YA believed that Pluris's valuation of the warrants were too high. (*Id.* ¶ 121.) Pluris then adjusted its model and came back with a substantially lower valuation, which the VC accepted. (*Id.* ¶ 123.)

In August 2007, YA decided to expand Pluris's engagement to valuing the Fund's convertible debentures. (*Id.* ¶ 124.) Over the next several months, Pluris attempted to value the debentures using its warrants model. (*Id.* ¶ 125.) While Pluris did not provide YA with any completed valuations, it provided YA with several draft valuation reports. (*Id.* ¶ 126; Pl.'s 56.1 Stmt. ¶ 126.) In or around July 2008, Pluris determined that its model could not effectively derive estimations of fair value for YA's convertible debentures. (*Id.* ¶ 129.) Shortly thereafter, YA

---

[4] YA's auditors testified that Defendant Angelo participated in valuation meetings during their audits. (Pl.'s 56.1 Stmt. ¶ 73.) Even if their testimony were true, there is no evidence that Defendant Angelo attempted to inflate the valuations for the 15 Positions or instructed anyone to do the same.

independently determined that Pluris's model was not effective.[5]  (Decl. of Todd Brody ("Brody Decl."), Ex. 743 ("Defendant Schinik Nov. 2010 Dep. Tr."), ECF No. 210-167, at 77:13–78:8.)

## G.    Valuation Research Corporation

In 2009, YA began foreclosing on some of the Fund's secured Hard-to-Value assets and exercising its rights to take over public (and some private) companies and operate them privately. (Defs.' 56.1 Stmt. ¶ 142.)  As a result of this process, the Fund came to own a number of private companies ("Foreclosed Private Assets").  (*Id.* ¶ 143.)

In the fall of 2009, the VC decided to retain Valuation Research Corporation ("VRC"), an independent global valuation firm, to independently value certain portfolio positions, primarily the Foreclosed Assets.  (*Id.* ¶ 146.)  The retainer agreement for VRC stated that:

> In arriving at its conclusions, VRC will assume and rely upon, without independent verification, the accuracy and completeness of all financial and other information and data publically available or furnished to VRC, or otherwise obtained by VRC, or discussed with VRC by knowledgeable employees and other representatives and advisors of [YA].

(Brody Decl., Ex. 36, ECF No. 207-43, at VRC0034302.)

The VC selected twelve portfolio positions for VRC to independently value, five of which were among the 15 Positions.  (Defs.' 56.1 Stmt. ¶ 147.)  The VC tasked Carr with being the primary "point person" responsible for providing VRC with the information and documents that it needed to provide fair value opinions.  (*Id.* ¶¶ 149, 151.)  Carr was not required to—and did not— seek approval from anyone at YA before providing information or documents to VRC.  (*Id.* ¶ 152.)  Neither Defendant Angelo nor Defendant Schinik prevented Carr, or anyone else at YA, from exchanging information or documents with VRC.  (*Id.* ¶¶ 154–56.)

---

[5] The parties dispute whether Pluris's engagement extended beyond July 2008.  This is the basis for one of the SEC's misrepresentation claims, and is addressed in Section V.E.i, *infra*.

During the Relevant Period, VRC provided the VC with several valuation reports, which included discounted cash flow models, weighted average cost of capital calculations, competitor information, and various other analyses. (*Id.* ¶ 159.) VRC always provided its indications of fair value as a range, with low, middle, and high numbers. (*Id.* ¶ 161.) The VC never used the "high" valuations provided by VRC. (*Id.* ¶ 163.) By December 2009, VRC was valuing approximately 65% of the Fund's portfolio (in terms of dollar value of assets under management). (*Id.* ¶ 164.) VRC continues to serve as YA's third-party valuation consultant to this day. (*Id.* ¶ 164.)

### H.   McGladrey & Pullen LLP

During the Relevant Period, YA retained McGladrey & Pullen LLP ("McGladrey") to audit the Fund's 2008 and 2009 financial statements in accordance with Generally Accepted Auditing Standards in the United States ("GAAS"). (*Id.* ¶ 173.) YA's engagement letters with McGladrey stated that YA was responsible "for making all financial records and related information available to [McGladrey]." (Brody Decl., Ex. 12 ("2008 McGladrey Engagement Letter"), ECF No. 207-19, at M&P 010560; *id.*, Ex. 17 ("2009 McGladrey Engagement Letter"), ECF No. 207-14, at M&P 016603.)) The letters also stated that McGladrey and YA would inform each other of any fraud that would cause a material misstatement of the financial statements. (2008 McGladrey Engagement Letter at M&P 010559–60; 2009 McGladrey Engagement Letter at M&P 016602–03.)

As part of its auditing procedures, and in accordance with GAAS, McGladrey selected certain investments for testing, which included the majority of the 15 Positions (collectively, "Test Investments"). (*See* Defs.' 56.1 Stmt. ¶ 176; Schechtman Decl., Ex. 47, ECF No. 192-47, at 51:10–52:16.) McGladrey was granted access to YA's employees, including analysts/bankers, the accounting department, and third parties, including Pluris and VRC. (Defs.' 56.1 Stmt. ¶ 178.)

McGladrey also received and reviewed numerous documents, including valuation memoranda, deal documents, documents relating to collateral, and others. (*Id.* ¶ 179.) In conducting its audits, McGladrey gained an understanding of the Fund, including its internal controls, and tested the valuation opinions reached by the VC for the Test Investments to determine whether they reflected fair value. (*Id.* ¶¶ 184, 186.)

After spending months on each audit, McGladrey ultimately opined that the Fund's 2008 and 2009 financial statements conformed with US Generally Accepted Accounting Principles ("GAAP"). (*Id.* ¶¶ 175, 197.) As a result, McGladrey issued "clean" (*i.e.*, not qualified, adverse, or disclaimed) audit opinions. (*Id.* ¶ 197.) McGladrey's work papers for the two audits spanned over seven thousand pages. (*Id.* ¶¶ 190–91, 197.)

## I.   Subsequent Review by McGladrey

In August 2009, the SEC launched its investigation into YA, which ultimately gave rise to the current lawsuit. (*Id.* ¶ 198.) In late 2010 and early 2011, the SEC learned from McGladrey personnel that McGladrey had not been aware of: (i) the existence of certain reports about the Fund's interests in the collateral of certain Portfolio Companies; and (ii) that YA had retained Pluris to provide valuations of the Fund's convertible debentures during the Relevant Period. (*Id.* ¶ 205.)

After the SEC informed McGladrey of this information in early 2011, McGladrey performed supplemental reviews and audit procedures that it believed were required under GAAS. (*Id.* ¶¶ 200, 205.) With respect to the collateral reports, McGladrey concluded that they did not impact its existing audit reports. (*Id.* ¶ 206.) With respect to Pluris, McGladrey concluded that YA's engagement of Pluris "was essentially a work in progress and did not affect the previously

issued audit opinions." (*Id.* ¶ 207 (quoting Schechtman Decl., Ex. 90 ("Feeney Dep. Tr."), ECF No. 192-90, at 91:16–18).)

As part of its supplemental review process, McGladrey also reviewed its working papers to determine whether its work was sufficient to support its previously issued audit opinions. (Defs.' 56.1 Stmt. ¶ 208.) McGladrey concluded that it was. (*Id.* ¶ 211.) As a result, at the conclusion of its audit procedures in September 2011, McGladrey did not withdraw or change its audit opinions. (*Id.* ¶ 219.)

**J.     Rothestein & Kass**

In 2011, YA retained a new auditing firm, Rothestein & Kass ("R&K"), to audit its 2010 financial statements. (*Id.* ¶ 223.) R&K's audit began with an initial review of some of McGladrey's 2009 working papers, but R&K decided not to conduct any further testing once it determined that it was sufficiently comfortable with McGladrey's audit. (*See id.* ¶ 224.) R&K ultimately concluded that McGladrey "had performed proper procedures in accordance with GAAS" for the 2009 audit. (*Id.* ¶ 226 (quoting Schechtman Decl., Ex. 95 (Natilli Dep. Tr.), ECF No. 192-95, at 19:8–20:10).)

R&K issued its audit opinion for YA's 2010 financial statements on November 8, 2011. (Defs.' 56.1 Stmt. ¶ 225.) In connection with its audit, R&K required YA to mark down a number of its investments for 2010. (*Id.* ¶ 227.) However, R&K did not require YA to mark down any investments for the Relevant Period. (*Id.* ¶ 228.)

**K.     SEC's Allegations**

The SEC's case against Defendants centers around two categories of misrepresentations: (i) misrepresentations concerning the valuations of the Fund's 15 Positions (the "Valuation

Statements"); and (ii) one-off misrepresentations concerning the Fund's internal procedures and financial health (the "One-Off Statements").

With respect to the Valuation Statements, the SEC alleges that Defendants Schinik and Angelo were engaged in a scheme to defraud third parties, particularly YA's investors and auditors, by valuing the 15 Positions at cost (*i.e.*, face value) rather than fair value so that they could inflate the value of the 15 Positions. (*See generally* Compl.) The SEC alleges that, had Defendants Schinik and Angelo adhered to fair value accounting principles, they would have had to mark down the value of these positions significantly. (*See id.*) In support of this claim, the SEC has offered the expert testimony of Mark Berenblut to demonstrate the extent to which the 15 Positions were overvalued. ((Decl. of Patrick Smith in Support of Mot. to Preclude, Ex. 1 ("Berenblut Report"), ECF No. 188-1.) With respect to its One-Off Statements, the SEC claims that, during the Relevant Period, Defendants Schinik and Angelo made fraudulent misrepresentations concerning: (i) the Fund's collateral; (ii) the VC's policies and procedures; (iii) the age of the Fund's portfolio; (iv) the Fund's liquidity; and (v) Pluris's engagement by YA.

## II.    MOTION TO PRECLUDE

Courts may make evidentiary determinations, including determinations of the admissibility of expert testimony, on a motion for summary judgment. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 incorporates the principles enunciated in both *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), which collectively held that trial courts have a "gatekeeping" function to ensure that not only scientific testimony, but any testimony based on technical or other specialized knowledge, is both relevant and reliable. *See Tchatat v. City of New York*, 315 F.R.D. 441, 443–44 (S.D.N.Y. 2016).

In determining whether the proffered testimony is sufficiently reliable, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).

The party seeking to introduce the expert testimony bears the burden of establishing by a preponderance of the evidence that the proffered testimony is admissible. *Daubert*, 509 U.S. at 592. There is a presumption that expert testimony is admissible, *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995), and "the rejection of [such] testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Where there is "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method . . . an expert's opinion [is not] *per se* inadmissible." *Amorgianos*, 303 F.3d at 267. "Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (citation omitted).

However, expert testimony that rests on merely subjective belief or unsupported speculation is inadmissible and should be precluded. *Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F.Supp.2d 278, 291 (S.D.N.Y. 2013) (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004)). "If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence." *Molina ex rel. Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (citing *Raskin*, 125 F.3d at 66).

Berenblut produced an expert report at the SEC's request in which he opines on whether the Fund's investments were valued appropriately. In his expert report, Berenblut notes that YA valued the 15 Positions "at amounts that were materially greater than their Fair Value during some or all of the period from 2008 through 2010." (Berenblut Report at 4.)

Defendants move to preclude Berenblut's testimony as unreliable on two grounds: first, that Berenblut failed to adhere to the Uniform Standards of Professional Appraisal Practice ("USPAP") in offering an opinion of value (as opposed to an opinion of quality) regarding the accuracy of YA's valuations of its investments; and second, that Berenblut's opinions lack adequate factual foundations. (Mot. to Preclude at 14–23.) Defendants also move to preclude Berenblut from offering any testimony regarding the oil-and-gas industry due to his lack of qualification and expertise in that industry. (*Id.* at 24–25.) Defendants' motion to preclude is GRANTED, but only with respect to those portions of Berenblut's testimony that consist of opinions of value, rather than opinions of quality.

## A.     Berenblut's Compliance with USPAP

Those portions of Berenblut's testimony that consist of opinions of value are precluded because Berenblut failed to comply with USPAP standards in reaching them. Where an expert is

bound by, or purports to be bound by, established standards for arriving at conclusions in a particular field, courts have looked to the extent of the expert's compliance with such standards in assessing the expert's reliability. *See, e.g., Davis v. Carrol*, 937 F. Supp. 2d 390, 415–17 (S.D.N.Y. 2013) (assessing compliance with the USPAP in determining the reliability of an expert's testimony); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, MDL No. 1358 (SAS), 2008 WL 2324112, at *4 (S.D.N.Y. June 5, 2008) (same). Here, Berenblut certified that he prepared his expert report in accordance with USPAP standards, and Defendants' principal objection to Berenblut's testimony is his failure to comply with such standards. (*See* Berenblut Report at 177.) Accordingly, USPAP standards, and the extent of Berenblut's adherence to them, represent a logical starting point for assessing the reliability of Berenblut's report.

USPAP Standard 3 sets forth the relevant criteria an appraiser should follow when reviewing another appraiser's work.[6] Under USPAP Standard 3, a reviewer may offer either an opinion of quality or opinion of value regarding another appraiser's work. Advisory Opinion 20 issued by the Appraisal Board offers guidance for determining whether an opinion constitutes an opinion of value or an opinion of quality. (Decl. of Dugan Bliss in Opp'n to Mot. to Preclude, Ex. 4 ("Advisory Opinion 20"), ECF No. 197-5.) An opinion of quality relates to the overall adequacy, reasonableness, or credibility of the work under review. (*See id.* at 137.) An opinion of value relates to a specific numeric value or range of values for the work under review. (*See id.* at 138.) Advisory Opinion 20 lists several examples of statements that qualify as opinions of value:

- I concur (or do not concur) with the value.
- I agree (or disagree) with the value.
- In my opinion, the value is (the same).

---

[6] Berenblut testified at his deposition that YA is not an appraiser. (Smith Decl., Ex. 2 ("Berenblut Dep. Tr."), ECF No. 188-2, at 169:22–171:9.) However, Berenblut expressly certified in his report that he prepared his report in accordance with USPAP Standards. (Berenblut Report at 177.) Berenblut also testified that it would have been improper not to have complied with USPAP in preparing his report. (Berenblut Dep. Tr. at 159:20–160:9.)

- In my opinion, the value is incorrect and should be $XXX.
- In my opinion, the value is too high (or too low).

(*Id.*)

It also lists several examples of statements that qualify as opinions of quality:

- the value opinion stated in the appraisal report is (or is not) adequately supported;
- The value conclusion is (or is not) appropriate and reasonable given the data and analyses presented;
- the value opinion stated in the report under review was (or was not) developed in compliance with applicable standards and requirements;
- the content, analyses, and conclusions stated in the report under review are (or are not) in compliance with applicable standards and requirements;
- I reject the value conclusion as lacking credibility due to the errors and/or inconsistencies found;
- the value conclusion is not appropriate due to (for example) a significant math error in the Sales Comparison Approach – if calculated properly, the value conclusion would change to $XXX;
- I accept (or approve) the appraisal report for use by XYZ bank (or agency).

(*Id.* at 137.)

Where a reviewer expresses an opinion of value regarding a business interest or an intangible asset, he must comply with USPAP Standards Rule 9. (Smith Decl., Ex. 3. ("USPAP Standards"), ECF No. 188-3, at 32 (Rule 3-3(c)(i)).) Under USPAP Standards Rule 9, a reviewer must, *inter alia*, "be aware of, understand, and correctly employ those recognized approaches, methods and procedures that are necessary to produce credible appraisal" and "develop value opinion(s) and conclusion(s) by use of one or more [such] approaches . . . ." (*Id.* at 62 (Rule 9-1(a)), 64 (Rule 9-4(a)).) As Berenblut outlined in his report, (*see* Berenblut Report at 22–23), and testified during his deposition, (Berenblut Dep. Tr. at 158:15–159:3), the three recognized and generally accepted approaches to measuring the fair value of an asset are: (1) the market approach; (2) the income approach; and (3) the cost approach.

In offering an opinion of quality, the reviewer must, *inter alia*, comply with USPAP Standards Rule 3-3, which provides that:

> (a)  When necessary for credible assignment results in the review of analyses, opinions, and conclusion, the reviewer must:
>
> > (i)  develop an opinion as to whether the analyses are appropriate within the context of the requirements applicable to that work
> >
> > (ii)  develop an opinion as to whether the opinions and conclusions are credible within the context of the requirements applicable to that work; and
> >
> > (iii)  develop the reasons for any disagreement.

(USPAP Standards at 31 (Rule 3-3(a)).)

Here, Berenblut states several times in his report that YA's valuations of various investments were too high and overstated, along with what the correct value should have been. For example, Berenblut states that "[YA] carried each of its investments in the 15 companies . . . at amounts that were materially greater than their Fair Value during some or all of the period from 2008 through 2010," and later provides the dollar amounts by which those investments were overvalued.  (Berenblut Report ¶¶ 4, 11; *see also, e.g., id.* ¶¶ 58 ("[T]his carrying amount overstates the Fair Value of [YA]'s investment by [x amount]."), 83, 91, 135.)  In summarizing his findings, Berenblut concludes, "[YA] did not have a reasonable basis to support the amounts at which it carried these investments, and in many cases had information that indicated that the Fair Value . . . was significantly less than the carrying value." (*Id.* ¶ 16.)

But in reaching these conclusions, Berenblut did not apply any established methodology. While Berenblut outlines the definition of fair value and the three generally accepted methodologies used to calculate it in his report, he never discusses, or even mentions, whether he used any of those methodologies, or his own methodology, in determining the dollar amount by

which YA overvalued the 15 Positions.  In fact, Berenblut admitted during his deposition that "[t]here [was] no generally applicable overall valuation rule that [he could] apply" to his review because his assignment was "so specific." (Berenblut Dep. Tr. at 243:23–244:18.)

On multiple occasions during his deposition, Berenblut also stated that he did not perform a separate valuation of the assets or state the precise methodology used in his report because he believed that his conclusions did not constitute opinions of value.[7]  (*See, e.g., id.* at 114:15–115:3, 117:25–118:9, 119:8–17, 177:18–178:2.)  When asked if he had applied the income approach, cost approach, or market approach to each of the 15 Positions, Berenblut acknowledged that he had done so only "implicitly."  (*Id.* at 176:16–177:2.)  Accordingly, because Berenblut failed to apply a sufficiently reliable method in forming his opinions of value, those opinions are precluded from consideration in deciding Defendants' motion for summary judgment. *See Davis*, 937 F. Supp. 2d at 415–18 (excluding expert's opinions of value in deciding a motion for summary judgment because expert "did not apply any established methodology" pursuant to, among other standards, USPAP.)[8]

However, not all of Berenblut's analyses and conclusions involve opinions of value.  Many of them constitute opinions of quality.  For example, Berenblut states in his report that YA's 2008 valuations of its convertible debentures in BlueCreek Energy, Inc. ("BlueCreek") do not accurately

---

[7] The fact that Berenblut does not view his conclusions as constituting opinions of value is irrelevant for purposes of determining whether Berenblut's report offers opinions of value, as defined by USPAP Standards and Advisory Opinion 20.

[8] The SEC argues that Berenblut can assign his own absolute value, or value range, to the fair value of YA's investments without providing an opinion of value, because Advisory Opinion 20 allows an expert to "make corrections to cure an error [found in the work under review], such as a mathematical miscalculation, by showing what the calculation would have been if correct but without expressing the results as the reviewer's own opinion of value[.]" (Advisory Opinion 20 at 135; *see* Pl.'s Opp'n to Defs.' Mot. to Preclude, ECF No. 196, at 6.)  However, the fair value figures provided in Berenblut's report involve subjective determinations about what valuation inputs YA should have used in valuing the Fund's investments, and not mere computational corrections.

reflect their fair value because several of BlueCreek's underlying assets were valued inappropriately. (*See* Berenblut Report ¶¶ 68–73.) Berenblut then proceeds to list four distinct pieces of information that YA failed to consider in calculating the fair value of BlueCreek's oil-and-gas reserves, including a conflicting third-party report and certain risk factors. (*Id.* ¶ 73.) Berenblut provides numerous other reasons throughout his report as to why "[YA] did not have a reasonable basis to support the amounts at which it carried [its various] investments." (*Id.* ¶ 16; *see, e.g., id.* ¶¶ 61, 69, 73, 101, 112, 123.)

In arriving at these conclusions, Berenblut followed the standards set forth in USPAP Standard 3 by developing an opinion as to whether YA's analyses were appropriate and credible within the context of the requirements applicable to that work, along with the reasons for any disagreement with such analyses. During his deposition, Berenblut testified: "I looked at what had been done by others. I had the benefit of the work of others and was able to determine what basis they used and able to interpret it using that information [in what would be understood as a review appraisal under USPAP Standard 3]." (Berenblut Dep. Tr. at 125:22–126:2–5.) Berenblut further explained:

> I think it's applying valuation knowledge to a specific circumstance. This is – this is a specific exercise whereby a fair value has been arrived at. It is supported – it is allegedly supported by documents and other valuations, and it is looking at those and saying do they adequately support the number that has been arrived at or not; and, if not, what – what has to change in order to reflect what is in those documents.

(*Id.* at 241:19–242:4.)[9]

Because Berenblut followed a reliable methodology in expressing opinions of quality that was guided by USPAP Standard 3, only those portions of Berenblut's report that constitute

---

[9] Defendants do not dispute that Berenblut complied with USPAP Standard 3 in reaching opinions of quality.

opinions of value lack sufficient reliability and are precluded in deciding Defendants' motion for summary judgment.

**B.      Berenblut's Factual Foundations**

Defendants argue that even if Berenblut's opinions of quality comply with USPAP, his testimony should nonetheless be precluded because it lacks adequate factual foundations. (*See* Mot. to Preclude at 20–23.)  Defendants point to a number of missteps that they allege Berenblut committed in arriving at his conclusions regarding YA's various investments.  For example, Defendants allege that in assessing the fair value of YA's investment in Falcon Natural Gas Corp. ("Falcon"), Berenblut "admittedly did no investigation to determine whether, as a legal matter, [Falcon's oil and gas] leases had in fact expired, and did not know whether, under GAAP, the ability to control the asset, rather than legal ownership, matter for purposes of accounting for the asset." (*Id.* at 10.)  Similarly, Defendants argue that in evaluating the fair value of YA's investment in Compass Resources, Ltd.  ("Compass"), Berenblut rejected YA's valuation of its investment without being aware that YA eventually became an equity holder in Compass. (*Id.* at 11.)

However, these challenges go to the weight rather than the admissibility of Berenblut's opinion and, in turn, are properly reserved for the fact-finder to resolve, not this Court.  *See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, Nos. 93 Civ. 6876 (LLM), 94 Civ. 2713 (LMM), 2000 WL 1694321, at *2 (S.D.N.Y. Nov. 13, 2000) (finding that objections to the scope of an expert's review go to the weight of the evidence rather than its admissibility); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS), 2006 WL 2128785, at *7 (S.D.N.Y. July 28, 2006) (finding that objections to an expert's assumptions go to weight rather than admissibility).  Courts should exclude expert testimony if it is based on assumptions that are "so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges

22

comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation and quotation marks omitted). However, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (citation and quotation marks omitted). As such, Defendants' argument that Berenblut's testimony should be precluded because it lacks adequate factual foundations is unavailing.[10]

## C.   Berenblut's Qualifications in the Oil-and-Gas Industry

Defendants argue that Berenblut should, at minimum, be precluded from testifying about any of the six oil-and-gas companies discussed in his report because he is not qualified to offer any opinion on oil-and-gas assets. (Mot. to Preclude at 24.) Defendants point to Berenblut's lack of formal education in areas relevant to oil-and-gas, lack of membership in any professional oil-and-gas organizations, inability to recall ever having completed his own valuation of an oil-and-gas asset, and lack of qualification to opine on technical aspects of the oil-and-gas valuation process. (*Id.* at 25.)

Defendants' arguments rest on an unduly narrow view of expert qualifications. Courts have liberally construed the expert qualification requirement. *See United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). An expert is not unqualified "merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Peretz v. Home Depot*, No. 08 Civ. 4106 (BMC), 2009 WL 3124760, at *2 (E.D.N.Y. Sept. 29, 2009) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997)) (reversing trial

---

[10] Defendants also argue that Berenblut's opinion should be precluded "because it will not help the jury determine whether [YA]'s valuations were fraudulent, and any relevance it may have is substantially outweighed by the risk of unfair prejudice to [YA] or misleading the jury." (Mot. to Preclude at 21–23.) However, given that Berenblut's redacted testimony consists of opinions of quality only, which comply with USPAP standards, and are helpful in understanding what even the SEC admits are "customized, complex securities that are not publicly traded on any market and have no market activity," (Defs.' 56.1 Stmt. ¶ 39), it is relevant, and its probative value is not substantially outweighed by its prejudicial effect.

court's preclusion order despite the fact that the expert had no experience designing the specific kind of system at issue). "In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Valentin v. City of New York*, No. 94 Civ. 3911 (CLP), 1997 WL 33323099, at *17 (E.D.N.Y. Sept. 9, 1997) (citation omitted). "As a result, one may be an expert solely based on one's practical experience notwithstanding a lack of professional education or one's formal education despite a lack of practical experience." *Mahoney v. J J Weiser & Co., Inc.*, No. 04 Civ. 2592 (VM) (HBP), 2007 WL 3143710, at *7 (S.D.N.Y. Oct. 25, 2007).

Here, while Berenblut may not have knowledge specific to the oil-and-gas industry, Berenblut has provided his expert opinion concerning the value of businesses and securities in the oil-and-gas industry before, as indicated in his curriculum vitae. (Berenblut Report (Appendix A) at 7, 8, 10.)   To the extent that Defendants are "able to point to areas where [Berenblut's] experience is less robust, those concerns go to the testimony's weight and credibility—not its admissibility." *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, Nos. 08 Civ. 11315 (WHP), 09 Civ. 2081 (WHP), 2011 WL 855876, at *2 (S.D.N.Y. Feb. 28, 2011) (citation omitted); *see also McCullock*, 61 F.3d at 1043 (expert's lack of experience performing or interpreting air quality studies was "properly explored on cross-examination and went to his testimony's weight or credibility—not its admissibility").   Therefore, Berenblut's testimony regarding [YA's] investments in the six oil-and-gas companies is not precluded from consideration in considering Defendants' motion for summary judgment.

### III.   MOTION FOR SUMMARY JUDGMENT

**A.   Motion for Summary Judgment Legal Standard**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the non-moving party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara*, 315 F.3d at 175. The court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

**B.      Section 10(b), Rule 10b-5, and Section 17(a)**

Section 10(b) of the Exchange Act and Rule 10b–5 prohibit fraudulent conduct in connection with the purchase or sale of a security. *See* 15 U.S.C. § 78j(b); 17 C.F.R. §§ 240.10b–5(a), (b) and (c). To state a claim under Section 10(b) and Rule 10b–5, the plaintiff must allege that defendants: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities using the mails or the instrumentalities of interstate commerce. Section 17(a) contains three subsections which forbid: (1) the direct or indirect use of any device, scheme, or artifice to defraud; (2) obtaining money or property through misstatements or omissions of material facts; and (3) any transaction or course of business that operates as a fraud or deceit upon a purchaser of securities. 15 U.S.C. §§ 77q(a). Claims under Section 17(a) of the Securities Act have essentially the same elements as those under Exchange Act Section 10(b) and Rule 10b-5. However, the *mens rea* elements of Section 17(a)'s three subsections differ. Claims brought under Section 17(a)(1) require proof of scienter, while claims brought under Sections 17(a)(2) or (3) only require proof of negligence. *See Monarch*, 192 F.3d at 308.

## C.    Section 206 of the Advisers Act

Section 206(1) of the Advisers Act prohibits "any investment adviser" from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client,"[11] and Sections 206(2) and (4) and Rule 206(4)–8 prohibit fraudulent and deceptive practices by investment advisers.[12] Scienter is a required element of proof for a violation of Section 206(1), but Sections 206(2) and 206(4) only require proof of negligence. *SEC v. Moran*, 922 F. Supp. 867, 897 (S.D.N.Y. 1996).

## D.    Aiding and Abetting Liability

For aiding and abetting liability for securities violations, the plaintiff must prove: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (citation and quotation marks omitted). "Satisfaction of the [knowledge] requirement will . . . depend on the theory of primary liability[,] and . . . there may be a nexus between the degree of [knowledge] and the requirement that the alleged aider and abettor render 'substantial assistance.'" *Id.* (citation and quotation marks omitted). However, the plaintiff must at least demonstrate recklessness to satisfy the knowledge requirement. *See SEC v. Wey*, 246 F. Supp. 3d 894, 926 (S.D.N.Y. 2017) (noting the split in authority in this Circuit regarding whether actual knowledge or recklessness is required for aiding and abetting claims arising before the Dodd-Frank Act took effect on July 21, 2010). Mere negligence does not suffice. *Id.*; *see also Katz v. Realty Equities Corp. of N.Y.*, 406 F. Supp. 802, 805 (S.D.N.Y. 1976).

---

[11] 15 U.S.C. § 80b-6(1)

[12] 15 U.S.C. § 80b-6(2)–(4); 17 C.F.R. § 275.206(4)-8

E.     **Control-Person Liability**

To establish control-person liability under Section 20(a) of the Exchange Act, the plaintiff must prove: (1) a primary violation by the controlled person; (2) control of the primary violator by the defendant, and (3) that the defendant was a culpable participant in the controlled person's fraud. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).   Among the district courts in this Circuit, the weight of well-reasoned authority requires the plaintiff to prove "some level of culpable participation at least approximating recklessness in the section 10(b) context." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 492 (S.D.N.Y. 2010) (citing *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008)).

## IV.     MOTION FOR SUMMARY JUDGMENT: SCHINIK

Defendants' motion for summary judgment as to the SEC's claims against Defendant Schinik is DENIED.   However, the SEC may only proceed against Schinik on the basis of the Pluris Engagement Representation (*see infra* Section IV.C.ii.a.).

Scienter is a mental state "embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).   At the summary judgment stage, the SEC "must produce evidence '(1) showing that the defendants had motive and opportunity to commit fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 305 (S.D.N.Y. 2012) (quoting *Shaar Fund, Ltd.*, 493 F.3d at 95).   Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).   Opportunity consists of "the means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

Conscious misbehavior is conduct that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). An "egregious refusal to see the obvious, or to investigate the doubtful" can also establish recklessness. *Novak*, 216 F.3d at 308 (citation and quotation marks omitted). Actual knowledge of or conscious disregard of numerous red flags can establish scienter. *See Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 622 (S.D.N.Y. 2010). However, general allegations of red flags are insufficient to demonstrate scienter. *Id.* at 623.

To survive a motion for summary judgment, the plaintiff must provide admissible evidence that defendants were aware of facts or had access to (i) information contradicting their statements, or (ii) facts demonstrating that defendants failed to review or check information that they had a duty to monitor. *See Novak*, 216 F.3d at 308. Plaintiff must identify *specific* information that defendants knew, had access to, or had a duty to review. *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (broad reference to raw data, without identification of specific reports or statements that defendants knew contained contrary information insufficient for scienter); *Steinberg v. Ericsson LM Tel. Co.*, No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *13–14 (S.D.N.Y. Dec. 10, 2008) (generic identifications of adverse information insufficient). Mere allegations that a defendant knew or should have known of fraudulent conduct based solely on his or her corporate title or position are insufficient. *See In re Sotheby's Holdings, Inc., Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000). It is also insufficient to allege that a defendant "ought to have known" of the fraud. *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (quotation marks omitted).

29

A.   **Motive and Opportunity**

The SEC advances three theories as to why Defendants Angelo and Schinik had both motive and opportunity to commit fraud.  However, all three theories fail to establish scienter as a matter of law because the SEC fails to point to any evidence that Defendants Angelo or Schinik could have derived a concrete or personal benefit from their alleged fraud.

The SEC attempts to allege motive based on YA's fee structure, under which "[YA] received a Management Fee of 2% of the net worth of each fund," and "the Funds paid an incentive fee of 20% of their income (including net unrealized gains), of which 70% was paid to Defendant Angelo." (Compl. ¶¶ 23–24.)  The SEC argues that "Defendants employed a fraudulent scheme to increase [YA's] net worth, and thus the fees charged . . . ." (*Id.* ¶ 25.)

However, as mentioned earlier, the Second Circuit has made it clear that motive requires a demonstration of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit*, 264 F.3d at 139 (internal quotation marks omitted); *SEC v. Treadway*, 430 F. Supp. 2d 293, 331 (S.D.N.Y. 2006) ("This potential gain must be a 'concrete and personal benefit to the individual defendants resulting from the fraud' beyond desire for the corporation to appear profitable or desire to keep stock prices high to increase officer compensation.") (citing *Kalnit*, 264 F.3d at 139).  The mere "desire to earn management fees . . . does not suffice to allege a 'concrete and personal benefit' resulting from the fraud.  To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute." *Edison Fund*, 551 F. Supp. 2d at 227 (S.D.N.Y.) (internal citation omitted).

Here, the SEC's theory of motive based merely on YA's compensation incentives plainly fails as a matter of law to establish scienter.  Furthermore, Defendant Angelo's status as majority

owner of YA is insufficient for purposes of establishing opportunity. *See Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234–35 (scienter cannot be inferred "solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information"). Therefore, the SEC cannot rely on YA's fee structure to establish scienter for their misrepresentation claims.

The SEC also alleges that Defendants Angelo and Schinik had motive and opportunity to defraud due to the economic downturn in the Relevant Period and YA's increasingly distressed financial situation. (Opp'n at 35.) The SEC claims that during this period, "YA was caught in a death spiral" in which "YA was both hemorrhaging current investor money and was also not attracting sufficient new money because its returns weren't high enough." (*Id.* at 36.) However, it is not enough to assert that Defendants were motivated "to raise money that [was] 'desperately needed' or necessary 'to protect the very survival' of a company." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) (holding that "[t]he alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price—even if such a drop would allegedly threaten the 'survival' of a company— is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit") (citation omitted). As such, the SEC's theory of motive and opportunity based on the general financial status of the economy and YA in the Relevant Period is also insufficient as a matter of law to establish scienter.

Lastly, the SEC alleges that motive and opportunity can be inferred by Defendants Angelo and Schinik's attempts to redeem their investments from YA and "sell their own interests in the funds at [an] inflated value." (Opp'n at 37.) The SEC points to evidence that in October 2008, Defendant Angelo submitted a $10 million redemption request, while Defendant Schinik likewise

made a full redemption request in January 2009. (*Id.*)  Cases in this Circuit have held that the "motive" showing may be met by allegations that corporate insiders allegedly engaged in misrepresentations in order to sell their own shares at inflated prices. *See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citing *Novak*, 216 F.3d at 308).  However, the SEC's theory—that Defendants Angelo and Schinik engaged in misrepresentations so that they could redeem and sell their own investments in YA at inflated prices—is belied by the record.  Defendants Angelo and Schinik made their redemption requests when YA was actively marking the Fund *down* by approximately $33 million (or 3.4% of the NAV) in October, November, and December 2008.  (Schechtman Decl. Ex. 36, ECF No. 192-36.)  The theory that Defendants Angelo and Schinik were somehow attempting to redeem and sell their investments at inflated values is not supported by the circumstances in existence at the time, and, in turn, fails for purposes of establishing scienter.

**B.   Defendant Schinik's Scienter as to the Valuation Statements**

The SEC alleges that Defendant Schinik demonstrated an intent to overvalue and misrepresent the value of the Fund's 15 Positions based on his failure to disclose "key" documents to McGladrey during its audit of YA in the Relevant Period, and his affirmative misrepresentations regarding the 15 Positions to investors and McGladrey.  However, the SEC fails to offer sufficient evidence that Defendant Schinik knew, had access to, or had a duty to review (aside from the duties imposed by his corporate responsibilities) contrary information that he consciously disregarded.

First and foremost, internal and external reviews of YA's valuations of the 15 Positions never showed any evidence of fraud or deceit.  YA's VC met regularly and attempted to value assets that were inherently difficult to value and required subjective judgments, due to their illiquid and customized nature.  There is no evidence that Defendants Schinik or Angelo instructed anyone

to withhold material information from the VC, or delay the write down of any investment. YA also brought in at least two independent valuation consultants, Pluris and VRC, to assist in the valuation of YA's Hard-to-Value assets, which included a majority of the 15 Positions. In addition, YA's auditors, McGladrey, issued not one, but two "clean" audit opinions for the Relevant Period, finding that YA's valuations had complied with GAAP principles. After the SEC launched its investigation into YA, McGladrey reviewed its working papers again, considered two pieces of information that YA had not disclosed during the audits, and found no basis to withdraw or modify its 2008 and 2009 audit opinions. Then, in 2010, R&K concluded that McGladrey had performed proper procedures in accordance with GAAS in issuing its 2009 audit opinion.

Despite the foregoing evidence, the SEC alleges that Defendants Schinik and Angelo nonetheless possessed the requisite intent to defraud others because they hid information from YA's auditors and made affirmative misrepresentations regarding the value of the 15 Positions. In support of its claim that YA hid certain documents from McGladrey, the SEC relies primarily on the declaration of Jeff Yager, McGladrey's engagement partner during YA's audits, in which Yager identifies thirteen documents (out of the hundreds provided to McGladrey) that YA apparently never provided to its auditors during their audits. (*See* Brody Decl., Ex. 45 ("Yager Decl."), ECF No. 207-53, ¶ 6.) However, examining these allegations in detail reveals that there is, once again, no material evidence of fraud or negligence.

### i.   Failure to disclose key documents

The SEC alleges that Defendant Schinik failed to disclose a 2009 report prepared by the Ryder Scott Company ("Ryder Scott"), a third-party valuator, which indicated that KD Resources, LLC's ("KD") oil and gas reserves were "greatly diminished." (Opp'n at 39.) The basis for the SEC's allegation is that the document "does not appear in the documents produced by McGladrey

during the course of the Commission's investigation *suggesting* that it was not provided to them." (Pl.'s 56.1 Stmt. ¶ 613 (emphasis added).)

However, the SEC provides no record evidence for this assertion, aside from a statement from Brody himself who simply repeats the assertion in his declaration. (Brody Decl., ECF No. 190, ¶ 238 ("A copy of the reserve report does not appear in the document production from McGladrey demonstrating that this document was not provided to the auditors.") Such a declaration does not qualify as evidence on a motion for summary judgment. *See Sterling Fin. Servs. Co., v. Franklin*, 259 F. App'x. 367, 370 (2d Cir. 2008) ("The . . . pertinent . . . declaration[] w[as] properly credited no weight [on a motion for summary judgment] because . . . the . . . declaration, dated February 23, 2006, was conclusory with no original documentary corroboration."). Furthermore, this report does not even appear in Yager's declaration as one of the thirteen documents that YA did not provide to McGladrey during its audits. (*See* Yager Decl. ¶ 6.) The record also demonstrates that YA, in fact, disclosed the report to VRC and explicitly told it to use the report to update its valuations for YA. (Schechtman Decl., Ex. 191, ECF No. 220-68.) As such, the SEC's allegation concerning the 2009 report lacks sufficient evidence to support an inference of scienter or negligence.

As evidence of an intent to defraud, the SEC also points to an email that a YA employee, Jason Dawkins, sent to Defendant Schinik and forwarded to Defendant Angelo in June 2010, while McGladrey's 2009 audit was ongoing, entitled "Valuation Concerns." (Opp'n at 11–12; Brody Decl., Ex. 49 ("Valuation Concerns E-mail"), ECF No. 207-57.) In the email, Dawkins raised particular concerns about the valuations for several of the Fund's Portfolio Companies, including BlueCreek, Falcon, Striker, KD, and Westport Energy LLC ("Westport"). (Valuation Concerns E-mail.) Dawkins implied that many of the companies were overvalued and stated that "Yorkville

34

investors may not be fully informed about the true nature of their investments." (*Id.* at YA8 (8175)
0140659.)  This email was not provided to McGladrey, (Yager Decl., ¶ 6; Pl.'s 56.1 Stmt. ¶ 382),
and on that basis, the SEC alleges that Defendants Schinik and Angelo intended to defraud
McGladrey regarding its valuations.  (Opp'n at 11–12.)

However, rather than trying to hide or conceal these concerns, Defendant Schinik, along
with members of YA's Board of Directors and the VC, actively investigated these concerns to their
satisfaction.  (*See* Schechtman Decl., Ex. 17 ("Fine Dep. Tr."), ECF No. 192-17, at 281.)  Fine,
YA's Senior Legal Counsel, testified:

> I remember that this was taken very seriously, that there were a lot of allegations in
> here, particularly concerning valuation.  So me and the rest of the people on the
> valuation committee took this extremely seriously.  And, you know, reviewed all
> the allegations made and the facts asserted in here.  And, I mean, basically I think
> took a thorough analysis of all the claims and all the values that we had on these
> positions.

(*Id.* at 281:14–22.)

YA took these steps even though Les Garret, Dawkins's supervisor at the time, believed
that Dawkins's accusations concerning the positions were "riddled with inaccuracies and
misinformation."  (Schechtman Decl., Ex. 146, ECF No. 220-15 ¶ 38.)  In fact, by his own
admission, Dawkins testified that he was not even qualified to provide any input regarding the
valuation of YA's investments, as he was not familiar with GAAP's fair value accounting
standards, including FAS 157, or even YA's own valuation policies and procedures.  (Schechtman
Decl., Ex. 167 (Dawkins Dep. Tr.), ECF No. 220-43, at 59:16–62:5.)  Dawkins admitted that he
did not even know YA had a valuation committee while employed at YA.  (*Id.* at 60:17–19.)
Dawkins also testified that he never raised his concerns with McGladrey, and no one at YA ever
told him to withhold information from anyone.  (*Id.* at 60:3–11.)  Based on the active steps that
YA took to investigate Dawkins's valuation concerns, despite Dawkins's perceived and actual lack

of qualifications to raise them, the SEC fails to present sufficient evidence that Defendant Schinik attempted to conceal information from McGladrey.

As other evidence of alleged fraud, the SEC also points to two valuation reports in 2009 that were prepared and sent to YA in relation to its investment in Westport: (1) the September 2009 VRC Report; and (2) the November 2009 MHA Report. (Opp'n at 16; Pl.'s 56.1 Stmt. ¶ 552.) The September 2009 VRC Report (prepared by VRC) provided a valuation of Westport based on, *inter alia*, an economic forecast prepared by a third-party, which assumed that Westport possessed 51 producing gas wells. (*See* Brody Decl. Ex. 335, ECF No. 208-142; *id.*, Ex. 376, ECF No. 208-188; Schechtman Decl. Ex. 61 ("September 2009 VRC Report"), ECF No. 192-61, at 90.) The November 2009 MHA Report, which was prepared by MHA Petroleum Consultants and sent to Defendant Schinik, concluded that one of Westport's wells would not be profitable (and lead to negative cash flow) under conditions that would be 50% likely to occur. (Brody Decl., Ex. 107 ("November 2009 MHA Report"), ECF No. 207-121, at YA8 (8175) 0121175.) Based on these two reports, the SEC seems to suggest that Defendant Schinik fraudulently "preferred" or "trusted" the September 2009 VRC Report more so than the November 2009 MHA Report to support YA's inflated value of Westport. (Pl.'s 56.1 Stmt. ¶ 552 ("Based on [the 2009 MHA Report] alone, it is unclear how Defendants could have believed that VRC"s valuation, which assumed 51 economic wells, was realistic.").)

Not only is it difficult to understand the nature of the SEC's claim, but the SEC does not point to any evidence to support its suggestion that Defendant Schinik either hid the November 2009 MHA Report from VRC (or others), or that he used the report to overvalue Westport. In fact, the evidence shows just the opposite. After receiving the November 2009 MHA Report, YA sent it to VRC. (Schechtman Decl., Ex. 180, ECF No. 220-56.) After VRC received the November

2009 MHA Report, YA and VRC then proceeded to discuss the report specifically in relation to the September 2009 VRC Report. (*Id.*, Ex. 181, ECF No. 220-57.) As such, the SEC has provided no evidence of fraud or negligence to support its claims.[13]

The SEC also criticizes the September 2009 VRC Report for basing its valuation on the assumption that that gas prices were fixed at an overly high $8/mcf (1,000 cubic feet) even though the price was outdated (from 2007) and was only secured through a memorandum of understanding ("MOU") between Westport and a third-party to purchase the gas for that price that was not even binding. (Pl.'s 56.1 Stmt. ¶ 552.) However, the SEC does not provide any support for its contention that the price was outdated. (*See id.*) Nor does the SEC's record cite show that the $8/mcf figure came from an MOU. (*See* Brody Decl., Ex. 13, ECF No. 207-20.) In addition, the September 2009 VRC Report plainly provides that the basis for the $8 gas price was Westport's "virtual monopoly on energy supply to the region."[14] (September 2009 VRC Report at 90.)

Therefore, neither the 2009 reports nor any of the other aforementioned instances where Defendant Schinik allegedly failed to disclose certain documents to McGladrey raise a triable issue of fact regarding scienter or negligence.

### ii.   Affirmative Misrepresentations

The SEC also alleges that Defendant Schinik attempted to defraud investors and McGladrey by making affirmative misrepresentations concerning the value of the Funds'

---

[13] To suggest that one report is more "correct" than the other would also be inappropriate. (*See* Opp'n at 16; Pl.'s 56.1 Stmt. ¶ 552.) The two reports are fundamentally different. While the September 2009 VRC reported valued Westport, based on its ownership of 51 producing wells, (*see* September 2009 VRC Report, at 90), the November 2009 MHA Report only assessed the economic outlook of Westport on the economic viability of a *single* well. (*See* November 2009 MHA Report at 1 ("[T]he analysis focused on one well to determine economic feasibility.")

[14] As far as the accuracy of the September 2009 VRC Report is concerned, the report was acceptable to VRC, YA, and McGladrey. (*See* September 2009 VRC Report; Schechtman Decl., Ex. 13, ECF No. 13.) No evidence of any concerns or "red flags" exists.

investments.   However, the SEC attempts to support its allegations by misinterpreting and mischaracterizing the record.

For example, the SEC alleges that "a valuation memo for Striker that YA sent to McGladrey on April 17, 2009 [approved by Defendant Schinik] said that 'oil and gas reserves continue to remain in high demand' notwithstanding that not even two weeks earlier, Striker management specifically told YA that it had been marketing its properties for months with little interest." (Opp'n at 13; *see also* Pl.'s 56.1 Stmt. ¶ 564.) First, there is no evidence that Defendant Schinik ever saw or even had access to Striker's email to YA.  Second, even if Defendant Schinik did, the SEC mischaracterizes the April 17, 2009 valuation memo.  A closer inspection of the memo reveals that the quoted language actually refers to the general outlook on the oil-and-gas industry at the time, not the marketability of Striker's specific properties, which is what Striker discusses in its email.  Under the heading of "Traction of Product or Idea," the memo states:

> Oil and gas reserves continue to remain in high demand despite the recessionary effects causing higher inventories and lower commodity pricing.  Oil and gas prices have rebounded strongly since their lows in early 2009.  Natural gas prices are lower because of recent environmental reports suggesting a mild hurricane season.

(Brody Decl., Ex. 216, ECF No. 208-17, at M&P 105270.)

On the other hand, in its email to YA, Striker describes the performance of its own properties and states, "[h]aving marketed these properties for several months now we have only received interest in our Welsh field from KD resources."  (*Id.*, Ex. 195, ECF No. 207-217, at Yorkville 001590163.)  Based on a lack of evidence that Defendant Schinik saw or had access to Striker's email to YA, and the differences between the content of the email and the valuation memo, the SEC fails to adequately demonstrate that Defendant Schinik was reckless or negligent in endorsing the memo.

The SEC also alleges that, despite knowing that a merger between TXP Corporation ("TXP") and another company, Cambridge Industries Group ("CIG"), had failed to close by December 2008, Defendant Schinik signed off on a valuation memo that was sent to McGladrey in 2009 in which YA represented that its valuation of TXP was supported because "[t]he company has moved in a positive direction and is concurrently looking to close a merger which would create the dominant 'pure play' provider of ONTS's." (*Id.*, Ex. 358 ("August 2008 Valuation Email and Memo"), ECF No. 208-170, at M&P 104849; Opp'n at 12.) However, the SEC, again, fails to point to any evidence that Defendant Schinik knew or had access to specific information that the merger had collapsed.

Even if Defendant Schinik did, the valuation memo's representations concerning the merger were not false because the memo was from *before*, not *after* the merger fell apart. The memo plainly states under the headline of "Investment/ M&A Activity" that "TXP and Cambridge Industry Group (CIG) . . . announced *today* that they have signed a Memorandum of Understanding (MoU) to merge the two companies." (August 2008 Valuation Email and Memo at M&P 104847 (emphasis added).) As the evidence shows, and the SEC concedes, TXP and CIG announced their merger on August 21, 2008. (Pl.'s 56.1 Stmt. ¶ 786 (citing Brody Decl., Ex. 363, ECF No. 208-175).) YA also emailed the August 2008 memo to McGladrey in 2009 not as a representation of TXP's value as of 2009, but rather as part of a series of documents that YA continued to send to McGladrey over time so that McGladrey could conduct its 2008 audit of YA. (*See* August 2008 Valuation Email and Memo, at M&P 104818 ("[McGladrey], Please see the attached valuation *memos.* We will be sending *more* in a separate email later today." (emphases added).) Thus, the August 2008 valuation memo does not serve as an adequate basis to infer scienter or negligence.

The SEC also alleges that Defendant Schinik tried to deceive McGladrey by endorsing a 2008 valuation memo ("Isonics 2008 Valuation Memo") for Isonics Corporation ("Isonics"). In that memo, YA represented to McGladrey that its value for Isonics was supported by YA's ability to trade out of the company, if need be, even though Isonics had already terminated its SEC registration, "thus making an exit through trading virtually impossible." (Opp'n at 13; *see also* Pl.'s 56.1 Stmt. ¶¶ 872–73.) However, Isonic's termination of its SEC registration was a *2009* event, not a 2008 event, meaning it had no bearing on YA's 2008 valuation memo for Isonics. (*See* Pl.'s 56.1 Stmt. ¶¶ 872–73.) Furthermore, Isonic's delisting was publicly available information, which McGladrey and YA discussed, undermining the SEC's contention that Defendant Schinik was somehow trying to hide this information. (*See* Schechtman Decl., Ex. 253, ECF No. 220-156, at MP 18649.)

In relation to the Isonics's 2008 Valuation Memo, the SEC also faults Defendant Schinik for failing to provide McGladrey with an updated version of the memo to reflect the fact that Isonic sold its semi division for $1.2 million. (Pl.'s 56.1 Stmt. ¶ 875.) However, the SEC provides no evidence to support its allegation. In fact, the record, again, suggests the exact opposite. Oren Franks, YA's comptroller, sent an email on April 8, 2009, to several other YA employees stating, "[t]he auditors have requested additional information in respect [sic] the memos you have prepared, and it will be necessary to 'beef up' the memos. I am attaching a log of the memos prepared, where you can identify the memos marked for comments so far, as well as specific comments from the auditors." (Brody Decl., Ex. 438, ECF No. 209-38, at Yorkville 001164535.) Several days later, on April 17, 2009, Michael Rosseli, another YA employee, specifically wrote, "Updated. Sold Semi division for $1.2 mil via distressed sale more or less to eliminate the burn[,]" and attached an updated valuation memo reflecting the addition. (*Id.* at Yorkville 001164354.)

40

As a result, the SEC's reliance on the Isonics 2008 Valuation Memo as evidence of Defendant Schinik's recklessness or negligence is unfounded.[15]

As another instance of fraud, the SEC alleges that despite knowing that, as of December 31, 2009, Falcon had lost most of its oil-and-gas leases, Defendant Schinik decided to value Falcon as if the leases had not been lost (*i.e.*, not renewed). (Opp'n at 12, 39; Pl.'s 56.1 Stmt. ¶¶ 525–26.) However, Defendant Schinik's decision was based not on an intent to defraud, but rather his (and others') business judgment. In July 2010, in response to questions by McGladrey concerning Falcon's 2009 value, Defendant Schinik decided to value Falcon as if the leases had not been lost for two reasons. First, to the best of Defendant Schinik's, Rillo's (Senior Managing Director at YA), and Garrett's (Head of YA's Energy Group), knowledge, they did not know that Falcon had lost the leases as of December 31, 2009. Second, even if they had known, it was understood and believed by many at YA that renewal of the leases was a virtual certainty. (Schechtman Decl., Ex. 45 (Defendant Schinik Dep. Tr.), ECF No. 192-45, at 361:3–13; *id.*, Ex. 21 (Eicke Dep. Tr.), ECF No. 21, at 200:13–202:3; Fine Dep. Tr. at 285:9–17.) Regaining and renewing the leases was merely a matter of paying for a new lease term. (Schechtman Decl., Ex. 164 ("Garrett Dep. Tr."), ECF No. 220-40, at 207:24–208:3, 281:17–282:12; *id.*, Ex. 32, ECF No. 192-32 (Rillo Dep. Tr.), at 255:18–259:18.) As a matter of fact, YA exercised its option and renewed the leases in or

---

[15] The SEC also attempts to allege that it was fraudulent for YA to fail to notify McGladrey that, in October 2008, Robert Weeks, a potential buyer for Isonics's semi division, offered $7 million to purchase the business, (Brody Decl., Ex. 439, ECF No. 209-39), but later "backed off," two months later. (*See* Pl.'s 56.1 Stmt. ¶¶ 859, 864; *see also* Pl.'s 56.1 Stmt. ¶ 189 (Response to Defs.' 56.1 Stmt.).) Yet the evidence does not support this allegation. The report that contains the reference to the investor "backing off" actually says that "Nestec has backed off," not Weeks. (Brody Decl., Ex. 44, ECF No. 207-52, at 001601151.) The SEC also fails to demonstrate that Defendants Schinik or Angelo knew, had access to, or had a duty to review this information (aside from any duty imposed merely by their corporate titles or positions).

around July 2010. (Garrett Dep. Tr. at 230:10–19.) The SEC does not allege that YA's valuation decision contravened accounting rules or YA's internal valuation policies and procedures.

Accordingly, based on the lack of material evidence demonstrating scienter or negligence, the SEC is unable to proceed against Defendant Schinik for the Valuation Statements.[16]

## C.   Defendant Schinik's Scienter as to the One-Off Statements

In addition to its Valuation Statements, the SEC alleges that during the Relevant Period, Defendant Schinik and Angelo allegedly endorsed a series of misrepresentations to investors and potential investors concerning the VC's policies and procedures, and Pluris's engagement by YA. The SEC raises a material dispute as to Schinik's scienter and Angelo's negligence (but not scienter) arising out of the alleged misrepresentations concerning Pluris's engagement by YA.

### i.   YA's Valuation Policies

The SEC's alleged misrepresentations concerning YA's valuation policies fall into two categories: (i) those concerning YA's valuation methods, (*see* Compl. ¶¶ 36–39); and (ii) those related to YA's VC procedures, (*see* Opp'n at 55).

#### a.   YA's valuation methods

The SEC points to the following representation made in YA's management representation letters to McGladrey in connection with the 2008 and 2009 Audits:

> Various factors were reviewed in order to make a good faith determination of a security's fair value. In determining fair value, the General Partner evaluated whether an impairment of an investment has occurred as a result of a specific adverse condition affecting the Issuer of a convertible debt or promissory note obligation . . . . In some cases, the General Partner employed financial models to

---

[16] The SEC claims in a footnote in its opposition brief that Schinik falsely represented to an investor that the VC regularly reviewed YA's proprietary deal tracking system when, in reality, it did not. (*See* Opp'n at 55 n.62.) However, this allegation is not pled in the complaint, and as such, cannot be properly considered in deciding Defendants' motion for summary judgment. *See Southwick Clothing LLC*, 2004 WL 2914093, at *6.

determine a 'best estimate' valuation or determine that cost approximates fair value for the particular security.

(Schechtman Decl., Ex. 120, ECF No. 192-120, at M&P 001131; *id.*, Ex. 121, ECF No. 192-121, at M&P 013525.)

The SEC alleges that this representation was false or misleading because YA never employed any financial models to value its investments at fair value. (Compl. ¶ 37.) Yet, the record is replete with instances in which YA used financial models in connection with their investments. For example, YA used financial models to calculate the illiquidity discount for the equity component of the Fund's convertible debentures. (*See* Schechtman Decl., Ex. 52, ECF No. 192-52, ¶ 7; *id.*, Ex. 50, ECF No. 192-50; *id.*, Ex. 49, ECF No. 192-49; *id.*, Ex. 22, ECF No. 192-22, at 40:1–12; *id.*, Ex. 43 ("Defendant Schinik Dep. Tr."), ECF No. 192-43, at 150:14–151:21; *id.*, Ex. 48 ("Franks Dep. Tr."), ECF No. 192-48, at 140:15–17.) YA also used financial models to analyze projected cash flows for portfolio companies. (Feeney Dep. Tr. at 154:20–155:20; Schechtman Decl., Ex. 75, at ECF No. 192-75, at 252:3–257:9; *id.*, Ex. 18, ECF No. 192-18, at 113:19–114:8; *id.*, Ex. 42, ECF No. 192-42; *id.*, Fine Dep. Tr. at 122:20–123:10; *id.*, Ex. 94, ECF No. 192-94, at 7:23–9:24, 25:19–26:10.) In connection with the 2008 Audit, YA explained to McGladrey how it was using these financial models. (Schechtman Decl., Ex. 122, ECF No. 192-122, at 000500044-49; *id.*, Ex. 78, ECF No. 78, at 107:2–108:25.)

The SEC fails to offer any evidence to the contrary, nor does it point to any evidence in the record that Defendants Angelo or Schinik knew (or had a duty to know, aside from the duty imposed by their mere corporate titles) specific facts that financial models were not being used to value YA's investments. The SEC attempts to argue that Defendant Schinik's statement during his deposition that, "in most cases we haven't used financial models, except for the spreadsheets related to the intrinsic value for determining convertible debentures[,]" contradicts YA's

representations in its PPMs. (*See* Pl.'s 56.1 Stmt. ¶ 293 (Response to Defs.' 56.1 Stmt.).) Yet, the SEC's record cite does not even contain such a statement. (*See* Schechtman Decl., Ex. 46 (Defendant Schinik Dep. Tr.), ECF No. 192-46, at 150:14–151:5.) Thus, based on the record evidence, there is no disputed issue regarding the veracity of YA's representations concerning its use of financial models.

The SEC also alleges that YA "did not conduct any testing of the Funds' convertibles to determine whether the investments' cost equaled their fair value[,]"despite representations to the contrary to its investors and auditors. (Compl. ¶ 37.) Specifically, the SEC alleges that YA falsely stated in its 2008 and 2009 compliance manuals, which were made available to investors and prospective investors, (Brody Decl., Ex. 40, ECF No. 202-47, at 0631605), that YA employed independent pricing services, periodic reviews and testing, and exception reporting to value its investments, when it in fact never did. (*See* Compl. ¶¶ 31, 37; *see also* Pl.'s 56.1 Stmt. ¶ 298 (Respons to Defs.' 56.1 Stmt.).)  YA's Compliance 2008 and 2009 compliance manuals state:

> Proper valuations are necessary for accurate performance calculations and fee billing purposes, among others. Because of the many possible investments, various pricing services and sources and diverse characteristics of many investment vehicles, independent sources, periodic reviews and testing, exception reviewing, and approvals and documentation or pricing changes are necessary with appropriate summary disclosures as to [YA's] pricing policy and practices.

(*See* YA 2008 Compliance Manual § VI-4; YA 2009 Compliance Manual § VI-4.)

The manuals also state that:

> In obtaining the necessary values to calculate each client's Net Asset Value ('NAV'), as described below, [YA] will utilize one or more independent pricing services. If a pricing service is not able to provide the necessary information to calculate the NAV, then [YA] shall refer to the section called 'Valuation of Securities Not Valued by an Independent Pricing Services'.

(*Id.*)

However, YA did in fact employ independent pricing.  For example, YA employed VRC (in 2009) to provide independent pricing on a significant percentage of its portfolio, (September 2009 VRC Report), and Pluris (in 2008 and 2009) to provide independent pricing for its warrants. (Schechtman Decl., Ex. 23, ECF No. 192-23, at 9–10; YA 2008 DDQ at 10; Schechtman Decl., Exs. 49, 50, ECF Nos 192-49–50.)  The evidence also demonstrates that YA conducted periodic reviews and testing, and exception reporting in connection with the valuation of its investments. (*See id.*, Franks Dep. Tr. at 34:8–15 (Comptroller for YA stating that part of his responsibilities was to conduct "variance testing" on the portfolio); *id.*, Ex. 16, ECF 192-16, at 133:2–20 (member of YA's Investment Committee and Valuation Committee stating that he conducted periodic reviews of the Funds' convertible debenture portfolio).)  The SEC fails to set forth any material evidence to the contrary, nor does it present any evidence that Defendants Angelo or Schinik had any specific knowledge of such information, even if it existed.  Accordingly, the SEC's allegations concerning YA's valuation methods do not provide an appropriate basis for a misrepresentation claim.

### b.    YA's VC procedures

With regard to YA's VC procedures, the SEC asserts that YA made misrepresentations regarding the frequency with which the VC met.  (Compl. ¶¶ 59–61; Opp'n at 55.)  In several of its DDQs, YA represented to its investors that "the Valuation Committee meets each month to *re-evaluate* the asset value of the underlying collateral of each of the Fund's positions . . . ."  (Brody Decl., Ex. 4., ECF No. 202-8, at 15 (emphasis added); *id.*, Ex. 5, ECF No. ECF No. 202-11, at 17 (emphasis added).)  However, the SEC, whether in its briefs or Rule 56.1 Statement, does not point to any evidence that demonstrates that Defendants Angelo or Schinik were reckless or negligent in endorsing the statement that the VC re-evaluated (as opposed to valued) the asset value of the

underlying collateral for each position every month.  If anything, the evidence suggests that from

at least Defendant Schinik's perspective, for example, the VC did meet monthly to re-evaluate the

value of the underlying collateral for each of the Fund's positions.   During his deposition,

Defendant Schinik testified to the following regarding the VC's meetings: "We reviewed one-third

of the positions monthly but we considered all the positions on a monthly basis. We were always

up to date on the portfolio as a whole." (Schechtman Decl., Ex. 22 (Defendant Schinik Dep. Tr.),

ECF No.192-22, at 53:3–5.)  He also stated:

> The Valuation Committee meets monthly.  We talk about the portfolio as a whole,
> basically a third of the portfolio every month so by the end of the quarter we have
> gone through the entire portfolio, and we look at a variety of factors [including]: . .
> . collateral in terms of what do we have as collateral.  That is a big part of it, because
> even if we can't collect and we need to foreclose or take ownership of collateral,
> what is the value of that collateral, whether it is land, whether it is mining, oil and
> gas assets, whether it is IP.

(Defendant Schinik Dep. Tr. at 74:6–20.)

The SEC points to evidence that Defendants Schinik and Angelo had, at least, some input

regarding the content of the DDQs.  For example, YA's Director of Investor Relations testified

that information in the DDQs concerning the valuation policy came from Defendant Schinik (*See,*

*e.g.*, Schechtman Decl., Ex. 119 ("Anderson Dep. Tr."), ECF No. 192-119, at 24–25.)  However,

mere involvement in the drafting of the DDQs, without an identification of specific, contrary

information which Defendants Angelo or Schick had access to or knowledge of is insufficient for

purposes of establishing an intent to defraud. *See Novak*, 216 F.3d at 308.  Therefore, the SEC's

allegations concerning YA's VC procedures also do not provide an appropriate basis for a

misrepresentation claim.

46

### ii.   Pluris

The SEC alleges that YA made certain misrepresentations regarding Pluris and its engagement with YA to both investors and McGladrey.  However, material factual disputes exist to preclude summary judgment with respect to YA's alleged misrepresentations to its investors, but not to McGladrey.

#### a.   Investors

The SEC alleges that beginning in August 2008, Defendants Schinik and Angelo allegedly misrepresented to various investors that Pluris was engaged to value the Funds' convertible securities, despite having decided internally before then not to use Pluris for such purpose ("Pluris Engagement Representation"). (Compl. ¶¶ 76–85.) All parties agree that after engaging Pluris in August 2007 to value the Fund's convertible portfolio, YA decided in July 2008 to stop using Pluris to value its convertibles (the "July 2008 Decision"). (Defendant Schinik Nov. 2010 Dep. Tr. at 77:13–78:8.) Defendant Schinik informed Pluris of this decision via email in August 2008. (*See* Brody Decl., Ex. 602, ECF No. 210-42.) Both YA and Pluris agreed that Pluris could not use its models to derive effective estimations of fair value of YA's convertible portfolio, due in large part to the securities' illiquid nature. (*See* Schechtman Decl., Ex. 53 ("Robak Dep. Tr."), ECF No. 192-53, at 71:21–25; 87:3–18.)

Yet, Defendants assert that once this determination was made, neither Defendant Angelo nor Defendant Schinik ever told an investor or prospective investor that the Fund's convertible debenture portfolio was valued by Pluris or that Pluris had provided YA with valuations of the convertible debenture portfolio that reflected fair value. (*See* Defs.' 56.1 Stmt. ¶ 134.) The SEC counters by pointing to several statements made after the July 2008 Decision, with Defendant Angelo's and Defendant Schinik's endorsement, suggesting that Pluris was still involved in

valuing the Funds' convertibles. For example, on August 5, 2008, YA sent a 2008 Second Quarter Letter to investors stating that "Yorkville has engaged Pluris Valuation Advisors LLC to assist in valuing the Fund's convertible debentures and convertible preferred stock on a monthly basis." (Brody Decl., Ex. 607, ECF No. 210-6, at YAHV 000255.) YA's Director of Investor Relations, Thomas Anderson, testified that Defendant Angelo was involved in the creation and drafting of YA's quarterly letters to investors. (Anderson Dep. Tr. at 28:3–16.) On November 4, 2008, YA sent an email to a prospective investor, attaching answers to the investor's questions concerning YA. (Brody Decl., Ex. 611, ECF No. 210-10, at Yorkville 001509515.) The email stated, "Yorkville has engaged Pluris Valuation Advisors LLC to assist in valuing the Funds' convertible debentures and convertible preferred stock on a monthly basis" and "[a] third party, [Pluris], independently values the Fund's warrant book was well as its convertible debentures and convertible preferred stock." (*Id.*) Defendant Angelo was copied on the email, which stated that "Mark [Defendant Angelo] and I are looking forward to speaking with you in a few hours." (*Id.* at 001501819.)

Likewise, the SEC points to similar statements endorsed by Defendant Schinik. On August 11, 2008, Defendant Schinik drafted a statement that was sent to an investor in which YA stated, "[w]e have engaged Pluris Valuations Advisors to assist us in the valuation process." (*Id.*, Ex. 609, ECF No. 210-8 at 001516101, 001516105.) Similarly, on October 20, 2008, YA sent an investor a DDQ, after providing a draft for Defendant Schinik's review, which answered the question "What percentage of your portfolio is subject to subjective valuation?" with the following: "The most subjective part of our valuation process is the decision to impair certain positions. . . . A decision to write down or impair a position was always made by our internal Valuation Committee. This will change in the next few months since a third party, Pluris

Valuations, will soon be responsible for fully valuing our convertible book as well as warrants."
(*Id.*, Ex. 711, ECF No. 210-130, at 001512608; *id.*, Ex. 610, ECF No. 210-9, at 000843138.) Based
on the foregoing factual disputes, a reasonable jury could find that YA's representation that Pluris
was engaged to value the Funds' convertibles, at a time when YA had decided to stop utilizing
Pluris's for such purpose, was false or misleading.

Defendants allege that their representations to investors after the July 2008 Decision were
not false because Pluris continued to assist YA in the valuation of its convertible portfolio "by
providing illiquidity discount data that the Valuation Committee used to test its internal model for
discounts on the optionality component." (Defs.' Reply, ECF No. 217, at 32–33.) Robak testified
that even after the July 2008 Decision, YA still requested that Pluris send over its valuation reports
with illiquidity discounts so that YA could use them in its internal valuations. (Robak Dep. Tr. at
87:3–18; *see, e.g.*, Brody Decl., Ex. 628, ECF No. 210-34 ("Pluris 2008 Convertible Report").)
However, the SEC points to evidence that, as of October 22, 2008, approximately three months
after the July 2008 Decision, Defendant Schinik still may not have made up his mind about whether
to even use Pluris's illiquidity discounts. (Brody Decl., Ex. 605, ECF No. 210-5.) In fact, in
December 11, 2008, Defendant Schinik told a fellow YA employee that YA was not using "inputs
from liquidity discount from [Pluris]." (*Id.*, Ex. 724, ECF No. 210-145.) Thus, material factual
disputes remain concerning YA's representations to its investors about Pluris's engagement, and
the extent of such engagement, after July 2008.

Material disputes also exist regarding whether these statements were material and made
with the requisite level of scienter. As noted above, materiality is generally a factual issue to be
decided by a jury as it pertains to whether a reasonable investor would find an alleged
misrepresentation to be misleading. *See Rombach*, 335 F.3d at 172 n.7. As for scienter, the

evidence demonstrates that Defendant Schinik was the one who decided to terminate Pluris's engagement. A reasonable jury could find that it was reckless for Defendant Schinik to endorse YA's representations regarding Pluris's continued engagement to investors, assuming it also finds that YA did not continue to utilize Pluris for any other purpose after the July 2008 Decision. Consequently, all of the SEC's misrepresentation claims involving the Pluris Engagement Representation against Defendant Schinik survive Defendants' motion for summary judgment.

On the other hand, the SEC fails to point to any specific evidence that Defendant Angelo knew of or had access to information that would have alerted him to the allegedly misleading nature of his representations regarding Pluris's engagement.[17] The SEC argues that "Defendant Angelo was part of the decision making process to not use Pluris to value the convertible debentures and, in fact, led the telephone conference with Pluris where YA expressed its displeasure at Pluris's valuations." (Opp'n at 58.) Yet, the SEC does not cite to any evidence to support this assertion.

The SEC also points to Defendant Schinik's testimony that he "certainly" spoke with YA's partners regarding terminating Pluris for purposes of valuing YA's convertible portfolio. (Defendant Schinik Nov. 2010 Dep. at 150:14–151:5.) From this statement alone, the SEC infers that Defendant Angelo must have been included in this conversation. However, Defendant Schinik never explicitly identified who these partners were nor does the SEC cite to sufficient evidence that Defendant Angelo was or is a "partner" at YA.[18]

---

[17] The SEC asserts generally that Defendant Angelo had "access to . . . information" that YA was no longer using Pluris to value YA's convertible portfolio. (Opp'n at 65.) However, it fails to identify any *specific*, contrary information to which he had access.

[18] The SEC points to an excerpt from a May 2008 Private Placement Memorandum ("PPM") as support for its claim that Defendant Angelo is a "partner" at YA. (Brody Decl., Ex. 733, ECF No. 210-167.) However, the PPM does not refer to Defendant Angelo as a partner but rather identifies him, and several other YA employees including Eicke, as a "managing member" and "principal" of YA.

A reasonable jury may, however, conclude that Defendant Angelo was negligent with respect to the alleged misrepresentations concerning Pluris's engagement.   Not only was Defendant Angelo YA's President and portfolio manager for the Fund during the Relevant Period, but Defendant Angelo was involved in endorsing, either directly or indirectly, numerous representations concerning Plursis's engagement after the July 2008 Decision.   (*See* Defs.' 56.1 Stmt. ¶ 17; Pl.'s 56.1 Stmt. ¶ 134 (Response to Defs.' 56.1 Stmt.).)   As such, the SEC's Negligence-Based Claims against Defendant Angelo arising out of the Pluris Engagement Representation survive Defendants' motion for summary judgment.

> ### b.      McGladrey

The SEC also alleges that YA misrepresented Pluris's role to McGladrey by providing the auditor with a memo that falsified the fair value that Pluris had assigned to the Fund's convertible positions as of December 31, 2008.   (Compl. ¶¶ 87–93.)   In a memo sent to McGladrey on May 14, 2009, Defendant Schinik attached a report ("Defendant Schinik 2008 Convertible Report") that stated that, as of December 31, 2018, the total dollar amount of the Fund's convertibles, using Pluris's valuation method and discount factor, was $303,478,194.   (Brody Decl., Ex. 626 ("Defendant Schinik 2008 Convertible Report"), ECF No. 210-32.)   However, according to the SEC, Pluris's actual convertible valuation report (the "Pluris 2008 Convertible Report"), as of December 31, 2008, valued the same YA convertibles, utilizing the same method, at only $239,168,685, not $303,478,194.   (Pluris 2008 Convertible Report.)

The SEC lacks a sufficient basis to allege that the Defendant Schinik 2008 Convertible Report was false or misleading.   The disparity between the total dollar amounts in the two reports exists because the Defendant Schinik 2008 Convertible Report calculated the total dollar value of

---

the Fund's convertibles using a different number of convertibles—it included the value of several convertibles that the Pluris 2008 Convertible Report specifically excluded from its own calculations. At the end of the Pluris 2008 Convertible Report, Pluris lists several convertibles that were excluded from its calculation of the total fair value of the Funds' convertibles and not assigned any numeric value (labeled, "REMOVED POSITIONS"). (*Id.*) The basis for the removal appears to be because these convertibles had "NEGLIGEBLE VALUES." (*Id.*) These removed positions include, for example, convertibles with the ticker symbols "eagb2," "eyii," and "eyii2." (*Id.*)

On the other hand, these convertibles were included in the Defendant Schinik 2008 Convertible Report's totals calculation. "Eagb2" is listed in the report with a value of $59,068, "eyii" with a value of $31,770, and "eyii2" with a value of $773,714. (Defendant Schinik 2008 Convertible Report at 000500045, 000500046.) The SEC does not provide any additional details or evidence as to why Pluris decided to exclude some convertibles that YA later included in its report, or whether Pluris ever assigned values to these excluded convertibles and sent these to YA. Without such accompanying details, there exists no genuine issue of fact regarding the veracity of Defendant Schinik's 2008 Convertible Report.[19] Accordingly, the SEC may not proceed against Defendant Schinik for misrepresentations based on his 2008 Convertible Report.[20]

---

[19] The SEC also fails to provide any evidence as to who at YA received the Pluris 2008 Convertible Report.

[20] The Complaint also faults YA for never providing McGladrey with Pluris's valuation reports. (Compl. ¶¶ 92–93.) However, as the SEC acknowledges, YA did not disclose Pluris's valuation reports because it did not believe that the reports reflected fair values, were reliable, or incorporated relevant data. (Defs.' 56.1 Stmt. ¶ 131.) Furthermore, during McGladrey's subsequent review of its audit working papers in 2011, it found that Pluris's engagement did not impact its previous audit opinions.

## V.    MOTION FOR SUMMARY JUDGMENT: ANGELO

### A.    Defendant Angelo's Scienter as to the Valuation Statements

As with Defendant Schinik, the SEC alleges that Defendant Angelo possessed an intent to defraud with respect to the Valuation Statements because he failed to disclose key documents, ignored red flags, and made affirmative misrepresentations to McGladrey.  However, the SEC's claims of scienter and negligence with respect to Defendant Angelo are equally unsupported and based on mischaracterizations of the record evidence.

### i.    Failure to Disclose and Red Flags

The SEC alleges that Defendant Angelo failed to disclose to McGladrey a "side agreement" that he signed between YA and Prentice Capital Management, LP ("Prentice"), another senior creditor of SmarTire Systems Inc. ("SmarTire") (like YA), which provided the terms and conditions of how proceeds from a liquidation sale of SmarTire's assets would be maintained in escrow.  (Opp'n at 12; Brody Decl., Ex. 532 ("Side Agreement"), ECF No. 209-131, at 001644969–76.)  However, the SEC never articulates why YA's failure to disclose this agreement constituted an intent to defraud McGladrey with respect to YA's valuations.  The SEC does not point to any specific information YA was trying to hide, let alone why it was material, or what benefit YA would have derived from withholding it.  Without these accompanying allegations, the SEC's accusations concern a mere failure to disclose.  However, "an inference of scienter does not follow from the mere fact of non-disclosure of relevant information." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 579 (S.D.N.Y. 2016) (citing *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F. 3d 199 (2d Cir. 2016)).

The SEC appears to suggest that Defendant Angelo did not disclose the Side Agreement to McGladrey because he wanted to make it seem as if YA would receive the entirety of the proceeds

from the sale ($2.5 million), when in reality the proceeds were going to be split with Prentice and another secured creditor. (*See* Pl.'s 56.1 Stmt. ¶ 1001.) The Side Agreement states that the proceeds from the asset sale would be put into escrow "until a determination on the allocation of such proceeds among the parties can be reached." (Side Agreement at 001644969.)

However, the SEC fails to establish sufficient evidence of scienter or negligence for several reasons. First and foremost, the Side Agreement (like the 2009 Ryder Scott report) is not even listed in in Yager's declaration as one of the thirteen documents not provided to McGladrey. (*See* Yager Decl. ¶ 6.) Second, as the agreement itself makes clear, the Side Agreement was principally an escrow agreement that detailed the terms and conditions of how proceeds from the asset sale would be handled and managed by the escrow agent. It was not the agreement governing the actual division of the sale proceeds among the parties. Rather, the distribution was governed mainly by a separate Liquidation Agreement, along with an Asset Purchase Agreement. (Side Agreement at 001644970 ("The parties agree that any and all payments made . . . to the Lenders and/or Collateral Agent under [sic] Asset Purchase Agreement, the Liquidation Agreement, [or] the Escrow Agreement . . . shall be paid to . . . [the] escrow agent . . . .").) Email communications between YA and Prentice also make clear that the Liquidation Agreement was to govern the distribution of the sale proceeds while the Side Agreement governed the "*process* of the split of [the] proceeds." (Brody Decl., Ex. 531, ECF No. 209-130, at Yorkville 001280608 (emphasis added).)

The SEC does not point to sufficient evidence that Defendant Angelo, or anyone else at YA, failed to disclose these agreements to McGladrey, or that he attempted to conceal that Prentice was a secured creditor of SmarTire who also possessed liquidation preferences. In fact, by the SEC's own admission, the relative creditor positions of the parties were made publicly available through a Security Agreement between YA and Prentice that was filed in 2007 in a Form 8-K.

(Pl.'s 56.1 Stmt. ¶ 972); *see In Re Pfizer Inc. Shareholder Deriv. Litig.*, 722 F. Supp. 2d 453, 464 (S.D.N.Y. 2010) (holding that the defendants' failure to disclose certain agreements involving a defendant company that were publicly available did not constitute fraud).   In addition, Prentice also publicly filed a lawsuit against YA in connection with the Security Agreement.  (Brody Decl. Ex. 521, ECF No. 209-120.)   As a result, the SEC fails to demonstrate that Defendant Angelo's failure to disclose the Side Agreement was reckless or negligent.

As another instance of failure to disclose, the SEC alleges that Defendant Angelo received two reports in connection with YA's investment in Compass that he failed to disclose to VRC in connection with its 2009 valuation of Compass.   The first was a pre-feasibility study ("PFS") produced by a third-party that measured the viability of the mining and processing of sulfide in a particular territory in Australia (the "Sulfide Project").   (Opp'n at 41; Pl.'s 56.1 Stmt. ¶¶ 649, 658.)   The second was a summary of the PFS written by Richard Dosser ("Dosser Summary"), Compass's former head of the Sulfide Project.   (Opp'n at 41; Pl.'s 56.1 Stmt. ¶¶ 651, 658.)   Yet, as the SEC itself acknowledges, there is no evidence in the record that Defendant Angelo, or anyone else at YA, received the PFS or the Dosser Summary prior to March 7, 2010, after VRC had already completed its 2009 valuation of Compass.   (Brody Decl., Ex. 280 ("March 2010 Email"), ECF No. 208-85; Pl.'s 56.1 Stmt. ¶ 671; *see also* Pl.'s Rule 56.1 Stmt. ¶ 759.)   On March 8, 2010, Carr forwarded the PFS and Dosser Summary to both Defendant Angelo and Eicke, stating that he had received them "last night."[21]   (March 2010 Email, at Yorkville 000494333.)   The SEC

---

[21] The SEC also faults Defendant Angelo for responding to the March 2010 email by instructing that the Dosser Summary not be shown to anyone.  (Opp'n at 41; Pl.'s 56.1 Stmt. ¶ 671.)  However, the email thread plainly shows that Defendant Angelo only gave such an instruction because he and others at YA had not had the opportunity to review the summary—not because he wanted to hide it from anyone.  In the March 2010 email chain, Carr wrote, "I would hold . . . until we have had a chance to read it."  (March 2010 Email at Yorkville 000494333.)  Another employee at YA, Michael Holland, responded to Carr stating, "I am on the same page.  Let's read through before sending anything out and discuss internally, perhaps on the Wed.

also points to no evidence to suggest that either of these two documents would have been relevant to VRC's valuation of Compass since VRC received the PFS in connection with its mid-year 2010 valuation of Compass and determined that the PFS had no impact on its analysis. (Brody Decl., Ex. 98, ECF No. 207-111, at 12–16.)

In connection with the Sulfide Project, the SEC also alleges that YA misrepresented to its auditors in a July 14, 2010 memo ("Alleged July 2010 Memo") that the parent company of Compass's sole secured creditor, Hunan Nonferrous Metals Comp., Ltd. ("HNC"), would pay the full costs of a new feasibility study when in reality HNC had notified YA several weeks earlier that it would only cover 50% of them. (Pl.'s 56.1 Stmt. ¶ 179 (Response to Defs.' 56.1 Stmt.).)

The SEC mischaracterizes this piece of evidence. First, the Alleged July 2010 Memo to McGladrey does not bear an actual date, nor does the SEC point to any other evidence indicating when the memo was sent. (Brody Decl., Ex. 732 ("Alleged July 2010 Memo"), ECF No. 210-156. at MP 273736.) Thus, the SEC's contention that the memo was sent *after* HNC told YA that it would only cover 50% of the new feasibility costs is unsupported. Second, even if the Alleged July 2010 Memo had been sent afterwards, it never actually states that HNC will be covering all of the costs moving forward. Rather, the Alleged July 2010 Memo is clearly a backwards-looking document that provides McGladrey with a background and summary of YA's and HNC's involvement in Compass, and in particular, their efforts to date to restructure the company. (*See generally id.*)

The memo starts with a timeline of YA's and HNC's investment in Compass, and then proceeds to summarize the sections of several documents related to the investment. (*Id.*) For example, in summarizing a section of one document, the memo states, "[w]hen an acceptable

---

morning call . . . . If we send out after Wed call we are in good shape." (*Id.*) Defendant Angelo's comments, therefore, do not constitute sufficient evidence of scienter or negligence.

prefeasibility study is finalized, a subsequent feasibility study will be conducted.   Compass *envisioned* both when they negotiated a requirement that HNC pay for both feasibility studies." (*Id.* at MP 273740 (emphasis added).)  In summarizing another section, the memo states, "[t]he high cost of a definitive feasibility study is why Compass *partnered* with a deep-pocketed company and *arranged* for them to cover the costs." (*Id.* at MP273741 (emphases added).) Therefore, the SEC's claims of fraud concerning the Alleged July 2010 Memo are not supported and are dismissed.

With respect to YA's PLVTZ, Inc. ("Levitz") investment, the SEC alleges that Defendant Angelo received a 2007 appraisal prepared by FTI Consulting, Inc. ("FTI") that valued Levitz's intellectual property at $5 million, which apparently should have led him to conclude that YA's valuation of Levitz's IP was overvalued.  (Opp'n at 41; Pl.'s 56.1 Stmt. ¶¶ 898–906.)  Yet, the SEC never articulates or explains how this figure was different from YA's internal valuation of the IP, let alone why it constituted a red flag.   Even if the $5 million valuation was lower than the IP value ascribed by YA, the $5 million figure was specifically provided to YA at its request for an approximate "appraisal"/bid value of Levitz's IP in a 363 fire sale (sale of assets of an organization under Section 363 of the U.S. Bankruptcy Code), which took place twenty days after Levitz filed for bankruptcy on November 8, 2007.  (Brody Decl., Ex. 455, ECF No. 209-56).  The "book value" FTI assigned to Levitz's IP was actually considerably higher, at $15 million.  (*Id.*) As such, there is insufficient evidence of any wrongdoing by Defendant Angelo.[22]

---

[22] Along the same lines, the SEC alleges that a July 2008 valuation of SmarTire from Grace Advisory, a third-party consultant who provided a valuation range for the company of up to $7 million, constituted a red flag that should have alerted Defendant Angelo to YA's inflated valuation of the company. (Opp'n at 41.)  Yet, as indicated in the subject line of the email attaching the report, Grace Advisory explicitly described the valuation as "Very Prelim[inary]." (Brody Decl., Ex. 517, ECF No. 209-116.)  In fact, a few months later, in October 2008, Grace Advisory presented a new opinion valuing SmarTire between $18.5 and $22.6 million, based on the purchase of the company by another party. (*Id.*, Ex. 525, ECF No. 209-124.)

In relation to YA's investment in TXP, the SEC also alleges that in 2008 "Defendant Angelo knew that TXP was in default, insolvent, and unable to raise money," which should have alerted him that TXP was overvalued. (Opp'n at 41.) However, the SEC does not articulate how YA failed to account for these factors in valuing TXP in 2008.[23] (*See id.*) Further, any contention that Defendant Angelo tried to conceal TXP's financial status from McGladrey is belied by the fact that information concerning TXP's financial status was publicly available through TXP's SEC filings, including its September 2008 Form 10-Q. (*See, e.g.*, Schechtman Decl., Ex. 252, ECF No. 220-154.) Defendant Angelo's awareness of this fact does not constitute recklessness.

In connection with Levitz, the SEC also alleges that Defendant Angelo failed to disclose two 2008 valuation projections to VRC that were prepared by Jeff Roland, a third-party whom YA engaged to develop a business plan to commercialize Levitz's IP that YA purchased in the fire sale. (Opp'n at 41; Pl.'s 56.1 Stmt. ¶¶ 928, 931.) Yet, these valuation projections, by Roland's own admissions, were not only preliminary, but also baseless. In providing his projections in October 2008, Roland wrote to Defendant Angelo stating, "I['']m pretty sure that the attached is 'correct' . . . I'm trying to put together the timeline we discussed. As mentioned, *so much* of the attached is *speculation*." (Brody Decl., Ex. 468, ECF No. 209-69, at YA8 (8175) 0272211 (emphases added).) After providing another round of projections in November 2008, YA asked Roland whether he could make some adjustments to his model to reduce general and administrative expenses. He responded by stating, "I can put whatever numbers you want on it [the model], but I have no real facts to use. I can definitely get them [G&A expenses] down, but until I go out with checkbook in hand . . . it is all *guesstimates*." (*Id.*, Ex. 476, ECF No. 209-76, at Yorkville

---

[23] Any testimony by Berenblut concerning the extent to which YA's 2008 valuation of TXP was inflated or otherwise incorrect is not admissible based on this Court's ruling on Defendants' motion to preclude. *See supra* Section III.

001287595 (emphasis added).)  These preliminary and speculative reports, even if not disclosed

to VRC, do not suffice to constitute the type of conscious disregard of "extremely obvious" and

"numerous red flags" that normally lead to an inference of scienter.  *Newman v. Family Mgmt.*

*Corp.*, 748 F. Supp. 2d 299, 310 (S.D.N.Y. 2010) ("Nor does this Court find the red flags so

'extremely obvious' that the FMC Defendants, but for their extreme recklessness, should have

recognized them and taken steps to investigate or disclose the risks.").

Accordingly, the SEC fails to present sufficient evidence of recklessness or negligence

based on Defendant Angelo's alleged failure to disclose certain documents to McGladrey and

VRC, and to consider red flags.[24]

### ii.   Affirmative Misrepresentation

The SEC also charges Defendant Angelo with approving two allegedly false statements

that were made to a YA investor in November 2009 concerning Westport:  (i) that "[a] company

valuation is in the process of being completed; and (ii) that "[u]sing a 'Best' to 'High' Isotherm

---

[24] The SEC also alleges that Defendants failed to disclose several other documents to YA's auditors including: (1) the Colliers February 2009 Global Outreach appraisal that valued Global Outreach at $35.85 million, (Brody Decl., Ex. 336, ECF No. 208-143; Yager Decl. ¶ 6.a); (2) the R.A. Lenser November 2009 Preliminary Reserve Report that valued Falcon's proven oil and gas reserves as approximately $4.3 million, (Brody Decl., Ex. 140, ECF No. 207-162; Yager Decl. ¶ 6.b); (3) the TXP Investment Committee memoranda for TXP (from May 20, 2009 or earlier) that stated the proposed CIG merger "fell apart[,]" (Brody Decl., Ex. 377, ECF No. 208-189; Yager Decl. ¶ 6.d); (4) Les Garrett's August 20, 2009 analysis of BlueCreek's undeveloped reserves, (Brody Decl., Ex. 95, ECF No. 207-180; Yager Decl. ¶ 6.e); (5) Isonics's June 12, 2009 Letter of Intent with Murdoch Security & Investigations, Inc. to sell Isonics's Protection Plus business for $3 million, (Brody Decl., Ex. 442, ECF No. 209-42; Yager Decl. ¶ 6.f); and (6) Snowden Mining Industry Consultants Pty Ltd's review of AMC Consultants' March 2010 valuation of Compass's assets (Snowden considered AMC's exploration value of $55.25 million AUD as "overly optimistic" and stated that "the exploration potential may be valued at ~$0.5M"), (Brody Decl., Ex. 286, ECF No. 208-93; Yager Decl. ¶ 6.m). However, the SEC does not point to evidence that Defendants Angelo or Schinik ever received, or had access to these documents.  As noted, a defendant's executive position, and the duty imposed by such a position, alone are insufficient to establish scienter.  The SEC also alleges "[f]or the 2009 Value Creek Valuation, VRC relied primarily upon Blue Creek's 15-year projection model, which YA knew was not meant for valuation purposes."  (Opp'n at 16.)  Again, however, the SEC does not offer any evidence that Defendants Angelo or Schinik received Blue Creek's projection model.

24mD permeability up to 100ft fracture half length data measure, we expect a considerably favorable valuation that provides an ROI [return on investment] that becomes an attractive exit within the next 18 – 36 months." (Ex. 104 ("Westport Investor Email"), ECF No. 207-119, at Yorkville 000998320.) These statements were allegedly false "not only because the company valuation had already been completed just two weeks prior but also because [a] report concluded that the likelihood of such a well occurring was very slim and the only wells that would be economic required a high isotherm, which only had a 10% likelihood of occurring." (Pl.'s 56.1 Stmt. ¶ 551; Opp'n at 39.)

However, neither statement was false when made. The record shows that, as of December 10, 2009, YA's valuation of Westport was still ongoing. (*See* Schechtman Decl., Ex. 182, ECF No. 220-58, at YA6 (8175) 004469.) Likewise, the second statement was accurate because it simply mirrored the language and conclusions of the report that the SEC references. The report referenced is the November 2009 MHA Report. (*See supra* Section IV.B.i.) That report stated:

> If a well is characterized by the "Best" [50% likelihood of occurring] Isotherm and the 6mD permeability, all scenarios lead to a negative cash flow discounted at 10%. However, positive cash flow is observed in all but one of the scenarios using the "High" [10% likelihood of occurring] Isotherm and 24mD permeability. . . . The most profitable scenario is a 100 feet fracture half-length, with $0.25/bbl water cost, a "High" Isotherm and 24mD permeability. . . . [T]he likelihood of achieving this scenario is very slim.

(November 2009 MHA Report at YA8 (8175) 0121177.)

The fact that the report also concluded that the likelihood of achieving such a scenario was "very slim" does not make the statement false or misleading. YA's representation to its investors concerned the valuation of the company under a very specific set of assumptions: "a 'Best' to 'High' Isotherm 24mD permeability up to 100ft fracture half length data measure." (Westport Investor Email at Yorkville 000998320.) Even if the statement were somehow false or misleading,

this isolated incident alone is "not the type of pervasive, glaring 'red flags' that [Defendant Angelo approved or ignored that] could support an inference of scienter." *Hanson v. Frazer, LLP*, Nos. 12 Civ. 3166 (JSR), 14 Civ. 4222 (JSR), 2015 WL 4561707, at *4 (S.D.N.Y. July 17, 2015) (collecting cases).

Accordingly, based on the lack of material evidence demonstrating scienter or negligence, the SEC is unable to proceed against Defendant Angelo for the Valuation Statements.

**B.    Angelo's Scienter as to the One-Off Statements**

In addition to the Valuation Statements, the SEC alleges that, during the Relevant Period, Defendant Angelo made a series of misrepresentations to investors and potential investors concerning the Fund's collateral, age of the Fund's portfolio, and the Fund's liquidity.[25] The SEC raises a material dispute as to Defendant Angelo's negligence (but not scienter) arising out of the December 2 Cash Statement (*see infra* Section V.B.iii.a.). Therefore, all of the SEC claims, except for the Negligence-Based Claims, against Defendant Angelo are Dismissed.[26]

**i.    The Fund's Collateral**

The SEC alleges that YA made both oral and written misrepresentations concerning the level and type of collaterals its Fund held. Because neither type of alleged misrepresentation by YA concerning its collateral presents triable issues of fact, they are dismissed.

**a.    Oral Statements**

The SEC alleges that YA made a series of oral misrepresentations from 2008 to 2009 concerning the Fund's collateral.

---

[25] The SEC also asserts that Angelo endorsed misrepresentations concerning the VC's policies and Pluris's engagement by YA, but those allegations are addressed above. (*See supra* Section IV.C.)

[26] The SEC's secondary violation claims, including aiding and abetting liability and control person liability, are dismissed due to the SEC's failure to establish that Defendant Angelo was reckless.

First, on April 11, 2008, Defendant Angelo allegedly misrepresented to Michael Gill of Austin Capital, an investor of YA, "that the Funds' investments' loan-to-value ratio ("LTV") was 33% (i.e. that the collateral was more than three times the amount of the loans" (the "Gill Statement"). (*See* Compl. ¶ 48.) The only piece of evidence that the SEC cites in support of its allegation that the Gill Statement was a false or misleading is a series of hand-written notes by Gill in relation to several conversations that took place at various points in time with various YA employees. However, nowhere in the notes—not those from April 11, 2008, or any other day—is there any reference to a statement made by Defendant Angelo that the Fund's LTV was 33% on April 11, 2008.

Gill's notes from a July 28, 2008 conversation with Defendant Angelo do indicate that the Fund's collateral may have been "over collateralized 3-5x [but] often turns out to be 1:1." (Brody Decl., Ex. 703, ECF No. 210-116, at 181.) However, this alleged misrepresentation is not pled in the complaint, and the SEC cannot now amend their complaint merely by raising new facts or theories in their briefs. *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 Civ 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec.15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."); *see also Alali v. DeBara*, No. 07 Civ. 2916 (CS), 2008 WL 4700431, at *3 n.6 (S.D.N.Y. Oct. 24, 2008) ("This Court will not consider these [new] allegations in deciding this motion because it is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment.") (citing *Kearney v. Cty. of Rockland*, 373 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2005) (collecting cases)). Gill's handwritten notes from a February 21, 2008 meeting also say "33% LTV." (Brody Decl., Ex. 703, ECF No. 210-115, at 1.). But that meeting predated the alleged April 11, 2008 statement, and, according to

the notes, Defendant Angelo was not even present in the meeting. (*Id.*)  As such, the SEC's misrepresentation claim relating to the Gill Statement concerning the Fund's collateral is dismissed.

Second, the SEC asserts that in or about December 2008, Defendant Angelo falsely told Daniel Coesmans of MN Services, another YA investor, that the Fund was "widely over-collateralized" (the "Coesmans Statement"). (*See* Compl. ¶ 49.)  Yet, the SEC's only evidence in support of this allegation is a declaration dated November 17, 2011, and signed by a "Mr. N.B. Oostenbrug" and "Mr. A.A.D. Droogh" of MN Services. (Brody Decl., Ex. 621, ECF No. 210-23.)  Neither individual attests to having participated in any conversations between Defendant Angelo and Cosemans in which the Coesmans Statement was made, nor do they purport to make their declaration based on personal knowledge.  Their declarations, therefore, contravene Federal Rule of Civil Procedure 56(c)(4), which requires affidavits and declarations used to support or oppose a motion for summary judgment to be based on personal knowledge, and cannot be considered in deciding Defendant's motion for summary judgment.  *See Bernstein v. Village of Welsley Hills*, 95 F. Supp. 3d 547, 559 (S.D.N.Y. 2015) ("While the Court does not doubt that A. Zaks is *aware* of at least some of the assertions in his Affirmation, they remain inadmissible if not based on personal knowledge.") (citation omitted); *see also Payne v. Huntington Union Free Sch. Dist.*, 219F. Supp. 2d 273, 278 (E.D.N.Y. 2002) ("Merely being 'aware' of purported facts is a far cry from having . . . personal knowledge.")).  Aside from this declaration, the SEC does not set forth any other evidence in support of this alleged misrepresentation.  As a result, the SEC's cannot proceed based on the Coesmans Statement.

The SEC also alleges that during an April 14, 2009 meeting, Defendant Angelo again told Coesmans that "the collateral underlying the Funds' convertible investments was 'in good shape'

and the convertible investments were 'well covered.'" (Compl. ¶ 51.) To support this allegation, the SEC again relies solely on the affidavit of Mr. N.B. Oostenbrug and Mr. A.A.D. Droogh of MN Services. (*See* Pl.'s 56.1 Stmt. ¶ 243 (Response to Defs.' 56.1 Stmt.).) Because this affidavit is inadmissible for the reasons discussed previously, the SEC likewise cannot proceed against Defendant Angelo for this statement.

Third, the SEC alleges that also in or about December 2008, Defendant Angelo falsely told Mitchell Slodowitz of JMC Partnership, an investor, that there were "'lots of collateral' behind each 'note,' and that if a Portfolio company couldn't pay off a 'note,' then the Funds would get 100% of the money back because they had secured collateral" (the "Slodowitz Statements"). (Compl. ¶49.) Yet, Slodowitz testified that he could not recall Defendant Angelo ever making either of those statements.[27] (Schechtman Decl., Ex. 101 ("Slodowitz Dep. Tr."), ECF No. 192-101, at 114:12–17; 116:2–13.) The SEC also asserts that notes allegedly taken by JMC's counsel during Slodowitz's conversations with the SEC concerning its investigation into YA in 2011 suggest that Defendant Angelo made the Slodowitz Statements. For example, JMC's counsel's notes state "notes are secured- created expectation that 100% of funds would be returned." (Brody Decl., Ex. 741, 205-166, at MSLODOWITZ000000025.) However, not only do these notes present multiple hearsay issues, but the notes do not indicate when these statements were made, let alone who made them. Accordingly, based on the SEC's failure to present sufficient evidence

---

[27] The SEC argues that while Slodowitz testified that he could not remember the exact words Defendant Angelo used, he recalled Defendant Angelo saying something to the effect of that "the collateral supported the value of the funds." (Slodowitz Dep. Tr. at 115:8–24.) Even if Defendant Angelo did in fact make such a statement, the nature of this statement is fundamentally different from the statements the complaint alleges Defendant Angelo to have made. Stating that the collateral merely "supports" the Funds is different than stating that there are "lots of collateral behind each note" or that the Funds have a guaranteed return on their investments. One is a vague and general statement concerning the Funds' collateral, while the others are specific comments related to the extent of the collateral. Additionally, because the statement, "the collateral supported the value of the funds," was never alleged in the complaint, it cannot serve as a basis for a misrepresentation claim against Defendant Angelo. *Southwick Clothing LLC*, 2004 WL 2914093, at *6.

of a false statement of fact, the Slodowitz Statements do not serve as a basis upon which the SEC's misrepresentation claims may proceed.

Fourth, the SEC alleges that Defendant Angelo misrepresented to Scott Bramwell of Cornerstone Wealth Management that "the value of the Portfolio Companies' assets, and the Funds' collateral in their assets, all supported the value of the Funds' portfolio" (the "Bramwell Statement"). (Compl. ¶ 49.) The only evidence the SEC offers in support of its allegation is Bramwell's deposition testimony. (*See* Pl.'s 56.1 Stmt. ¶¶ 246–50 (Response to Defs.' 56.1 Stmt.).) However, aside from testifying several times during his deposition in very general terms he may have had discussions with Defendant Angelo concerning the Funds' collateral, Bramwell never testified that Defendant Angelo made any representations to him concerning the level, extent, or scope of the Funds' collateral. (*See, e.g.*, Schechtman Decl., Ex. 102 (Bramwell Dep. Tr.), ECF No. 192-102, at 109:17–24 ("It seems like collateral discussion happened later with [Defendant Angelo] where we talked about some companies and, you know, we were kind of talking about valuations and collateral . . . ."); *id.* at 188:2–189:4 ("I think from the exhibits we've looked at, I had conversations with—with Mr. Defendant Angelo, and we did have discussions around the portfolio, the collateral, you know . . . .").) Rather, Bramwell testified that it was "kind of [his] understanding" that Defendant Angelo told him that the value of the Portfolio Companies' assets, and the Funds' collateral in their assets, supported the value of the Funds' portfolio. (*See id.* at 110:12–22.) This evidence falls short of raising a material dispute as to whether the alleged Bramwell Statement was in fact ever made.

Lastly, the SEC asserts that on July 22, 2009 YA's "director of investor relations told a prospective investor . . . that 95% of the Funds' convertibles have first liens on Portfolio Company assets worth 200% of the loan's value." (Compl. ¶53.) The SEC never cites to any record evidence

in support of this allegation in its opposition or its Rule 56.1 Statement (or its response to Defendants' 56.1 Stmt.).

**b.    Written Statements**

With respect to YA's allegedly false written representations concerning its collateral, the SEC focuses principally on a report called the "Collateral Data Report" (the "CDR") that Defendant Angelo allegedly instructed YA to distribute to certain investors in July 2009 and August 2009. (Compl. ¶ 55.) The SEC alleges that the CDR contained numerous false and/or misleading statements. (*Id.* ¶¶ 55–58; Opp'n at 43–44.) The SEC, however, does not present sufficient evidence that the CDR was false or misleading.

First, the SEC alleges that "by providing a total number for the value of collateral, the report suggested that the portfolio positions were cross-collateralize" (Opp'n at 43), and "collectively over-collateralized by $232 million." (Compl. ¶¶ 55–56.) However, an examination of the CDR demonstrates that this is simply not true. The CDR lists 116 of YA's Portfolio Companies, along with information about each company's collateral (if any), including the type of collateral held (*e.g.*, real property, intellectual property, etc.) and the value of the collateral. (Brody Decl., Ex. 673 ("CDR"), ECF No. 210-83.) The first row of the sixth column of the CDR lists the total collateral value for all 116 portfolio companies, which is simply the sum of each company's respective collateral value. (*Id.*) From this fact alone the SEC argues that the CDR suggests that the portfolio positions were "cross-collateralized" and "collectively over-collateralized by $232 million." (Compl. ¶¶ 55–56; Opp'n at 43.)

But nothing in the CDR even mentions these terms, nor is there any indication in the report that each Portfolio Company's collateral somehow cross-collateralizes every other position. Rather, the spreadsheet lists clearly the collateral value of each portfolio company and that 68 of

the 116 listed positions were in fact *under-collateralized* (*i.e.*, the "collateral value" (sixth column in the CDR) was lower than the "current market value" of the portfolio company (second column in the CDR)). (Compl. ¶¶ 55–56; Opp'n at 43.) In fact, Slodowitz—the only recipient of the CDR whom the SEC deposed—testified that he "wouldn't expect the collateral from one investment to be used for collateral for another investment. The investments stand by themselves. Companies stand by themselves." (Slodowitz Dep. Tr. at 80:5–9.) The SEC also cannot point to any evidence that anyone at YA ever told Slodowitz or any other investor that the collateral for any individual position cross-collateralized or otherwise secured the other positions. Accordingly, no triable issue of fact exists concerning the SEC's cross-collateralization claim with respect to the CDR.[28]

Second, the SEC alleges that it was misleading for the CDR to label certain companies as "SEDA Secured." (Compl. ¶ 56; Opp'n at 43.) For example, the SEC claims that the CDR listed YA's investment in Compass (identified as "Company 23" in the CDR) as "SEDA Secured," when in fact Compass's debt was unsecured and SEDA was not security at all. However, the SEDA (Standby Equity Distribution Agreement), when entered into between YA and a portfolio company, did in fact function as a form of security for YA's investment in the particular portfolio company. As YA's private placement memorandums describe, YA's SEDAs with its portfolio companies functioned in the following manner: "When the Fund enters into a SEDA with [a portfolio company], the Fund . . . provide[s] [the company] with an equity line of credit pursuant to which the Fund commits to make a certain amount of funds available to the [company] through the equity line for a certain period of time (generally two years), but [the company] [is] not . . . obligated to use the equity line." (*See, e.g.*, Schechtman Decl., Ex. 1, ECF No. 192-1, at 19.)

---

[28] If the CDR only displayed the total collateral value without listing each, individual company's collateral value, the SEC's suggestion may be more plausible. However, it plainly does not.

Should the Portfolio Company decide to utilize the equity line of credit, however, YA is entitled to "receive common stock of the issuer at a discounted price that is typically two to five percent below the price at which such instruments are trading in the open market[,]" (*id.*), which YA could in turn sell if it determined, for example, that the company was financially distressed and/or its investment was not safe.

The SEC does not dispute that this is how YA's SEDAs operated. Nor do they dispute or allege that that YA's SEDAs did not function properly, or that Compass, or any other portfolio company for that matter, was listed in the CDR as "SEDA Secured," when in reality there was no SEDA in place between YA and the company. Further, there exists no record evidence that YA employees or investors were confused by or did not understand what "SEDA Secured" meant for purposes of YA's portfolio companies. Most importantly, though, Defendant Angelo testified that it was his understanding this is how SEDAs operated and that SEDAs provided a form of security for YA's investments. (*See* Schechtman Decl., Ex. 26, ECF No. 192-26, at 132:16–133:14.) The SEC does not provide any contrary evidence of an intent to defraud by Defendant Angelo. Accordingly, the SEC's misrepresentation claims based on the SEDA Secured companies may not proceed against Defendant Angelo.

Third, the SEC argues that the CDR misrepresented that YA had "first liens" for portfolio companies Wentworth Energy, Inc. ("Wentworth"), KD, and SmarTire "without mentioning that there were other *pari pasu* senior noteholders who in several cases had larger positions than YA." (Opp'n at 44; *see* Compl. ¶ 56.) The SEC alleges that it was "incorrect (or at best incomplete)" for the CDR to describe YA as holding a first lien on Wentworth (identified as Company 113 in the report) in July 2009 because "YA only held approximately 20% of the senior secured debt and would not be entitled to recover more than approximately 20% should the debt-holders foreclose

on Wentworth's assets." (Pl.'s 56.1 Stmt. ¶ 415 (Response to Defs.' 56.1 Stmt.)); *see also id.* ¶¶ 253, 395.) However, the CDR plainly lists YA's lien over Wentworth as a "First Lien," along with the total value of YA's collateral in the company. (CDR.) Thus, the CDR makes the extent of YA's lien clear. Even if it did not, information concerning other secured holders of Wentworth was readily accessible in the public filings. (*See* Schechtman Decl., Ex. 154, ECF No. 220-23.)

Similarly, the SEC alleges that it was misleading for the CDR to list YA as holding a first lien over KD (identified as Company 63 in the report) when in reality YA's first lien as of December 2009 was only 77%. (*See* Pl.'s 56.1 Stmt. ¶ 614.) However, the CDR was updated and sent as of July 2009, (*see generally* CDR), and the SEC does not offer any evidence regarding the extent of YA's first lien at that time. In any event, as mentioned earlier, the CDR clearly lists YA's lien over KD as a "First Lien," along with the total value of YA's collateral in the company. (CDR.)

The SEC also alleges that it was false for the CDR to list YA as holding a first lien over SmarTire since, in 2007, YA owned approximately 38% of the SmarTire convertible debentures, while another entity held 62% of them. (Pl.s 56.1 Stmt. ¶ 973.) However, as with the case of KD, the SEC does not offer any evidence regarding the extent of YA's first lien as of July 2009. Furthermore, as admitted by the SEC, this information concerning other debt holders of SmarTire was publicly available. (*See* Pl.'s 56.1 Stmt. ¶ 972.) Accordingly, the SEC's misrepresentation claims concerning the CDR and SmarTire also do not present a disputed issue of material fact.[29]

---

[29] In its response to Defendants' Rule 56.1 Statement, the SEC also suggests that it was false for the CDR to describe YA as having first liens over BlueCreek and Global Outreach. (Pl.'s 56.1 Stmt. ¶ 253 (Response to Defs.' 56.1 Stmt.).) However, the SEC fails to articulate or present sufficient evidence as to why this statement was false or misleading as of July 2009. The SEC also fails to present sufficient evidence that Defendants Angelo or Schinik knew of or had access to any specific information that would have alerted them to the fact that the CDR's describing YA's liens over any of the listed companies as "First Liens" was false or misleading.

Fourth, the SEC claims that the CDR falsely "contained a collateral category called 'real property values,' which, in fact, was not the value of real property but rather the estimated value of certain collateral including oil and gas reserves of various levels (including possible reserves)," and that "the report included collateral values that had no basis ([for] Compass, Levitz) or which YA knew were wrong ([for Global Outreach S.A. ("Global Outreach")])."   (Opp'n at 44.) However, the SEC does not even provide a record cite for its first claim, and, with respect to its second claim, provides a record cite that does not even exist. (*See id.*); *see also McCalla v. City of New York*, No. 15 Civ. 8002 (LAK), 2017 WL 4277182, at *1 n.2 (S.D.N.Y. Sept. 22, 2017) ("The Court has confined its review to evidence to which counsel have drawn its attention. As has been said repeatedly, [J]udges are not like pigs [; they will not] hunt[ ] for truffles buried in briefs' or the record.) (quoting *Potter v. Dist. of Columbia*, 558 F. 3d 542, 553 (D.C. Cir. 2009) (internal quotation marks omitted) (alterations in original).  Accordingly, because the SEC fails to raise a triable issue of fact with respect to the falsity of the statements in the CDR, the SEC's misrepresentation claims concerning the CDR may not proceed against Defendant Angelo.[30]

### ii.   Age of Portfolio

The SEC also claims that YA made two misrepresentations concerning the age of its portfolio.   First, during a July 22, 2008 conference call, Defendant Angelo allegedly misrepresented to Michael Gill of Austin Capital, a prospective investor at the time, that "75% of

---

[30] The SEC also claims in its response to Defendants' Rule 56.1 Statement that the CDR listed false information regarding the collateral of several other companies, including New Earthshell Sustainable Products ("NESP"), Falcon, and Westport. (*See* Pl.'s 56.1 Stmt. ¶ 253 (Response to Defs.' 56.1 Stmt.).) Yet, the SEC fails, once again, to articulate, through sufficient evidence, how and why the CDR provided collateral information for these companies that was false or misleading as of July 2009.  For example, the SEC alleges that the CDR lists YA's investment in NSP as being secured by a first lien even though YA already owned all of NESP's assets. (*Id.*; Brody Decl., Ex. 735, ECF No. 210-159, at 1.))  However, the memo that the SEC cites in support of its allegation explicitly states that it "only speaks as of December 31, 2008[,]" seven months prior to when the first CDR was distributed. The SEC's evidence does not speak to the state of YA's creditor position with respect to NESP as of July 2009.

the Funds' portfolio was less than 18 months old and 90% of the portfolio was less than two years old." (Compl. ¶ 70.)  There exists a factual dispute regarding whether Defendant Angelo actually made this statement and whether the statement was false when made.  Gill testified during his deposition that he had no recollection of Defendant Angelo ever having made this representation to him.  (Schechtman Decl., Ex. 99 ("Gill Dep. Tr."), ECF No. 192-99, at 157:14–158:4.) However, Austin Capital's notes of the July 22, 2018 telephone call with Defendant Angelo states that "most of the loans have very short durations the current book has 90%<2 yrs old with 75% < 18 months old." (Brody Decl., Ex. 48, ECF No. 207-56, at 2.)

Defendants argue that even if Defendant Angelo made this statement, it was not false when made because on May 27, 2008, a YA employee circulated an email in which it was stated that 74% of the portfolio was less than 18 months old, and 84% of the portfolio was less than two years old. (Schechtman Decl., Ex. 123, ECF No. 192-123, at YA8 (8175) 0610524.)  The SEC refutes this document with a report prepared by another YA employee, James Carr, circulated in June 2008 (the "June 2008 Report"), which contained data that approximately 44% of the convertible debentures were over two years old.  (Brody Decl., Ex. 690, ECF No. 210-100–02.)

However, despite these disputed factual issues, the SEC fails to present sufficient evidence that Defendant Angelo saw or discussed the June 2008 Report, or that he had a duty to review the material.  As mentioned earlier, Defendant Angelo was never on the IC or the VC.  In fact, Defendant Angelo stated that he never even received the June 2008 Report and that "no one ever brought it to [his] attention prior to this litigation." (Schechtman Decl., Ex. 7 ("Defendant Angelo Decl."), ECF No. 192-7 ¶ 25.)  The SEC does not provide any evidence to the contrary with respect to statements that may or may not have been made concerning the age of YA's portfolio during the July 22, 2008 telephone conference.

The SEC's second misrepresentation claim regarding the age of YA's portfolio is also dismissed because there is no evidence that the statement was ever made. The SEC alleges that YA's Director of Investor Relations told a prospective investor that 75% of the Funds' investments were less than 18 months old, and that 100% of the Funds' investments were less than 24 months old." (Compl. ¶ 71.) However, the record is absent evidence concerning when this statement was made, who made it, or to whom it was made. In fact, the SEC does not even address this allegation in its moving papers.   As a result, because the record demonstrates that the SEC's misrepresentation claims concerning the age of YA's portfolio were either never made or made without scienter (or negligence), these instances cannot serve as a basis upon which the SEC's misrepresentation claims may proceed.

### iii.   Liquidity

The SEC alleges that Defendant Angelo misrepresented the Funds' liquidity and cash levels to various investors on three separate occasions in 2008 and 2009. The SEC claims that on December 2, 2008, Defendant Angelo allegedly misrepresented to an investor that "the fund has about $100 million in cash" (the "December 2 Cash Statement") and that YA was continuing to receive "follow-on" investments from Kodak, one of YA's investors, (the "December 2 Follow-On Statement"). (*Id.* ¶ 64.) The SEC also claims that on December 3, 2008, Defendant Angelo allegedly misrepresented to another investor that YA "maintained a cash position of approximately 8% of its assets under management (totaling approximately $75 million[])" (the "December 3 Statement"). (*Id.* ¶ 65.) Finally, the SEC alleges that on January 23, 2009, YA allegedly misrepresented to investors in a 2008 Q4 letter that "the Funds maintained a cash position of 7% of the Funds' assets under management at year-end 2008 (totaling approximately $69 million[])" (the "January 2009 Statement"). (*Id.* ¶ 66.)

### a.     December 2 Cash Statement

Sufficient factual disputes exist surrounding the December 2 Cash Statement.

### 1.     Falsity

There exists a genuine factual dispute as to whether the December 2 Cash Statement was ever made and whether it was false.  During his deposition, Gill testified that he had no recollection of Defendant Angelo ever speaking to him about YA's cash position in December 2008 or at any other time.  (Gill Dep. Tr. at 146:12–18, 147:3–7.)  Yet, Gill's contemporaneous notes of the December 2, 2008 call with Defendant Angelo reflect that Defendant Angelo told him that the Fund had "about $100 million of cash and an equivalent amount of redemptions."  (Brody Decl., Ex. 695 ("Gill Call Notes"), ECF No. 210-107, at YRK_SECe0002485–86.)  Gill's handwritten notes of the call, on the other hand, only reference "10% cash[,]" not a dollar amount of $100 million.  (Schechtman Decl., Ex. 100, ECF No, 192-100, at 300.)  Defendants contend that Gill's handwritten notes are consistent with Defendant Angelo's recollection that he regularly told investors that "the Fund generally holds cash and cash equivalents in the 5-10 % range." (Defendant Angelo Decl. ¶ 32.) Either way, whether Defendant Angelo made the December 2 Cash Statement or not is a factual dispute that should be resolved by a jury, not this Court on summary judgment.[31]

Likewise, the parties dispute the veracity of the December 2 Cash Statement.  There are multiple documents offered by both sides that reflect conflicting information regarding how much cash (and cash equivalents) the Fund actually held as of December 2008.  An internal YA report shows that the Fund's total amount of cash *and* cash equivalents including Exchange Traded Funds

---

[31] Gill's handwritten notes may also very well be consistent with the SEC's allegation since the Fund had approximately $1 billion AUM at the time, (Pl.'s Response to Defs.' 56.1 Stmt. ¶ 305; Defs.' 56.1 Stmt. ¶ 311), ten percent of which would be $100 million.

("ETFs"), as of December 31, 2008 was $70.3 million. (Schechtman Decl., Ex. 126, ECF No. 192-126.) Yet, YA's written communications to Gill, in the form of one-pagers, in November and December 2008 show different cash levels for the Fund. A "November Mid-Month Performance Estimate" report sent to Gill showed the Fund's "cash" position as of October 31, 2008 to be 9.67% (or approximately $97 million). (*Id.*, Ex. 127, ECF No. 192-127, at YRK_SECe0012932.) On the other hand, YA's "December Mid-Month Performance Estimate" report sent to Gill showed the Fund's "cash" level as of November 30, 2008 to be just 3.7% (or approximately $37 million).[32] (*Id.*, Ex. 128, ECF No. 192-128, at YRK_SECe0012915.)

YA's asset reconciliation reports in late November and early December paint yet another story, and list the Fund's cash position (described as "ZZZ – Not Classified" in the report) as approximately $31 to $32 million, not $100 million. (Brody Decl., Exs. 699–700 ("Asset Conciliation Reports"), ECF Nos. 210-111–12.) To make matters more unclear, YA's 2008 audited financial statement lists YA's "cash and cash equivalents" position as approximately $7 million, and the value of the Funds' ETFs as approximately $60 million. (Schechtman Decl., Ex. 12, ECF No. 192-12, at YAHV - 000146, YAHV - 000156.) Based on all of the foregoing evidence, there is clearly a factual dispute as to how much "cash" the Fund possessed in December 2008, what types of assets comprised "cash and cash equivalents," and, in turn, whether it was false or misleading for Defendant Angelo to categorize the $100 million to Gill as the Fund's "cash level" rather than the "cash *and* cash equivalents" level. *See Rombach v. Chang*, 335 F.3d 164,

---

[32] Defendants allege that the cash position of only 3.7% inadvertently did not include the Funds' cash equivalents, including ETFs, which would have brought the figure up to approximately 9.7% (or approximately $97 million). (Defs.' 56.1 Stmt. ¶ 313 n.13.) However, even if true, this is yet another disputed factual issue to be considered by a jury in determining whether including "cash equivalents" in calculating "cash" levels, without explicating stating so, is misleading to a reasonable investor. In fact, both parties dispute whether ETFs should have even been considered to be a "cash equivalent." (*See* Opp'n at 50–51.)

172 n.7 (2d Cir. 2004) ("The test for whether a statement is materially misleading . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor.") (citation and quotation marks omitted).

### 2. Materiality

There also exists a factual dispute regarding whether the December 2 Cash Statement was material. "[M]ateriality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'" *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)). Defendants argue that Defendant Angelo's December 2 Cash Statement was not material as a matter of law because Gill testified that the amount of the Fund's cash position was not important to him. (*See* Gill Dep. Tr. at 139:20–140:2.) However, the test for whether a misrepresentation is material is ultimately "judged according to an objective standard" that turns on "the significance of an omitted or misrepresented fact to a reasonable investor . . . ." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459, 467 (2013) (citation and quotation marks omitted). Thus, while Gill's testimony may assist the trier of fact in determining whether Defendant Angelo's statement was material, it is ultimately up to the jury to make such a determination.

### 3. Scienter

When it comes to scienter, the SEC fails to carry its burden of demonstrating that there exists a material dispute as to whether Defendant Angelo possessed an intent to defraud when making the December 2 Cash Statement. The SEC cannot point to any evidence that Defendant Angelo ever had access to specific information contradicting or calling into question the December 2 Cash Statement, or that he had a duty, based on something other than his mere corporate position

or title at YA, to review such information.  The SEC alleges that Defendant Angelo received the November and December asset reconciliation reports, (Opp'n at 52), but Defendant Angelo's name plainly does not appear on the list of recipients on emails attaching the reports.  (*See* Asset Conciliation Reports.)

The SEC also alleges that at an October 2008 board meeting, Defendant Angelo stated that he believed the fund could pay the 2008 year-end redemptions, totaling $100 million.  (Brody Decl., Ex. 688, ECF No. 210-98, at M&P 012747.)  Yet, if anything, this fact suggests that Defendant Angelo did not possess any intent to defraud when making the December 2 Cash Statement because he truly believed that YA had $100 million in cash (and/or cash equivalents) to satisfy YA's $100 million worth of year-end redemptions.  As such, the SEC's evidence fall short of demonstrating scienter.[33]

Nonetheless, based on all of the conflicting information contained in both the external and internal documents as described above, a jury could reasonably find that Defendant Angelo was negligent in making his December 2 Cash Statement without, for example, conducting further due diligence before making the statement, or providing additional context when making it. Accordingly, the SEC's Negligence-Based Claims stemming from the December 2 Cash Statement survive Defendants' motion for summary judgment.  All other claims against Angelo are dismissed.[34]

---

[33] The SEC also argues that Defendant Angelo possessed the requisite intent to defraud because "he was the signator for the funds' bank accounts . . . and, as such, had reasonable access to [information concerning the Funds' cash level]." (Opp'n at 53.) While that may be true, the test for scienter does not turn on whether a defendant had "reasonable access" to information.  The SEC cites to no case law to support this proposition.

[34] The SEC's secondary liability claims, including aiding and abetting liability and control person liability, are dismissed due to the SEC's failure to establish that Defendant Angelo was reckless.

### b. December 2 Follow-On Statement

While there is evidence to suggest that Defendant Angelo told Gill in December 2008 that YA was receiving follow-on investments from Kodak, (Gill Call Notes at YRK_SECe0002486 ("[Defendant Angelo] says they are still receiving follow-on investments from their two largest investors (Kodak and MN Services)")), the SEC fails to point to any evidence that shows that this statement was false when made. Nothing in the SEC's briefs or Rule 56.1 Statements even reference Kodak's follow-on investments in December 2008. Rather, there is evidence that YA received new investments from ANDYPOLO LLC, one of YA's limited partners in December 2008, (Schechtman Decl., Ex. 34, ECF No. 192-34), and MN Services in November 2008 (*id.*, Ex. 125, ECF No. 192-125, at YA8 (8175) 0623603–04.) Accordingly, the December 2 Follow-on Statement cannot serve as a basis for SEC's misrepresentation claim and is dismissed.

### c. December 3 Statement and January 2009 Statement

Likewise, aside from the allegations in its complaint, the SEC offers no evidence to demonstrate that the December 3 Cash Statement was ever made or that it was false. As such, the December 3 Cash Statement is also dismissed. The SEC also fails to cite any record evidence of the January 2009 Statement in their briefs or their Rule 56.1 Statements. More importantly, the SEC never indicates who at YA was responsible for making this statement. Without such identifying information, the SEC's misrepresentation claim concerning the January 2009 Statement must be dismissed.[35] *See In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("A corporate defendant's scienter is necessarily derived from its employees.") (citing *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d

---

[35] The SEC also argues in their briefs that "YA made false statements to investors about how year-end 2008 redemptions were going to be paid." (Opp'n at 51.) However, the SEC never raised these allegations in their complaint. As such, they are disregarded for purposes of deciding Defendants' motion for summary judgment. *See Southwick Clothing* LLC, 2004 WL 2914093, at *6.

Cir. 2001)); *Suez*, 250 F.3d at 101 ("A corporation can only act through its employees and agents

. . . .") (citing *Cedric Kushner Promotions, Ltd. v. King*, 219 F.3d 115, 116 (2d Cir. 2000)).

## VI.   MOTION FOR SUMMARY JUDGMENT: YA

YA's liability in this matter ultimately derives from that of Defendants Schinik and

Angelo.  As such, the SEC may only proceed against YA on the same bases, as provided for in

this Order, as it may against both Defendants.

## VII.   CONCLUSION

Defendants' motion to preclude is GRANTED with respect to those portions of the expert's testimony that constitute opinions of value, and DENIED in all other respects.

Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Defendants' motion for summary judgment is DENIED with respect to all claims against Defendant Schinik.  However, the SEC may only proceed against Defendant Schinik for the Pluris Engagement Representation (*see supra* Section IV.C.ii.a.)  Defendants' motion for summary judgment is GRANTED with respect to all claims against Defendant Angelo, except the Negligence-Based Claims.  However, the SEC may only proceed against Defendant Angelo for the December 2 Cash Statement (*see supra* Section V.B.iii.) and the Pluris Engagement Representation. Defendants' motion for summary judgment is DENIED with respect to all claims against YA.  However, because YA's liability derives from that of Defendants Schinik and Angelo, the SEC may only proceed against YA on the same bases, as provided for in this Order, as it may against both Defendants Schinik and Angelo.

Dated: March 29, 2018
       New York, New York

SO ORDERED.

GEORGE B. DANIELS
United States District Judge